# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Greystone Mortgage, Inc., and First Financial Lending LLC, *on behalf of themselves and all others similarly situated*, <br><br>                 Plaintiffs, <br><br>       vs. <br><br> Equifax Workforce Solutions LLC and Equifax, Inc., <br><br>               Defendants**.** | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> *Jury Trial Demanded* |

**DRAFT EQUIFAX COMPLAINT**

Plaintiffs First Financial Lending LLC and Greystone Mortgage, Inc. (collectively, "Plaintiffs") bring this antitrust action against Equifax Workforce Solutions, LLC and Equifax, Inc. (together, "Equifax" or "Defendants") under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, on behalf of themselves and a proposed class of similarly situated purchasers (collectively, "Direct Purchasers"), and allege as follows:

## I.     NATURE OF THE CASE

1.      This antitrust suit arises from Equifax's willful acquisition and maintenance of monopoly power in the market for electronic verification of income and/or employment ("Electronic VOIE Services"), as defined below.

2.      Electronic VOIE Services are a crucial component of consumer finance. When individuals apply for a mortgage, car loan, or apartment rental, lenders and property managers typically require confirmation of employment and income. For certain loans, like mortgages, proof of ability to pay—through employment and income verification—is required by lenders. While credit checks provide *historic* information about a consumer's past payment history, employment and income verification provides *forward-looking* information about a consumer's ongoing ability to make rental or loan payments. Besides credit reporting, and given that over 20% of consumers have minimal or poor credit history, payroll data is among the most reliable types of data that can be used to underwrite consumer financial transactions. Without the employment and income verification, many consumers would be unable to obtain mortgages, car loans, or rent apartments. While verification of income and employment can be done manually— e.g., by calling an employer—that process is slower and more expensive, and thus not a reasonable economic substitute for Electronic VOIE Services. Consequently, payroll data—more

than 40% of which Equifax exclusively controls as a result of the conduct described herein—is the key ingredient in Electronic VOIE Services.

3.      Equifax (through its division Equifax Workforce Solutions) controls almost the entire market for VOIE Services. Equifax has dominated the Electronic VOIE Services market for decades through its product, the TALX Work Number (the "Work Number" or "TWN"), which is part of its Equifax Verification Services business, as defined below. The Work Number was originally developed by an independent company called the Talx Corporation. When Equifax acquired Talx Corporation (and its Work Number product) in or around May 2007, the Work Number was essentially the only way that VOIE report purchasers—including but not limited to lenders, landlords, employers and individuals (together, "verifiers")—could electronically verify applicants' income and employment.

4.      Equifax Verification Services has become increasingly important to Equifax's bottom line. Profits from Equifax Verification Services now approach $2 billion per year— nearly 40 percent of Equifax's annual profits. The prices that Equifax charges for Electronic VOIE Services are far higher than a competitive market would bear. Because it is insulated from competition by its exclusive contracts and other anticompetitive conduct, Equifax raises the prices for access to TWN every year.

5.      Beginning in or around 2017, new entrants began to challenge Equifax's stranglehold on the market. Rather than compete with these new entrants on the merits, Equifax responded to the threat of competition with a multifaceted anticompetitive scheme to maintain its monopoly (the "Scheme"). This Scheme had at least three components.

6.      First, Equifax entered multiyear exclusive deals with large payroll software providers (e.g., ADP, Paychex, and Intuit Quickbooks), and large employers (e.g., Walmart and

Home Depot) (together, "Data Contributors"). These Data Contributors control income and employment data on tens of millions of Americans, which are key inputs for TWN and any other competing Electronic VOIE system. Equifax entered these exclusive agreements with the intent and effect of denying competitors access to critical data inputs, thereby making it impossible for rivals to build databases of sufficient size and scale to support viable competing VOIE services.

7.      Second, Equifax shares a portion of its monopoly profits with the Data Contributors to induce them to provide their data exclusively to Equifax, impede Equifax's competitors, and thereby help Equifax maintain its monopoly power. These payments often come in the form of what Equifax terms "revenue shares." As described in detail below, if a lender, landlord or other verifier makes a VOIE request for a particular individual, and that individual's data appears in the TWN database thanks to a particular Data Contributor, Equifax will pay the Data Contributor a portion of the fee that Equifax receives for that request. ██████████████ ████████████████████████████████████

8.      Third, Equifax spent billions of dollars acquiring companies that might present a risk of competition to its monopoly. This eliminated likely potential competitors by incorporating them directly into Equifax Workforce Solutions, while simultaneously increasing barriers to entry from other competitors by ensuring that they could never access the nascent competitors' data.

9.      Equifax's Scheme has substantially foreclosed competition in the market for VOIE Services and continues to do so. Through its exclusive agreements with Data Contributors, Equifax has been able to foreclose competitors from at least 40% of the data inputs necessary to make a competing VOIE product viable. That continues to be the case today.

3

10.     Statements from Equifax executives, former employees, and competitors confirm that Equifax's Scheme has had the intent and effect of maintaining Equifax's monopoly in the market for Electronic VOIE Services by denying competitors the scale they would need to compete on the merits. As detailed below, Equifax executives have admitted in public statements to investors that it faces no meaningful competition in the market for VOIE Services ("We're not Coke versus Pepsi."); that it uses exclusive contracts of sufficient duration to prevent meaningful competition by rivals ("On the payroll partnership side, those are multiyear agreements. The vast majority . . . are exclusive. That's our intention, for all of them to be exclusive."); and that customers have nowhere else to turn ("If you want income and employment data at scale, the only place to get it is here.").

11.     Equifax isn't shy about its market dominance. It markets its verification services under the slogan "Only Equifax," highlighting that Equifax possesses data that no competitor can offer. Its website says businesses can "[m]ake better credit decisions and expand access to credit with data and analytics only Equifax can deliver." Equifax vaunts "a portfolio that includes traditional credit data and alternative data that only Equifax can offer." And the company goes on to note, "Only Equifax offers streamlined access to our wealth of proprietary data assets including The Work Number®. . . ."

12.     The "Only Equifax" slogan is not just marketing puffery; it describes how Equifax's stranglehold on data inputs for Electronic VOIE Services has helped Equifax preserve its monopoly power and use that power to extract supracompetitive prices. In a speech to investors in 2023, Equifax's CEO Mark Begor boasted about Equifax's ability to continuously raise prices on TWN queries, noting that its "meaningful pricing power" exists because "only Equifax has that income and employment data." In seeking to sell its services to government

4

agencies, Equifax proclaimed that "no other vendor" had the data necessary to meet certain government requirements. To the extent it is true that "Only Equifax" can provide certain services, it is a result of the anticompetitive Scheme detailed herein.

13.    Potential rivals, including the startups Certree and Argyle, have explained to regulators how Equifax's anticompetitive scheme has slowed or prevented their entry to the market. According to Certree, "companies like ours face enormous obstacles competing in a market where major players [such as Equifax] use their overwhelming scale and ability to incentivize exclusivity arrangements to undercut competitors." According to Argyle, "large data payroll brokers [like Equifax] use their dominant positions to collect millions of payroll records, often through partnerships, acquisitions and exclusivity agreements that include employer incentives aimed at edging out competitors." In other words: Equifax uses three tactics— exclusivity agreements, payments to Data Contributors, and acquisitions—to impair the opportunities of rivals and exclude rivals on bases other than efficiency.

14.    Equifax has used its monopoly power to raise prices to supracompetitive levels, causing purchasers of Electronic VOIE Services, including the Plaintiff Class, to suffer antitrust injury in the form of overcharges. Equifax's Scheme has also denied purchasers a meaningful choice in a provider of Electronic VOIE Services, even though alternatives would charge less and do a better job of protecting consumers' data privacy.

15.    The allegations in this complaint are based on public statements by Equifax, regulators, competitors, and the press, as well as interviews conducted with confidential witnesses.

16.    Plaintiffs bring this action on behalf of themselves and others that purchased Electronic VOIE Services directly from Equifax during the Class Period as defined below.

Plaintiffs seek treble damages and injunctive relief, demanding a trial by jury of all issues so triable.

## II.     JURISDICTION AND VENUE

17.     Plaintiffs bring claims for violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2; seek treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15; and seek injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

18.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. §§ 15 and 22, as Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or can be found in this District.

20.     This Court has personal jurisdiction over the Defendants, as they market and distribute VOIE Services in this District, enter into contracts within this District, and otherwise transact business within this District. The Court also has personal jurisdiction over Equifax, Inc., under Pennsylvania's Long-arm statute, 42 Pa. C.S § 5322 & 5301(a)92)(i) because Equifax, Inc. is registered to do business in the Commonwealth of Pennsylvania.

## III.    PARTIES

21.     Plaintiff Greystone Mortgage, Inc. ("Greystone Mortgage") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wynnewood, Pennsylvania. Plaintiff Greystone Mortgage purchased Electronic VOIE Services from Equifax during the Class Period.

22.     Plaintiff First Financial Lending LLC ("First Financial") is a corporation organized under the laws of the State of New Jersey, with its principal place of business in

Cherry Hill, New Jersey. Plaintiff First Financial purchased Electronic VOIE Services from Equifax during the Class Period.

23.     Defendant Equifax Workforce Solutions LLC, also known as TALX Corporation (together with Equifax Inc., "Equifax"), is a Missouri corporation with its headquarters at 11432 Lackland Road, St. Louis, MO 63146. Equifax Workforce Solutions LLC is registered to do business in Pennsylvania.

24.     Defendant Equifax, Inc. is a Georgia corporation with its headquarters at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax, Inc. is registered to do business in Pennsylvania.

## IV.    FACTS

A.     **In 2008, the FTC Filed a Complaint Against Equifax for Conduct That Had Anticompetitive Effects in the Market for Electronic VOIE Services**

25.     TALX started the Work Number in 1985. Over the next 20 years, TALX acquired several of its competitors in the market for VOIE Services. In or around May 2007, Equifax acquired TALX.

26.     In March 2008, after TALX became an Equifax subsidiary, the Federal Trade Commission ("FTC") served a complaint on TALX, alleging that TALX made a series of acquisitions that substantially reduced competition in the market for Electronic VOIE Services, enhancing its ability to raise prices and decrease quality.

27.     The FTC alleged that barriers to entry into the market for Electronic VOIE Services inhibited the emergence of competition. In its Analysis of the Complaint and Proposed Consent Order to Aid Public Comment in the Matter of TALX, Inc., the FTC "allege[d] that entry into the market for VOIE services is difficult and slow. Among the factors that make entry into this market difficult and slow are, according to the Complaint, **the need to acquire a**

7

**sufficient scale and scope of payroll and employment data to attract and service a sufficient customer base**, the difficulty of developing software to automate the VOIE process, and the need to build a reputation for reliability and security."

28.     The FTC alleged that TALX's acquisition of the employment verification businesses of four competitors "have enhanced its ability to **increase prices** unilaterally and enhanced its ability to **decrease the quality of services**" in the market for Electronic VOIE Services.

29.     The FTC defined one of the relevant markets at issue as "the provision of out-sourced employment verification services known as VOIE . . . including, but not limited to, the collection, maintenance, or dissemination of payroll data and other data relating to employment." In other words, the FTC alleged that the relevant product market for purposes of its complaint included, inter alia, the market for Electronic VOIE Services. The FTC found that this market was highly concentrated.

30.     The FTC found the relevant geographic market to be the United States.

31.     The FTC alleged that TALX's acquisition of the employment verification businesses of four competitors eliminated direct and actual competition in the provision of Electronic VOIE Services.

32.     On or around August 6, 2008, TALX Corp. (an Equifax subsidiary) and Equifax, Inc. entered a consent order with the FTC that, inter alia, imposed limits on Equifax's rights to acquire competitors in the market for Electronic VOIE Services.

33.     The FTC ordered that "for a period of ten (10) years . . . TALX shall not, without providing advance written notification to the Commission . . . directly or indirectly: A. acquire

any assets of or financial interest in any . . . VOIE Services Provider; or B. enter into any

agreement to participate in the management or operation of a . . . VOIE Services Provider."

34.     The FTC entered the consent order on or around August 6, 2008, which by its

terms lasted for ten years. Equifax's recent spree of acquisitions began shortly thereafter.

       B.     **Equifax Workforce Solutions**

35.     After Equifax acquired TALX in or around May 2007, it rebranded the company

as a new division called Equifax Workforce Solutions ("EWS"). Today, EWS includes two

services: "Equifax Verification Services" and "Equifax Employer Services."

36.     The heart of Equifax Verification Services is the Work Number. TWN is a large

database containing records of nearly every working-age American in the country, with data on

their current and historical income and employment. It forms the backbone of Equifax

Verification Services. As Equifax describes it,

> The Work Number® is our key repository of employment and
> income data serving our Verification Services business unit. We rely
> on payroll data received from over three million organizations to
> regularly update the database. The updates occur as employers and
> other data contributors transmit data electronically to Equifax from
> their payroll systems. Employers provide this data to us so that we
> can handle verification requests on behalf of each employer. We use
> this data to provide automated employment and income verification
> services to verifiers, who are lenders, employers/background
> screeners and government agencies.

As alleged in more detail below, to keep the TWN database current, Equifax acquires data by

entering agreements with Data Contributors, including payroll providers and employers, to

contribute records to the TWN database.

37.     The "verifiers" who purchase Electronic VOIE Services from Equifax include

many public and private sector entities. Mortgage and car lenders verify applicants' income and

employment before extending credit to them. Landlords verify applicants' income and

employment before entering lease agreements. Some employers make VOIE requests part of a background check or pre-employment screening process. Federal, state, and local governments also use VOIE services, as social service agencies are often required to verify that applicants' income is low enough to qualify for benefits such as food, health care, or housing. Individuals make VOIE requests as well.

38.     The payroll data that Equifax collects and monopolizes through its exclusive agreements (alleged in more detail below) is crucial to consumers engaging in financial transactions because lenders regularly rely on payroll data when making credit decisions. As TransUnion, a competitor to Equifax in the credit reporting space, explained:

> Payroll data is a critical element that lenders consider when making credit decisions. In fact, in some cases such as when a consumer applies for a mortgage, this data is required. **Today's payroll data solutions are expensive with most of the costs being borne by the consumer**, or are manual/inefficient which delays a consumer's credit access or major financial decisions, and may increase incidences of fraud. Lenders can leverage payroll platform data, including gross and net pay, employment duration, hours worked, and job title, to construct a comprehensive borrower profile.

C.      **Key Personnel**

39.     Equifax's actions are part of, and in furtherance of, the illegal monopolization alleged herein, and were authorized, ordered, or done by Equifax's current and former officers, directors, agents, employees, or representatives while actively engaged in the management of Equifax's affairs.

40.     Mark Begor is Equifax's chief executive officer and member of its Board of Directors. He oversees all of Equifax's businesses, including Equifax Workforce Solutions.

41.     Rodolfo O. "Rudy" Ploder was Equifax's Executive Vice President and President of Equifax Workforce Solutions up until May 2024.

42.     Chad Borton is Equifax's Executive Vice President and President of Equifax Workforce Solutions as of May 2024.

43.     John Gamble is Equifax's Chief Financial Officer and Chief Operating Officer.

44.     Dominic Arulsamy is Senior Vice President of Technology at Equifax Workforce Solutions.

45.     Harald Schneider is Equifax's Chief Data & Analytics Officer.

46.     On information and belief, Begor, Ploder, Borton, Arulsamy, Schneider and other current and former Equifax officers, directors, agents, employees or representatives have developed and executed the strategy of entering exclusive agreements with Data Contributors, raising barriers to entry, foreclosing competition, and raising prices for Equifax's Electronic VOIE Services to supracompetitive levels.

D.     **Faced with Challenges from New Market Entrants, Equifax Embarks on an Anticompetitive Scheme to Preserve its Monopoly**

47.     As noted above, the FTC had found in 2008 that barriers to entry in the Electronic VOIE Services market include "the need to acquire a sufficient scale and scope of payroll and employment data to attract and service a sufficient customer base."

48.     In or around the time that the FTC Consent Decree expired in 2018, several startup competitors began to challenge Equifax's dominance in the market for VOIE Services. Equifax responded by embarking on a scheme to strengthen the barriers to entry—namely, "the need to acquire a sufficient scale and scope of payroll and employment data to attract a sufficient customer base"—that had animated the FTC's complaint a decade earlier. By denying competitors the inputs they would need to compete on the merits, Equifax has been able to maintain its monopoly and its ability to continue raising prices.

49.     The Scheme had several components, including (a) entering exclusive deals with Data Contributors; (b) paying Data Contributors a portion of its monopoly profits; and (c) acquiring companies that were either likely competitors to Equifax, or that possessed data that would be additive to the Work Number database in order to keep that data out of the hands of Equifax's competitors.

50.     Equifax's Scheme to prevent competition in the market for Electronic VOIE Services, consisting of multiple acts as detailed herein, resulted in antitrust injury to Plaintiffs and the Class in the form of overcharges—i.e., paying more than they would have for Electronic VOIE Services absent Equifax's illegal conduct—and reduced choice.

E.      **Equifax Enters into Multi-Year Anticompetitive Exclusionary Contracts That Entrench its Monopoly Power**

51.     The first component of Equifax's Scheme is its entry into multi-year deals with Data Contributors, which are either expressly or de facto exclusive, and which have the intent and effect of denying competitors the scale needed to compete.

52.     The sources of data acquisition for the Work Number fall largely into two categories: payroll providers and employers. Beginning in or around 2018, if not earlier, Equifax entered into multi-year exclusionary agreements with large payroll providers and employers with the intent and effect of denying payroll data inputs to the VOIE products of its competitors.

53.     As of April 2024, Equifax claims that the Work Number database contains 670 million records—an increase of over 100 percent compared to the 300 million records in the TWN database as recently as 2021. Those 670 million records (172 million of them current) represent 126 million unique individuals (over 75% of U.S. non-farm payroll) from over 3 million employers. Most of that data is exclusive to Equifax.

### 1.      Payroll Providers

54.      First, Equifax pulls in data from payroll providers (the "Payroll Providers"). The Payroll Providers are companies that sell software to large and small businesses to handle their payroll and other human resources tasks. While providing those services, the Payroll Providers acquire vast quantities of payroll data on their customers' employees. Equifax receives data from the largest Payroll Providers in the country, such as ADP, Paychex, Ceridian, Paycor, PrismHR, Alight, Oracle's Taleo, Workday, and two dozen other HR software providers. In the past year, Equifax has signed agreements with 19 new payroll processors, bringing the total to 35 payroll processors over the preceding three years. In the first quarter of 2024, Equifax signed two new payroll processors on an exclusive basis. One of the largest sources of data for Equifax's TWN is Intuit's Quickbooks Payroll, which is used by approximately 1.4 million small businesses. On information and belief, Equifax pays (or has paid) Intuit for a backdoor that enables Equifax to ingest payroll data on these QuickBooks customers' millions of employees. As of the end of 2023, Equifax claimed to pull in records from 3 million businesses in the United States.

55.      As alleged in further detail below, Equifax views these entities as its business "partners." Equifax shares a portion of monopoly profits with these partners in exchange for their agreement to supply payroll data exclusively to Equifax, to the detriment of competition. Significantly, Equifax and its Payroll Provider partners financially benefit from Equifax's exclusive access to the payroll data, but Plaintiffs and the Class (which include individuals and small employers, to the extent they make VOIE requests themselves) are harmed by higher prices for VOIE services and in the other ways alleged herein.

56.      Discovery will show that, through its agreements with payroll providers, Equifax enjoys exclusive control over well over 40% of payroll records. On information and belief, these payroll data providers gave the income and employment data in their systems exclusively to

Equifax during the class period and continue to do so. Through its deals with these payroll providers, Equifax has exclusive access to the income and employment information of tens of millions of Americans. These exclusive agreements deny Equifax's competitors access to payroll data necessary to compete with Equifax.

57.     Equifax represents that it continuously enters deals with new payroll providers on an exclusive basis. As Begor stated in a 2022 earnings call summarizing the new deals it executed in 2021, "Our strong momentum continued during the fourth quarter with the signing of 3 new exclusive agreements with major payroll processors that we expect to implement during 2022." In 2022, Begor said that "everything in the last 4 to 5 years that we've signed up has been on an exclusive basis." And Equifax has stated that its goal is to continue signing up data providers on an exclusive basis. As Begor put it, "The contracts that we're signing are and will continue to be exclusive going forward. That's our plan."

58.     Equifax's contracts with payroll data providers are of sufficient duration to prevent meaningful competition by rivals. As Begor has put it, "**On the payroll partnership side, those are multiyear agreements. The vast majority . . . are exclusive**. That's our intention, for all of them to be exclusive."

59.     On an earnings call from April 2024, Begor offered the following response to an analyst's question:

> Q: I was wondering if you can remind us when renewals are coming up for most of your exclusive contracts with payroll providers.. . . .
>
> A: . . . [T]hey're generally structured with auto-renewals and they auto-renew. . . . So there's a lot of work that goes into that integration that makes our relationships quite sticky. And then, of course, from a monetization standpoint, as we keep growing our business, our partners' monetization grows every quarter. So there's a very strong relationship there. . . . **we've got a lot of confidence in the long-term nature of our partnerships around TWN records**.

14

60.     Equifax's executives routinely express a lack of concern about the company's "so called competitors" because it knows its exclusive deals operate as a barrier to entry:

> . . . **There are some others that are trying to enter the space. We think it's going to be quite challenging** . . . [J]ust start with records. The 19% growth that we had, the 135 million, 105 million uniques. We added a large payroll processor last year in the third quarter that was exclusive. [We're] adding 3 more that are all exclusive. **And of course, exclusive means they're only going to work with Equifax and Workforce Solutions. So that's quite challenging. . . . So while we know there are others in the space, we think our market position is quite strong, and we got [sic] a lot of confidence in maintaining that position going forward.** And it really starts with the ability to build out a data set that looks like Equifax's; we think that's very, very hard to do.

61.     In other words, Equifax's CEO admits that its exclusive control of millions of records in the TWN database—which, as noted above, now exceeds 670 million records, 172 million of them current—makes it impossible for anyone else to compete.

62.     In another recent earnings call, Begor represented that Equifax essentially *has no competitors* in the market for Electronic VOIE Services; its only competitor is "paper pay stubs," which are not part of the relevant product market because they are not a reasonable economic substitute for Electronic VOIE Services. Equifax has accomplished this by acquiring as much data as possible via exclusive deals or acquisitions that preclude competitors from achieving scale:

> Q: [I] wanted to ask about Work Number. There have been a few income and employment verification providers moving into the space. I guess, how do you see the long term playing out? . . . A: Yes. It's not lost on us. There's other players there. . . . [But] **our biggest competitor, the way we think about it, is paper pay stubs**. . . The scale of our dataset, obviously, is a real advantage, and we continue to grow that. Being up double digits in records in the quarter, adding 3 new payroll processors. . . . . So scale is a big deal for us . . . That's a big growth lever for us to add records.

63.     As recently as April 2024, Begor reiterated this message:

Q: Within your Workforce Solutions business, can you talk a little bit about what you're seeing around . . . overall competition . . .?

A: We think we have a very strong market position. We don't feel an impact from the 1 or 2 participants that have much smaller businesses in income and employment. Frankly, we think about **our biggest competitor in EWS and income and employment is manual verifications**.

64.     Acquiring data for itself and denying that data to competitors creates leverage for Equifax: "Think about some of **the leverage points we have**. . . . [including] payroll partners that we have. . . . Most of them are exclusive." As discussed more fully below, Equifax's acquisition of data from payroll providers and employers on an exclusive basis gives Equifax pricing power to increase prices to supracompetitive levels.

65.     ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████

66.     ███████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████████

67.     As detailed more fully below, Equifax secures Payroll Providers' agreement to provide data to Equifax on an exclusive basis, in part, in return for Equifax's agreement to share its monopoly profits with them, in the form of "revenue shares" and other payments.

### 2.     Employers

68.     In addition to its payroll partnerships, Equifax derives income and employment data from many of the country's largest employers. These employers control the payroll data for

millions of Americans. On information and belief, employers send their payroll data exclusively to Equifax.

69. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

70. ███████████████████████████████████████████

███████████████████████████████████████████

71.    As detailed more fully below, Equifax secures employers' agreement to provide data about their employees to Equifax on an exclusive basis, in part, in return for Equifax's agreement to share its monopoly profits with them, in the form of "revenue shares" and other payments.

72.    By way of Equifax's access to data from Payroll Providers, large employers, and small employers, over 75% of US non-farm payroll records are on Equifax's servers. On information and belief, it exclusively controls far more than 40% of the nation's payroll and employment data, thus denying rivals the sufficient scale and scope they would need to compete with Equifax and challenge its ability to charge supracompetitive prices.

F.    **Equifax's Multi-Year Exclusive Agreements and Payments to Data Contributors Operate as Barriers to Entry and Raise Rivals' Costs**

73.    Equifax's Scheme has had the intent and effect of raising rivals' costs and otherwise erecting and maintaining barriers to their entry.

74.    First, Equifax enhances and expands barriers to entry through the multi-year exclusive dealing agreements detailed above. By denying competitors the sufficient scale and scope of payroll data they would need to compete, Equifax ensures that it faces no price competition.

17

75.    Second, Equifax induces Data Contributors to enter exclusivity arrangements by sharing Equifax's monopoly profits with its Data Contributor "partners." When Equifax sells a VOIE report on a particular individual's income and employment, Equifax will share a portion of the revenue it makes from that VOIE search with the partner that provided Equifax with data on that individual. The more that Equifax can charge for the VOIE report because of its supracompetitive, monopoly prices, the larger the payment that Equifax gives to its partner. In this way, the Data Contributor is incentivized to provide its data exclusively to Equifax, help Equifax maintain its monopoly, and preserve Equifax's ability to charge monopoly prices. In short, Equifax is sharing a portion of its supracompetitive monopoly profits with its Data Contributor partners in exchange for their efforts to help Equifax maintain its inflated, supracompetitive prices.

76.    Certree and Argyle, two startups that have attempted to enter the market for Electronic VOIE Services in competition with Equifax's TWN, refer to these revenue shares as "incentives" that Equifax offers to secure exclusivity.

77.    As Certree put it in its letter to the FTC:

> It is our understanding that these brokers [like Equifax] even offer distinct financial incentives to employers to gain exclusive access to their workers' personal data. Our experience in this industry has yielded several conversations with salespeople, former executives, and other workers at these brokers' client companies, many of whom attest to 'loyalty-rewards' that brokers offer to employers that consider ending their contracts and withholding their payroll data from [competing] brokers. In some cases, we understand that brokers have offered to share the revenue derived from worker data with that worker's employer, often guaranteeing the employer a minimum amount of revenue. This system enables both the brokers and the employers to monetize a worker's most personal information, leading to the neglect of worker privacy, data security, and consumer choice.

78.     The revenue shares create a strong economic incentive for employers to provide data exclusively to Equifax. Begor has admitted that Equifax uses its sharing of monopoly profits as a "powerful" tool to maintain and increase its control over critical data inputs:

> Q: . . . [W]hen you're having discussions with clients and data providers, now that there is a fairly determined competitor in play, are those conversations changing at all? A: They're not. We still have very effective ability to add new relationships. . . . And we have the scale of Workforce Solutions . . . [a]nd then **the ability to deliver a rev share immediately at scale for those records from a partner gives us a lot of power** to continue to grow our record base . . . .

79.     Relatedly, Equifax admits that the revenue shares it offers makes Data Contributors "sticky" and discourages them from providing their data to anyone but Equifax. As Begor put it:

> On the payroll partnership side, those are multiyear agreements. . . . . **And when they come up for renewal, it's an easy dialogue because remember, we're paying a revenue share that's driven off the network we have. . . . So the idea that they're not going to renew with us is . . . we view them as very sticky** too because if they want to go somewhere else, they would have to really start up with someone else versus they continue the momentum they have with Equifax.

80.     As Begor put it at a conference just this month,

> When we add a new record, it turns into revenue and then we pay a rev share. And we pay a rev share as a percentage of the revenue we receive in any vertical to our partners, so your question about why do they renew, why do they auto-renewal: Because we're very sticky. **And if they wanted to go somewhere else, it will be very challenging to replicate our distribution; said differently, challenging to replicate our rev share that we're paying**.

81.     Equifax's payments function as a mechanism for Equifax to share its supracompetitive monopoly profits with Data Contributors as compensation for helping Equifax maintain and expand its monopoly. Because of the revenue share, Data Contributors benefit from the increasing monopoly prices that Equifax can charge.

82.      ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

83.      These payments function to raise rivals' costs and prevent their entry into the market. In order to acquire the data that Equifax obtains exclusively, rivals would need not only to wait for the Data Contributors' multi-year exclusive agreements to expire, but also to match or exceed the payments that Equifax offers. But rivals are not able to match the revenue shares that Equifax pays to the Data Contributors because, unlike Equifax, they are not monopolists, and thus do not have monopoly profits to share.

84.      In this way, Equifax uses its exclusive dealing arrangements and revenue shares to raise its rivals' costs high enough to prevent them from growing into effective competitors that could exert discipline on the supracompetitive prices that Equifax charges. In short, Equifax uses its payments to Data Contributors to purchase exclusivity, which it uses to exclude competitors, preserve its monopoly power, and charge supracompetitive prices.

G.      **Equifax Acquires Competitors to Insulate it From Competition**

85.      The third component of Equifax's Scheme is the acquisition of actual or likely potential competitors. These acquisitions are an element of Equifax's anticompetitive scheme because they have substantially lessened competition and augmented or reinforced Equifax's monopoly by means other than competition on the merits.

86.     Since at least 2020, Equifax has pursued a strategy of "bolt-on acquisitions": *i.e.,*
acquiring smaller companies that are potential competitors in the same line of business.
Equifax's ostensible purpose for doing so is to enhance the quality of its product. But comments
by Equifax executives reveal that the true purpose and effect of the acquisitions is to augment
and reinforce Equifax's monopoly. In the last 3 years, Equifax has made 14 acquisitions, one-
third of them relating to Equifax Workforce Solutions.

87.     As noted above, the FTC issued a complaint against Equifax in 2008 for similar
conduct, alleging that Equifax made a series of acquisitions that substantially reduced
competition in the VOIE market, enhancing its ability to raise prices and decrease quality.

88.     Equifax resolved the matter pursuant to a consent order. As noted above, the FTC
ordered that "for a period of ten (10) years from the date this Order becomes final, TALX shall
not, without providing advance written notification to the Commission . . . directly or indirectly:
A. acquire any assets of or financial interest in any . . . VOIE Services Provider; or B. enter into
any agreement to participate in the management or operation of a . . . VOIE Services Provider."

89.     Shortly after that consent decree expired, Equifax embarked on a spree of
precisely the type of acquisitions that the FTC had restricted.

90.     In its 2019 annual report, Equifax reported that "[i]n 2018, the Company
completed various acquisitions in our Workforce Solutions and International segments to expand
the Company's product offerings," but did not disclose the identify or nature of its "various
acquisitions."

91.     In its 2022 annual report, Equifax reported that it had signed or completed "14
strategic and accretive bolt-on acquisitions totaling more than $4.1 billion since the beginning of

2021." Each of these acquisitions added data to Equifax's TWN database, removed a competitor from the market, or both.

92.     In or around March 9, 2021, Equifax closed the acquisition of HIREtech, a "technology-focused human capital management and employer tax incentive firm." Equifax's Chief Executive Officer, Mark Begor, stated that "[w]e are energized by the opportunities we can offer by adding the HIREtech capabilities to our differentiated Workforce Solutions' Work Number income and employment verification and HR services." Equifax incorporated HIREtech into Equifax Workforce Solutions.

93.     In or around March 24, 2021, Equifax closed the acquisition of i2Verify, "an income and employment verification provider" that "serves employers nationwide, with a concentration in the healthcare and education sectors." Equifax incorporated i2Verify into Equifax Workforce Solutions.

94.     In or around October 1, 2021, Equifax closed its acquisition of Appriss Insights, "a provider of comprehensive risk and criminal justice intelligence products and solutions." Equifax stated in a press release that "[t]his acquisition expands Equifax's largest and fastest-growing business unit, Workforce Solutions, by broadening the Equifax suite of complementary verification capabilities." Equifax highlighted this acquisition in its 2021 Annual Report, listing Appriss Insights among the, "Differentiated data that 'Only Equifax' can provide." Equifax explained, "We substantially strengthened and broadened Workforce Solutions through the acquisition of Appriss Insights, the second largest acquisition in Equifax history, for $1.825 billion. Their unique 170 million criminal justice and incarceration data is used in the hiring and social services spaces and will expand the breadth of our differentiated data sources, expand Workforce Solutions verification capabilities, enhance our identity and fraud prevention

offerings, and advance our strategy for a comprehensive Workforce Solutions data hub." Equifax incorporated Appriss Insights into Equifax Workforce Solutions.

95. In or around February 8, 2022, Equifax closed its acquisition of Efficient Hire. Among other things, Efficient Hire offered "E-Verify" software. Equifax incorporated Efficient Hire into Equifax Workforce Solutions.

96. Equifax's "bolt-on acquisitions" and "Only Equifax" strategy work not only to eliminate nascent competitors, but also to acquire data that then becomes unavailable to *any* competitor, denying them the data they need to scale and compete. As Begor put it,

> Quite deliberately . . . I use the term bolt-on. I believe that the best acquisitions we could do or where we're bringing in something that strengthens the core of Equifax. . . . We think there's a lot of opportunities to strengthen the core of Equifax, so really 3 priorities around our M&A. One is differentiated data . . . And **if we can find data assets at scale that others don't have, and that's very unique, we want to buy that** . . . . And we've done in the last 15 months, 4 acquisitions . . . to strengthen the core of what we call Workforce Solutions.

97. ███████████████████████████████████████
███████████████████████

98. As a result of Equifax's anticompetitive Scheme, including its "bolt-on acquisition" and "Only Equifax" strategy, in tandem with the other conduct described herein, Equifax faces no meaningful competition in the market for Electronic VOIE Services.

H. **Equifax's Scheme Substantially Foreclosed Competition**

99. Equifax's Scheme has substantially foreclosed competition in the market for Electronic VOIE Services and enabled Equifax to charge supracompetitive prices for those services. In order to be a viable competitor to Equifax, a rival provider of Electronic VOIE Services would need to secure enough income and employment data from Data Contributors in order to create a database of sufficient scale. Equifax has pursued the anticompetitive Scheme

with the intent of denying to competitors sufficient data to develop a viable VOIE database, and the Scheme has been successful.

100.    In the income and employment verification space, the "Data Waterfall" or "Verification Waterfall" refers to the order in which available VOIE services are utilized to obtain needed information. As a verifier seeks to obtain information on a borrower, the first service utilized to check the borrower sits at the top of the Waterfall. If the borrower's information is not found there, rival service providers further down the Waterfall are checked until there is a hit. The higher a VOIE service sits on the waterfall, the more often it is utilized and more profitable it is. And the more comprehensive the data set of the VOIE service at the top of the waterfall, the less likely a verifier would purchase VOIE services from other rivals further down in the waterfall. Accordingly, VOIE service providers compete for a position as high in the waterfall as possible.

101.    Equifax's Talx Work Number sits atop the Waterfall: according to the financial technology press, Equifax is "[t]he dominant provider of employment and income verification services in the U.S." Equifax's exclusive control of data from Data Contributors and foreclosure of competitors from accessing more than 40% of those key inputs is how Equifax maintains that position.

102.    ███████████████████████████████████████████████
███████████████████████████████████████████████

103.    Relatedly, there is a value hierarchy of different types of data offered by VOIE service providers. When lenders try to gain an understanding of a person or entity's financial health, certain data points are more valuable than others because of their ability to paint the clearest possible picture of financial health. The more valuable data points (those offering the

greatest insight) sit higher in the waterfall. The less valuable data sits lower. Electronic payroll data—particularly, data that comes directly from the payroll provider's backend database—is the most valuable of all VOIE data sources.

104.    Equifax has built a moat around this valuable data and denied access to its rivals. Gamble used precisely that term at a conference in 2023, stating that Equifax was not concerned about competitors because of "the moat we have," including the "depth of the database."

105.    Further, there is no reason why Data Contributors could not provide their data to both Equifax and rivals. Data is not a finite resource in that each piece of data provided to Equifax cannot also be provided to others. The only economic justification for maintaining the exclusivity for rivals is the monopoly rents they receive from Equifax.

106.    Though nascent competitors have tried, none have been able to gain a foothold in the market for Electronic VOIE Services, or displace Equifax from the top of the waterfall. Two such competitors are Argyle and Certree, each of which submitted a letter to the FTC in the fall of 2022 alleging that the barriers to entry Equifax had erected slowed or prevented their entry to the market.

107.    According to Certree, "companies like ours face enormous obstacles competing in a market where major players [such as Equifax] use their overwhelming scale and ability to incentivize exclusivity arrangements to undercut competitors." According to Argyle, "large data payroll brokers [like Equifax] use their dominant positions to collect millions of payroll records, often through partnerships, acquisitions and exclusivity agreements that include employer incentives aimed at edging out competitors."

108. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

109.    Equifax's monopoly is recognized by consumer interest groups, too. The National

Consumer Law Center noted in recent comments to the Consumer Financial Protection Bureau

that competitors should have access to the same data Equifax currently monopolizes, so that "the

Work Number does not have a monopoly over this type of financial data." TransUnion similarly

encouraged the CFPB to expand a proposed rule—which aims to make financial data more

broadly available—to include payroll data because "[t]oday's payroll data solutions are

expensive with most of the costs being borne by the consumer."

110.    Equifax represents to customers that they have little meaningful option other than

TWN because Equifax's exclusive access to payroll data renders its rivals' offerings inadequate.

For instance, Equifax represented, in the course of a government procurement process, that none

of its rivals could service the contract because "no other vendor maintains a database of the

majority of their records. Instead, [Equifax] primarily leverage[s] access to payroll providers

who **do not provide other vendors a view of their entire database"—that critical payroll

information is reserved** "**exclusively for Equifax**." Thus, according to Equifax itself, its multi-

year exclusive agreements frustrate competition.

111.    In the context of another government contract, the state agency represented to a

legislative committee overseeing the procurement process that it must give the contract to

Equifax because, "**Employers who send records to Equifax use this service exclusively**; in

other words, they do not supply other vendors with the same payroll data, for the purposes of

employment and income verification. Therefore, Equifax is the only entity capable of providing access to these records."

112.    These representations to and by government purchasers (along with the "Only Equifax" marketing statements) acknowledge that (as Equifax intended), Equifax's exclusive control over payroll data has undermined rivals' ability to offer viable Electronic VOIE Services. In the company's own words, "There aren't competitors at scale," because "[Equifax has] data our competitors don't have. That's the heart of Equifax."

113.    While there may be some VOIE inputs that are not exclusive to Equifax, the data over which Equifax does have exclusive control is sufficient to deny its competitors the scale they would need to compete. One exchange from a recent Equifax earnings call is instructive:

> Q: . . . If you look at the non-exclusive records that you have, have there been any recent share changes for digital verifications?
>
> A: Yes, not that I would characterize as meaningful Jeff, but we don't see it in our marketplace, but we hear **our so called competitors** talking about their revenue growth and I don't know what the real numbers are that some of those smaller players have, but they are definitely getting revenue somewhere. **We just don't feel it in our business** but we continue to watch it.

114.    At the end of the day, Equifax has no real competitors—only "so called competitors."

115.    In sum and as detailed above, through its multi-year exclusive agreements with Data Contributors, payments to Data Contributors, and/or anticompetitive acquisitions, Equifax has exclusive access to payroll and employment data for tens of millions of workers in the United States. Equifax's conduct has foreclosed competitors from access to far more than 40% of inputs necessary to make a competitor's Electronic VOIE Service viable to purchasers.

116.    Equifax has foreclosed access to necessary inputs, raised rivals' costs, erected and preserved barriers to entry, excluded competitors, and maintained its monopoly, enabling it to

charge supracompetitive prices and deny purchasers of Electronic VOIE Services a meaningful choice in a provider of such services.

I.    **The Intent and Effect of Equifax's Anticompetitive Scheme is to Charge Supracompetitive Prices for Electronic VOIE Services, Causing Antitrust Injury to Plaintiffs and the Class**

117.    Equifax has caused and continues to cause antitrust injury to Plaintiffs and the Class by charging supracompetitive prices, and by decreasing the variety and choice of services available to purchasers of Electronic VOIE Services.

118.    Electronic VOIE Services is one of the largest sources of revenue for Equifax. In 2023, Equifax, Inc. recognized $5.2 billion dollars in operating revenue across all its business lines. Of that figure, Equifax derived $2.3 billion in revenue from its Equifax Workforce Solutions business. Of that $2.3 billion figure, $1.85 billion—or 80 percent—came from Equifax Verification Services. Thus, roughly 36% of Equifax, Inc.'s overall revenue comes from its verification services.

119.    Equifax sells its Electronic VOIE Services at gross margins exceeding 50 percent. Its revenues and profits continue to grow year after year, and it continues to raise prices, despite the (largely unsuccessful) efforts of other companies to loosen Equifax's grip on the market. Simply put, Equifax charges more for Electronic VOIE Services than it could charge if it had not undertaken an anticompetitive Scheme to exclude competitors from the market.

120.    Because there is no viable competitor in the marketplace that can impose price discipline on Equifax, Equifax regularly increases prices on the Work Number.

121.    In January 2012, Equifax offered two types of electronic verification. At the time, for "Employment Only" verification, Equifax charged $14.70. For "Income and Employment" verification, Equifax charged $17.85.

122.    By January 2017, Equifax was charging $29.95 for Employment Only verification and $36.95 for Income and Employment verification. The $7.00 price differential between those two products persisted for the next four years.

123.    In or around May 2017, Equifax increased the price for Employment Only verification to $35.95 and the price for Employment and Income verification to $42.95—increases of 16.69% and 13.97%, respectively.

124.    In or around August 2020, Equifax increased these prices to $41.95 and $48.95—again, increases of 16.69% and 13.97%, respectively.

125.    In or around February 2021, Equifax set the price for *both* Employment Only verification and Income and Employment verification at $49.95—increases of 19.07% and 2.04%, respectively. By collapsing the price difference between these two products, Equifax eliminated the lower-cost alternative.

126.    In or around November 2021, Equifax increased the prices for both Employment Only verification and Income and Employment verification to $54.95—an increase of 10.01%.

127.    In or around August 2022, Equifax ceased offering Employment Only verification at all. At about this time, Equifax increased the price for Income and Employment verification to $60.45—again, an increase of 10.01%. From this point on, Purchasers had no choice but to buy the more expensive verification service.

128.    In or around December 2023, Equifax increased the price for Income and Employment verification to $66.45—an increase of 9.93%.

129.    Thus, Equifax increased the price for a verification of income and employment from $17.85 in 2012 to $66.45 today—an increase of 272%. Since 2017, Equifax has increased

the price from $36.95 to $66.45, an increase of 80% in just 7 years. Meanwhile, employment-only verification is no longer available at all.

130.    These are prices for a single transaction verifying an individual's current income and employment information; the price rises to $200 for records with more historical information.

131.    █████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

132.    In a recent call with investment analysts, Begor confirmed that customers chafe at Equifax's constant price increases, but Equifax rams them through anyway:

> Q: Within your Workforce Solutions business, can you talk a little bit about what you're seeing around customer price sensitivity . . . ?
>
> A: . . . [O]n so-called price sensitivity, and I would say universally nobody . . . likes a price increase. So from a sensitivity standpoint, there's always challenges in any of our verticals when we go out to take price up. But our customers understand the value of our data and the uniqueness of our data. So those are conversations that we work through.

133.    Equifax is able to constantly raise prices because its customers have no choice.

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

134. Equifax's CEO has recognized that it has "meaningful pricing power" as a result of "only Equifax" having the data it does. The fact that Equifax is able to raise prices without losing a significant number of sales for Electronic VOIE Services is direct evidence of its monopoly power.

135. While Equifax regularly imposes price increases on purchasers of all of its services, this is particularly the case in Equifax Workforce Solutions, the business division that includes Equifax's VOIE services. As Begor put it recently, "I think we've been clear that we have **more pricing leverage in EWS** than our other businesses."

136. The company's executives admit that the "pricing leverage" it enjoys for Electronic VOIE Services derives from the success it has had in denying any potential competitor the scale necessary to compete: "We have more leverage on pricing in Workforce Solutions than the rest of Equifax because of the uniqueness of the data set."

137. There is a direct correlation between Equifax's addition of records to the TWN database and the revenue it derives from EWS. Begor admits that its exclusive dealing and ability to exclude competitors from the marketplace enables it to regularly increase prices:

> **Workforce Solutions has more pricing power** because of the uniqueness of the assets they deliver and the scale of the database. So it's clearly one of the levers. . . . And of course, the other lever is the adding of TWN records, our TWN records being up 19%. The **new relationships that we've signed exclusively** in the latter part of the year that will be adding to our records in 2022.

138. Even when the economy is struggling, Equifax increases prices on its Electronic VOIE Services because—immune from competition—it can. For example, some of the largest customers for Equifax's Electronic VOIE Services are mortgage originators, which use TWN to verify the income and employment of mortgage applicants. Yet even when mortgage origination dropped in recent years, Equifax managed to continually increase the revenue for its VOIE

Services, largely by continually increasing prices. Equifax told investors that "EWS is benefiting from strong growth levers that are not directly tied to economic activity, including . . . measured price actions, taking advantage of the scale of the TWN database." In an April 2023 earnings call, Equifax attributed higher revenue to, inter alia, "pricing actions more than offsetting the macro effect" of broader economic indicators.

139.    In one quarter of 2022, Equifax attributed its "above market" performance to, among other things, "very strong performance on TWN record additions" and "new . . . pricing." In other words: the more data that Equifax acquires on an exclusive basis (and denies to competitors), the more Equifax can charge.

140.    Echoing Equifax's admissions, nascent *competitors* also allege that the company's anticompetitive conduct—in particular, its exclusive dealing—gives Equifax market power to inflict antitrust injury on purchasers in the form of supracompetitive prices. In its September 2022 letter to the FTC, Certree alleged that Equifax "use[s] anti-competitive practices to . . . **extract premium pricing** by securing exclusive access to payroll data."

141.    In short, there is a clear connection between Equifax's anticompetitive conduct and the "pricing power" that Equifax possesses in the market for Electronic VOIE Services. Equifax admits as much.

142.    The emergence of additional providers of Electronic VOIE Services could have spelled trouble for Equifax's dominance of that market. If the competitors were able to acquire and access data from enough of the country's payroll providers and employers to build databases of sufficient scale to support competitive products, their entry would have engendered competition among providers of Electronic VOIE Services that would have led to lower prices and increased choice for Plaintiffs and members of the Class.

143.    Instead, Equifax deployed its anticompetitive Scheme to foreclose competition and maintain its monopoly. The Scheme had the intent and effect of harming competition in the market for Electronic VOIE Services, resulting in higher prices, reduced competition, and reduced product choice. This is the type of injury that the antitrust laws were intended to prevent and is a direct and proximate result of Defendants' anticompetitive Scheme. As such, Equifax has caused antitrust injury to the Class.

J.    **No Procompetitive Benefit Justifies Equifax's Anticompetitive Conduct**

144.    Equifax claims that the success of its EWS business is due to the scale of its database, which is continually growing because of its exclusive deals with Data Contributors. Equifax claims that the breadth of the TWN database makes it unique and a more valuable resource for customers.

145.    These are not procompetitive effects from competition on the merits. Equifax's market power does not stem from Equifax's creative ability to design a superior product, but rather from its use of exclusive agreements, payments to its partners, and acquisition of nascent competitors to hobble rivals. Equifax has not made its product *better*, but rather worked with its "partners" to hamper competition.

146.    Even if there were any procompetitive effects arising from Equifax's conduct (there are not), the anticompetitive effects of Equifax's conduct outweigh any such benefits. And even if any such procompetitive effects exist, they could easily be achieved via less restrictive means: namely, obtaining the same data currently in the TWN database on a non-exclusive basis and without sharing monopoly profits with Data Contributor partners to induce them to help Equifax preserve its monopoly.

K.     **Equifax's Anticompetitive Scheme Denies Choice to Purchasers of Electronic VOIE Services, Including Choices That Would Better Protect the Privacy of Consumers**

147.   In addition to overcharges, Equifax's exclusion of rivals has denied purchasers the choice of selecting a VOIE provider that would better protect consumer data and privacy.

148.   Equifax has a history of insufficiently protecting consumer data; it famously suffered one of the largest data breaches in history. In 2017, Equifax announced that the personal data of 147 million Americans was breached, some of which was later used by hackers to steal and modify additional personal data. And in at least some cases, Equifax sells data on particular individuals without their knowledge.

149.   As Certree contended in its letter to the FTC, Equifax's "business model has created **unique harms to consumer privacy, data security, choice, and financial security** . . . . [Equifax's] employment verification services have dangerous ramifications for consumers due to an abundance of inaccurate data and a systemic lack of consent that makes consumers bystanders in their own careers and financial lives."

150.   Certree also noted that in addition to failing to protect consumer data, Equifax has been regularly accused of producing flawed results due to inaccurate data—resulting in consumers erroneously failing background checks for jobs or being denied loans and leases. Consumers often do not know that their employer shares data with Equifax, consenting only when they apply for a mortgage or a lease. Worse still, if flawed data results in a denial, consumers often will never find out that the flawed data was the reason for their rejection.

151.   Equifax has little incentive to protect consumer privacy because purchasers have little other choice when purchasing Electronic VOIE Services. By excluding rivals, Equifax compels Data Contributors to put the privacy of their employees and customers at risk.

## V.      RELEVANT MARKET AND MONOPOLY POWER

### A.      **The Relevant Product Market is the Market for Electronic VOIE Services**

152.    To the extent Plaintiffs' claims require the definition of a relevant product market, the relevant product market in which Equifax competes, and has monopoly power, is the market for Electronic VOIE Services.

153.    As the FTC defined it in its 2008 complaint, Electronic VOIE Services are "the provision of out-sourced employment verification services known as VOIE . . . including, but not limited to, the collection, maintenance, or dissemination of payroll data and other data relating to employment." In other words, the relevant product market is the market for Electronic VOIE Services. No change in the Electronic Services VOIE market since 2008 would justify the application of a different product market.

154.    There are high barriers to entry in the market for Electronic VOIE Services, due in part to the cost and difficulty of acquiring data to support a database of sufficient scale to compete in that market. Equifax has raised those barriers by acquiring payroll data exclusively from Data Contributors.

155.    Electronic VOIE Services are not reasonably interchangeable with non-electronic methods of verifying income and employment. For instance, paper pay stubs or verification by phone call to an employer are not a reasonable economic substitute for Electronic VOIE Services. Paper pay stubs and phone verifications take more time, effort, and cost to verify a person's income and employment than Electronic VOIE Services, which are nearly instantaneous and have a variable marginal cost close to zero. Paper pay stubs and phone verifications are also more susceptible to manipulation and can therefore be less accurate than Electronic VOIE services.

156.     Nor are screen-scraping services reasonably interchangeable with Equifax's TWN. Screen-scraping is a process for extracting data from websites, such as an individual consumer's bank or payroll information, based on user consent. Screen-scraping can be automated by allowing an intermediary to gain access to electronic records using password sharing or other means. It can also be more manual, such as using screen shots or manual copying and pasting. Each individual consumer must engage with the screen-scraping process, either by providing access to their data or by capturing the data themselves. Screen-scraping is not a viable substitute to Equifax's TWN because it lacks the same scale and immediacy. Screen-scraping may require a consumer to grant access to multiple sources of income and employment information one by one, as opposed to the instantaneous, comprehensive view that a full VOIE database would provide. Further, screen-scraping may be less reliable than Electronic VOIE Services because consumers can manipulate certain types of data.

157.     As noted above, Equifax represented, in the course of a government procurement process, that none of its rivals could service the contract because "no other vendor maintains a database of the majority of [payroll] records. Instead, [other vendors] primarily leverage access to payroll providers who **do not provide . . . a view of their entire database like those payroll providers do exclusively for Equifax**." On information and belief, the vendors that "leverage access to payroll providers" are screen-scrapers. Thus, according to Equifax itself, rivals or potential rivals that do not maintain a database like Equifax—and no rival can, because of the anticompetitive Scheme detailed herein—do not offer reasonably interchangeable services.

158.     There are no other viable alternatives to Electronic VOIE Services.

159.     Electronic VOIE Services exhibit low cross-price elasticity of demand with respect to screen-scraping and non-electronic methods of verifying income and employment.

160.     Further, the demand for Electronic VOIE Services is relatively inelastic. At any given moment in time, there is a universe of individuals who need to apply for loans, credit, or jobs. Change in the price for Electronic VOIE Services will not change the quantity of such services demanded by the market. The relative inelasticity of demand, combined with the lack of competition, enables Equifax to charge supracompetitive prices without fear of losing volume.

B.     **The Relevant Geographic Market is the United States**

161.     To the extent Plaintiffs' claims require the definition of a relevant market for VOIE Services, the relevant geographic market is the United States and its territories.

162.     On information and belief, the verifiers that use Equifax's TWN are based primarily in the United States and seek income and employment data primarily for individuals working in the United States. Further, on information and belief, the data that Equifax uses to provide TWN services are predominantly, if not exclusively, based on U.S. employment and income records. Equifax describes the data in its TWN database in terms of the portion of United States non-farm employees for whom it has data.

163.     The FTC in its complaint alleged that the relevant geographic market for purposes of analyzing Equifax's conduct "is the United States as a whole." No change in the Electronic VOIE Services market since 2008 would justify the application of a different geographic market.

C.     **Equifax has Monopoly Power in the Relevant Market**

164.     At all relevant times, Equifax had—and continues to have—monopoly power in the market for Electronic VOIE Services in the United States. Equifax had the power to maintain the price of Electronic VOIE Services at supracompetitive levels profitably without losing substantial sales to other products, and barriers to entry slow or prevent rivals from competing.

165.     At all relevant times, Equifax has controlled almost the entire market for Electronic VOIE Services in the United States. But notably, Equifax represents to investors that,

as a result of the anticompetitive conduct outlined herein, it *has no competitors* in the market for Electronic VOIE Services. Begor has stated, "If you want income and employment data at scale, the only place to get it is here." Equifax refers dismissively to its "so called competitors" and says its nearest competitor is "paper pay stubs." Yet for the reasons described above, paper pay stubs are not a reasonable economic substitute, and thus not part of the relevant market.

166.    The scale of Equifax's employment data is unmatched—as it advertises, "only Equifax" has amassed the sheer volume of data necessary to compete in the Electronic VOIE Services market. As of 2021, Equifax's databases contained 250 billion payroll records on 172 million U.S. workers, including the records of 85% of the federal government workforce, 75% of Fortune 500 companies, and hundreds of state governments, agencies, courts, colleges, and small businesses. Over 75% of US non-farm payroll records are on Equifax's servers.

167.    In one recent exchange, an analyst asked whether Equifax perceives any "threats" to its market position. Begor said no:

> Q: I want to ask a little bit more about the competitive environment on The Work Number. You have a competitor in the market . . . . [A]re you seeing increased threats to your market position and the volumes that are coming through?
>
> A: We're not . . . . We haven't seen them as a competitive threat in the marketplace. I think as you know, our record additions are quite substantial. . . . [W]e added in the quarter . . . more unique records than they have. So we've clearly got an ability to attract new partnerships and individual relationships given the scale of the company.

168.    The barriers to entry described above have enabled Equifax to maintain its market share, despite increased efforts from its "so called competitors." There is no other Electronic VOIE Services provider that even comes close. As Begor has put it, "We are not Coke versus Pepsi."

169.    Equifax sells Electronic VOIE Services substantially in excess of marginal costs, and in excess of competitive prices. The revenue Equifax derives from selling Electronic VOIE Services far outstrips the cost of acquiring the data that fuels that service, leaving the marginal variable cost of each query of the TWN database close to zero. As Gamble, the CFO, put it on a recent earnings call, "the addition of records in EWS is very accretive for us as we go because obviously that's very high margin revenue."

170.    A small but significant and non-transitory artificial inflation of the price of Electronic VOIE Services would not cause any significant number of consumers to purchase other potentially substitutable products instead, so as to make Equifax's routine price inflation unprofitable.

171.    Indeed, with no competitors constraining its price-setting behavior, Equifax increases the prices for its Electronic VOIE Services every year. Yet Equifax suffers no appreciable loss of sales volume as a result.

172.    But for Equifax's conduct, one or more competitors would have subjected Equifax to meaningful competition, considerably reduced Equifax's share in the relevant market, and undermined its monopoly power—leading to lower prices for Plaintiffs and the Class.

## VI.    INTERSTATE COMMERCE

173.    The market for electronic VOIE Services in the United States is a national market.

174.    Defendants have marketed VOIE Services to Purchasers in all U.S. states and territories.

175.    Defendants have sold VOIE Services to Purchasers in all U.S. states and territories.

176.    Defendants' business in VOIE Services involves a continuous and uninterrupted flow of commerce across state lines.

177.    Defendants' anticompetitive actions have had a substantial effect on interstate

trade and commerce in the market for VOIE Services.

## VII.    CLASS ACTION ALLEGATIONS

178.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rule of Civil Procedure 23 as representatives of a Class defined as follows:

> All persons or entities in the United States that purchased Electronic
> VOIE Services directly from Defendants Equifax Workforce
> Solutions and/or Equifax, Inc., during the period beginning May 28,
> 2020 until such time as the anticompetitive conduct alleged herein
> has ceased (the "Class Period"). Excluded from the Class are
> (a) Defendants, their subsidiaries, affiliate entities, and employees,
> and (b) all federal government entities or agencies.

179.    The members of the Class are so numerous that joinder is impracticable. Tens of

thousands of purchasers have bought Electronic VOIE Services directly from Defendants during

the Class Period.

180.    There are numerous questions of law and fact that are common to the Class and

that predominate over any issues affecting individual members of the Class, including but not

limited to:

1.    Whether Equifax entered multiyear exclusive agreements with Data
      Contributors with the intent and/or effect of maintaining and/or enhancing
      its monopoly power in the market for Electronic VOIE Services;

2.    Whether Equifax made payments to Data Contributors with the intent
      and/or effect of maintaining and/or enhancing its monopoly power in the
      market for Electronic VOIE Services;

3.    Whether Equifax acquired competitors with the intent and/or effect of
      maintaining and/or enhancing its monopoly power in the market for
      Electronic VOIE Services;

4.    To the extent a relevant product market must be defined, what that
      definition is;

5.    To the extent a relevant geographic market must be defined, what that

definition is;

6.    Whether Equifax has monopoly power in the relevant market(s);

7.    Whether Equifax's Scheme artificially maintained, preserved, or enhanced Equifax's monopoly power in the relevant market(s);

8.    Whether Equifax has substantially foreclosed competition in the relevant market(s);

9.    Whether Equifax's Scheme has artificially raised prices and reduced competition in the relevant market(s);

10.    Whether Equifax's Scheme had any anticompetitive effects;

11.    Whether Equifax's Scheme had any legitimate pro-competitive justifications;

12.    If any such procompetitive justification exists, whether the anticompetitive harm from Equifax's conduct outweighs any such procompetitive benefit;

13.    If any such procompetitive justification exists, whether Equifax could have accomplished such procompetitive benefit through less restrictive means;

14.    The operative time period and extent of Equifax's antitrust violations;

15.    Whether Equifax's Scheme caused damages to the members of the Class in the form of overcharges paid for Electronic VOIE Services, and the proper measure of such overcharge damages;

16.    Whether Equifax's Scheme caused damages to the members of the Class in the form of reduced choice for Electronic VOIE Services, and the proper measure of such damages; and

17.    The appropriate injunctive and equitable relief for the Class.

181.    Plaintiffs' interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that they can fairly and adequately represent and protect the interests of the Class members.

182.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

183.    Class treatment of Plaintiffs' federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

184.    The members of the class are reasonably ascertainable.

185.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**COUNT ONE**
**Monopolization (Exclusive Dealing) in Violation of Sherman Act §2**

186.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

187.    To the extent it is necessary to define the relevant markets, the relevant product market is the market for Electronic VOIE Services, and the relevant geographic market is the United States and its territories.

188.    At all relevant times, Equifax possessed monopoly power in the relevant market. Equifax possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

189.    As more fully alleged above, Equifax has willfully engaged in exclusionary conduct by entering into multi-year exclusive agreements with Data Contributors. This conduct has had the anticompetitive effect of allowing Equifax to unlawfully maintain and enhance its monopoly power in the Electronic VOIE Services market and prevent its rivals from competing.

190.    Through its anticompetitive Scheme, Equifax has substantially foreclosed competition in the market for Electronic VOIE Services, namely by foreclosing rivals from

access to a sufficient volume of inputs for a VOIE database—*i.e.*, income and employment records—sufficient to create a competitive product. Equifax's anticompetitive acts have had harmful effects on competition and consumers.

191.    Equifax's contracts are of sufficient duration to prevent meaningful competition by rivals.

192.    Equifax has maintained its monopoly power in the Electronic VOIE Services market through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

193.    The direct, foreseeable, and proximate result of Equifax's anticompetitive conduct was to increase prices, reduce output, and harm competition in the Electronic VOIE Services market. Equifax's anticompetitive Scheme has enabled Equifax to impose supracompetitive prices for Electronic VOIE Services.

194.    Equifax's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

195.    To the extent Equifax offers any non-pretextual procompetitive justification for its conduct, Equifax could have achieved any such benefit through less restrictive means.

196.    As a direct, material, and proximate result of Equifax's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Equifax's monopolization of the Electronic VOIE Services market.

197.    Plaintiffs and the Class seek treble damages for Equifax's violations of § 2 under § 4 of the Clayton Act.

198.     Plaintiffs and the Class seek an injunction against Equifax, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## <u>COUNT TWO</u>
### Monopolization (Course of Conduct) in Violation of Sherman Act §2

199.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

200.     To the extent it is necessary to define the relevant markets, the relevant product market is the market for Electronic VOIE Services, and the relevant geographic market is the United States and its territories.

201.     At all relevant times, Equifax possessed monopoly power in the relevant market. Equifax possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

202.     As more fully alleged above, Equifax has willfully engaged in conduct that has monopolized the Electronic VOIE Services Market. Each of Equifax's actions, when viewed collectively, increased, maintained, or protected its monopoly in the market for Electronic VOIE Services. Equifax's conduct had the anticompetitive effect of allowing Equifax to unlawfully maintain and enhance its monopoly power in the Electronic VOIE Services market and prevent its rivals from competing.

203.     Through its anticompetitive Scheme, Equifax has substantially foreclosed competition in the market for Electronic VOIE Services, namely by foreclosing rivals from access to a sufficient volume of inputs for a VOIE database—*i.e.*, income and employment records—sufficient to create a competitive product. Equifax's anticompetitive acts have had harmful effects on competition and consumers.

204.    Equifax's anticompetitive conduct includes, but is not limited to, the entry of multi-year exclusive agreements with Data Contributors, payments to those Data Contributors, and the acquisition of competitors or potential competitors. Equifax's anticompetitive acts have had harmful effects on competition and consumers.

205.    Equifax has maintained its monopoly power in the Electronic VOIE Services market through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

206.    The direct, foreseeable, and proximate result of Equifax's anticompetitive conduct was to increase prices, reduce output, reduce choice, and otherwise harm competition in the Electronic VOIE Services market. Equifax's anticompetitive Scheme has enabled Equifax to impose supracompetitive prices for Electronic VOIE Services.

207.    Equifax's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

208.    To the extent Equifax offers any non-pretextual procompetitive justification for its conduct, Equifax could have achieved any such benefit through less restrictive means.

209.    As a direct, material, and proximate result of Equifax's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Equifax's monopolization of the Electronic VOIE Services market.

210.    Plaintiffs and the Class seek treble damages for Equifax's violations of § 2 under § 4 of the Clayton Act.

211.    Plaintiffs and the Class seek an injunction against Equifax, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

<u>**COUNT THREE**</u>
**Conspiracy to Monopolize in Violation of Sherman Act § 2**

212.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

213.    To the extent it is necessary to define the relevant markets, the relevant product market is the market for Electronic VOIE Services, and the relevant geographic market is the United States and its territories.

214.    At all relevant times, Equifax possessed monopoly power in the relevant market. Equifax possessed the power to control prices in, prevent prices from falling in, and/or exclude competitors from the relevant market.

215.    Through the exclusivity agreements described herein, Equifax conspired with the counterparties to those agreements to unlawfully maintain Equifax's monopoly power in the relevant market by agreeing to provide payroll data exclusively to Equifax and not to Equifax's competitors.

216.    Equifax secured the cooperation of its co-conspirators by (*inter alia*) providing payments, including but not limited to "revenue shares," *i.e.*, a payment to a Data Contributor of a portion of the fee that Equifax receives for a VOIE request for a particular individual, whose data the Data Contributor sent to Equifax for addition to the TWN database. Equifax used these payments to share its monopoly profits with its co-conspirators.

217.    The goal, purpose and/or effect of Equifax's anticompetitive Scheme was to maintain, enhance, and extend Equifax's monopoly power, in violation of Sherman Act § 2. The Scheme was intended to and did slow or prevent competition in the market for Electronic VOIE

Services and enabled Equifax to continue charging supracompetitive prices for Electronic VOIE Services without a substantial loss of sales.

218.    Equifax and its co-conspirators knowingly and intentionally conspired to maintain, enhance, and extend Equifax's monopoly power in the relevant market.

219.    Equifax and its co-conspirators specifically intended that Equifax's anticompetitive Scheme would maintain Equifax's monopoly power in the relevant market, and injure Plaintiffs and the Class thereby.

220.    Equifax and its co-conspirators each committed at least one overt act in furtherance of the conspiracy, including entering into exclusive agreements.

221.    Through its anticompetitive Scheme, Equifax and its co-conspirators substantially foreclosed competition in the market for Electronic VOIE Services, namely by foreclosing rivals from access to a sufficient volume of inputs for a VOIE database—*i.e.*, income and employment records—sufficient to create a competitive product. Equifax's anticompetitive acts have had harmful effects on competition and consumers.

222.    As a direct, proximate, foreseeable, and intended result of Equifax and its co-conspirators' concerted monopolistic conduct, as alleged herein, Equifax unlawfully maintained, enhanced, and extended its monopoly power. As a result, Plaintiffs and the Class were harmed and suffered damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Equifax's monopolization of the Electronic VOIE Services market.

223.    Equifax's anticompetitive acts have had harmful effects on competition and consumers. Equifax's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

224.    To the extent Equifax offers any non-pretextual procompetitive justification for its conduct, Equifax could have achieved any such benefit through less restrictive means.

225.    Plaintiffs and the Class seek treble damages for Equifax's violations of § 2 under § 4 of the Clayton Act.

226.    Plaintiffs and the Class seek an injunction against Equifax, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

### COUNT FOUR
**(In the Alternative)**
**Attempted Monopolization in Violation of Sherman Act § 2**

227.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

228.    To the extent it is necessary to define the relevant market(s), the relevant product market is the market for Electronic VOIE Services, and the relevant geographic market is the United States and its territories.

229.    Equifax possessed sufficient market power to pose a dangerous probability of successfully monopolizing the relevant market(s).

230.    As detailed above, factors that demonstrate Equifax's dangerous probability of successfully monopolizing the relevant market(s) include its large share of the relevant market(s); its anticompetitive practices; the barriers to entry that exist and Equifax's efforts to erect and strengthen those barriers; the relative weakness of Equifax's competitors; the probable development of the industry towards more competitive offerings in the absence of Equifax's conduct; and the relative inelasticity of demand for Electronic VOIE Services.

231.    As detailed above, Equifax has willfully and intentionally engaged in exclusionary and/or anticompetitive conduct, which created a dangerous probability of successfully monopolizing the relevant market(s).

232.     Equifax's exclusionary and/or anticompetitive conduct includes but is not limited to the entry of multi-year exclusive agreements with Data Contributors, payments to those Data Contributors, and the acquisition of competitors or potential competitors.

233.     Through its anticompetitive Scheme, Equifax has substantially foreclosed competition in the relevant market(s), namely by foreclosing rivals from access to a sufficient volume of inputs for a VOIE database—*i.e.,* income and employment records—sufficient to create a competitive product.

234.     Equifax's contracts are of sufficient duration to prevent meaningful competition by rivals.

235.     Equifax's actions were carried out willfully and with the specific intent to monopolize the relevant market(s) through anticompetitive conduct and not through a superior product, business acumen, or historic accident.

236.     The direct, foreseeable, and proximate result of Equifax's anticompetitive conduct was to increase prices, reduce output, and harm competition in the relevant market(s). Equifax's anticompetitive Scheme has enabled Equifax to impose supracompetitive prices for Electronic VOIE Services.

237.     Equifax's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

238.     To the extent Equifax offers any non-pretextual procompetitive justification for its conduct, Equifax could have achieved any such benefit through less restrictive means.

239.     As a direct, material, and proximate result of Equifax's violation of § 2 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable

damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Equifax's monopolization of the Electronic VOIE Services market.

240.    Plaintiffs and the Class seek treble damages for Equifax's violations of § 2 under § 4 of the Clayton Act.

241.    Plaintiffs and the Class seek an injunction against Equifax, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

### COUNT FIVE
### Exclusive Dealing in Violation of Sherman Act § 1

242.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

243.    To the extent it is necessary to define the relevant markets, the relevant product market is the market for Electronic VOIE Services, and the relevant geographic market is the United States and its territories.

244.    At all relevant times, Equifax possessed market power in the relevant market. Equifax possessed the power to raise prices and/or restrict output in the relevant market.

245.    Equifax and certain unnamed co-conspirators have engaged in an unlawful contract, combination, or conspiracy to charge supracompetitive prices for Electronic VOIE Services, which unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

246.    Through the exclusivity agreements described herein, Equifax conspired with the counterparties to those agreements to unlawfully maintain Equifax's monopoly power in the relevant market by agreeing to provide payroll data exclusively to Equifax and not to Equifax's competitors.

247.     Through its anticompetitive Scheme, Equifax and its co-conspirators substantially foreclosed competition in the market for Electronic VOIE Services, namely by foreclosing rivals from access to a sufficient volume of inputs for a VOIE database—i.e., income and employment records—sufficient to create a competitive product.

248.     Equifax's agreements with the Data Contributors are of sufficient duration to prevent meaningful competition by rivals.

249.     The direct, foreseeable, and proximate result of Equifax and its Data Contributors' agreement(s) was to increase prices and harm competition in the Electronic VOIE Services market. Equifax and its Data Contributors' agreements have enabled Equifax to impose supracompetitive prices for Electronic VOIE Services.

250.     Equifax induced its co-conspirators to participate in the conspiracy by providing payments to them, in the form of "revenue shares" and otherwise. Equifax used these payments to share its monopoly profits with its co-conspirators. In this way, Equifax's co-conspirators benefitted from Equifax charging supracompetitive prices for Electronic VOIE Services.

251.     Equifax's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by its anticompetitive and unlawful conduct.

252.     To the extent any such procompetitive justification exists, Equifax and its co-conspirators could have achieved it through less restrictive means.

253.     As a direct, material, and proximate result of Equifax's violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property within the meaning of § 4 of the Clayton Act throughout the Class Period, including measurable damages in an amount to be calculated at trial, and face an ongoing threat of new injuries absent an injunction restraining Equifax's monopolization of the Electronic VOIE Services market.

254.     Plaintiffs and the Class seek treble damages for Equifax's violations of § 1 under § 4 of the Clayton Act.

255.     Plaintiffs and the Class seek an injunction against Equifax, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:

A.     That the Court determine that Plaintiffs' claim regarding the Class alleged herein is suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

B.     That the Court appoint Plaintiffs as the representatives of the Class;

C.     That the Court appoint Plaintiffs' counsel as counsel for the Class;

D.     That the Court award, pursuant to 15 U.S.C. § 15, compensatory and trebled damages to the Class resulting from Equifax's violations of the Sherman Act;

E.     That the Court order, pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Equifax from continuing its unlawful acts in violation of the Sherman Act;

F.     That Plaintiffs and the Class be awarded their costs, expenses, and reasonable attorneys' fees in bringing this action;

G.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

H.     Such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR JURY TRIAL

A.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

DATED: May 28, 2024

Respectfully submitted,

*/s/ Katie R. Beran*
Katie R. Beran (PA Bar No. 313872)
Jeannine M. Kenney (PA Bar No. 307635)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
kberan@hausfeld.com
jkenney@hausfeld.com

Brian A. Ratner (PA Bar No. 85661)
Sarah R. LaFreniere*
**HAUSFELD LLP**
888 16th Street NW
Suite 300
Tel: (202) 540-7200
bratner@hausfeld.com
slafreniere@hausfeld.com

**GARWIN GERSTEIN & FISHER LLP**
Bruce E. Gerstein*
David Rochelson*
Jon Gerstein*
Kimberly Hennings*
88 Pine Street, 28th Floor
New York, NY 10005
Tel: (212) 398-0055
bgerstein@garwingerstein.com
drochelson@garwingerstein.com
jgerstein@garwingerstein.com
khennings@garwingerstein.com

Joshua H. Grabar, Esq. (PA Bar No. 82525)
**GRABAR LAW OFFICE**
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com

*Counsel for Plaintiffs and the Proposed Class*

*\* pro hac vice forthcoming*