## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

GREYSTONE MORTGAGE, INC., and FIRST FINANCIAL LENDING LLC, *on behalf of themselves and all others similarly situated*,

   Plaintiffs,

 v.

EQUIFAX WORKFORCE SOLUTIONS LLC and EQUIFAX, INC.,

   Defendants.

Case No. 2:24-cv-02260-JFM

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COMPLAINT UNDER RULE 12(b)(6)

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 3

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.    Plaintiffs Fail to Allege Antitrust Injury ................................................................ 6

   A.    Antitrust injury requires harm to overall competition......................................... 7

   B.    Plaintiffs do not allege net harm to competition here. ...................................... 9

II.   Plaintiffs Fail to Allege Anticompetitive Conduct ............................................... 11

   A.    Plaintiffs' allegations of exclusive contracts do not support a Section 2 claim............. 11

   B.    Adding allegations of prior acquisitions still does not support a Section 2 claim. ........ 16

   C.    Relabeling the same alleged exclusive contracts as a "conspiracy to monopolize" also fails. ................................................................................................................. 18

   D.    Plaintiffs cannot save their claims by relabeling them.................................... 19

CONCLUSION................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) .................................................................................. 15-16

*Animal Sci. Prod., Inc. v. China Minmetals Corp.*,
    34 F. Supp. 3d 465 (D.N.J. 2014) ...............................................................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................................5

*Balaklaw v. Lovell*,
    14 F.3d 793 (2d Cir. 1994)..........................................................................................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................5, 16

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)....................................................................................................10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)..................................................................................................7, 9

*Buck v. Hampton Twp. Sch. Dist.*,
    452 F.3d 256 (3d Cir. 2006)........................................................................................3

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986)....................................................................................................10

*Coronavirus Rep. v. Apple, Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021), *aff'd*, 85 F.4th 948 (9th Cir. 2023)............ 9-10

*Credit Chequers Info. Servs., Inc. v. CBA, Inc.*,
    1999 WL 253600 (S.D.N.Y. Apr. 29, 1999), *aff'd*, 205 F.3d 1322 (2d Cir. 2000) ................18

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ......................................................................................18

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
    2014 WL 1343254 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016) ....................20

*Eisai, Inc. v. Sanofi Aventis U.S., LLC,*
    821 F.3d 394 (3d Cir. 2016)........................................................................... 6, 12-13

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009)........................................................................... 5

*Host Int'l, Inc. v. MarketPlace, PHL, LLC,*
    32 F.4th 242, 248 (3d Cir. 2022) ................................................................... 5-6

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.,*
    602 F.3d 237 (3d Cir. 2010)........................................................................... 19

*Ieradi v. Mylan Lab'ys, Inc.,*
    230 F.3d 594 (3d Cir. 2000)........................................................................... 17

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    44 F.4th 959 (10th Cir. 2022) ....................................................................... 11

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    507 F. Supp. 3d 1289 (D. Kan. 2020).............................................................. 12, 15

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed Cir. 1999)....................................................................... 15

*Levitch v. Columbia Broad. Sys., Inc.,*
    495 F. Supp. 649 (S.D.N.Y. 1980), *aff'd*, 697 F.2d 495 (2d Cir. 1983) ................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...................................................................................... 5

*N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.,*
    994 F.3d 1166 (10th Cir. 2021) ..................................................................... 20

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998)...................................................................................... 18

*Ohio v. American Express Co.,*
    585 U.S. 529 (2018)...................................................................................... 8-9

*PepsiCo, Inc. v. Coca-Cola Co.,*
    315 F.3d 101 (2d Cir. 2002)........................................................................... 12

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.,*
    886 F.3d 332 (3d Cir. 2018)........................................................................... 7, 11, 15, 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)............................................................................18

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010)............................................................................12

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*,
    113 F.3d 405 (3d Cir. 1997)............................................................................7

*SEI Glob. Servs., Inc. v. SS&C Advent*,
    496 F. Supp. 3d 883 (E.D. Pa. 2020), *aff'd*, 2022 WL 2356730 (3d Cir. June 30,
    2022) ............................................................................................................20

*Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*,
    638 F. Supp. 3d 430 (M.D. Pa. 2022), *aff'd*, 2023 WL 8866555 (3d Cir. Dec. 22,
    2023) ............................................................................................................16

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)..................................................................................7, 20

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)................................................................................12, 14

*United States v. Aluminum Co. of America*,
    148 F.2d 416 (2d Cir. 1945)..........................................................................18

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43, 58 (2d Cir. 2019)....................................................................8-9

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398, 407 (2004)..........................................................................11, 18

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)........................................................................6, 15

**Other Authorities**

Certree Letter to FTC (Sept. 27, 2022) ..........................................................3-4

Equifax Earnings Call Transcript (Apr. 18, 2024)................................................4

Press Release: Equifax Announces Acquisition of HIREtech (Mar. 9, 2021)................17

U.S. Dept. of Homeland Security, *What is E-Verify*............................................17

## INTRODUCTION

Through decades of investment, innovation, risk-taking, and relationship building, Equifax created a powerful platform for verification of income and employment information. Equifax's platform is widely used by employers and payroll companies that have income and employment data, and by lenders and others who need to verify information about those employees, for example in connection with a loan application. A process that traditionally required labor-intensive and time-consuming individual communications can now be handled in real time through Equifax's platform, which is known as "The Work Number."

Equifax's business model is relatively straightforward but requires constant investment and improvement. Employers and other holders of employment data ("Data Providers") make income and employment data available to the platform. This helps the Data Providers by allowing Equifax to automate and streamline the process of responding to verification requests without the Data Providers needing to be directly involved in each request. Data Providers may also earn a "revenue share" for each transaction matching their data to a verification request. Lenders and others seeking to verify income and employment information ("Verifiers"), for their part, can use the platform to verify information quickly and efficiently, paying a fee for each transaction.

Plaintiffs recognize the attractiveness of Equifax's platform. The Complaint acknowledges that Equifax's platform "nearly instantaneous[ly]" matches requests by lenders for consumer employment information with corresponding data from employers. Compl. ¶ 155 (D.I. 1). The Complaint acknowledges that the platform reduces the "time, effort, and cost" that lenders incur to verify information on loan applications. *Id.* And Plaintiffs acknowledge that Equifax's service also benefits Data Providers by saving them time and providing them with

1

revenue.  *Id.* ¶ 250.  Nevertheless, based on a word salad of antitrust jargon, isolated and out-of-context quotes, and allegations of "*de facto*" exclusive access to some employment data, Plaintiffs allege that Equifax has violated Sections 1 and 2 of the Sherman Act.

The Complaint falls far short of stating a claim.  To state a claim under the Sherman Act, a plaintiff must allege, among other things, that the defendant engaged in anticompetitive conduct *and* that this conduct caused harm to competition.  The Complaint does neither.

*First*, the Complaint does not plausibly allege harm to competition, which is critical to Plaintiffs' substantive antitrust claims and to their standing to pursue this action.  In fact, the Complaint alleges that Equifax's conduct provides substantial *benefits* to both Data Providers and Verifiers.  In a two-sided market like this, Plaintiffs have the burden of pleading and eventually proving that the overall effect of the alleged conduct, after considering both sides of the market, is to harm competition.  Plaintiffs plead themselves out of a case here by alleging clear and substantial benefits from Equifax's platform.  Plaintiffs' failure to allege overall harm to competition in the market they have described is fatal to their claims.

*Second*, the Complaint does not plausibly allege anticompetitive conduct.  Plaintiffs attack two types of purported conduct—exclusive contracts and acquisitions.  As to the first, Plaintiffs do not allege that exclusive contracts substantially foreclosed the relevant market to competitors, as required to support a Sherman Act claim.  In fact, the Complaint alleges that exclusive contracts cover a portion of the market *below* the minimum levels necessary to support an antitrust claim.  And, as to acquisitions, Plaintiffs do not articulate any cognizable theory that these constitute anticompetitive conduct.  These failures are independently fatal to Plaintiffs' claims.

Because the Complaint fails to allege facts plausibly supporting required elements of a Sherman Act claim, it should be dismissed in full.

## FACTUAL BACKGROUND

When a consumer applies to a lender for a mortgage, the lender will typically verify the consumer's employment and income information in evaluating the application.  Compl. ¶ 37. One way for a lender to verify this information is to call the consumer's employer directly.  *Id.* ¶ 2.  Another option is to contact a third-party service that can provide the information.  *Id.* Defendants Equifax Workforce Solutions LLC and Equifax, Inc. (together, "Equifax") offer a service called The Work Number, which is a platform that matches lenders seeking employment information with the employers who provide it.  *Id.* ¶ 3.  Following Equifax's lead, other companies—including Experian, Certree, and Argyle—have developed their own competing products for electronic employment and income verification services.  Ex. A, Certree Letter to FTC (Sept. 27, 2022) (quoted in Compl. ¶¶ 13, 77, 107, 140, 149, with references to "Equifax *and Experian*" elided to refer to Equifax only)[1]; Compl. ¶ 13 (discussing Certree and Argyle).

Named plaintiffs are two mortgage lenders who claim that they used Equifax's platform. Compl. ¶¶ 21–22.  In addition to lenders, other Verifiers including landlords, property managers, potential new employers, and companies performing background checks also use Equifax's platform to verify employment information.  *Id.* ¶ 37.  Verifiers find it convenient to obtain employment information through a third-party matching platform.  *Id.* ¶ 2.  And employers value

---

[1] Materials incorporated by reference in the Complaint may be considered by the Court on a motion to dismiss.  *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, [courts] may consider … any matters incorporated by reference or integral to the claim … .") (internal quotation marks omitted).  The Declaration of Alan B. Freedman attaches these materials as exhibits.

matching platforms, which help them handle incoming requests for verification more efficiently and with minimal burden.  *Id.* ¶¶ 7, 36.

Equifax invests substantial resources in building and improving its system for matching employer data to verification requests.  *Id.* ¶¶ 36, 155 (alleging that Equifax delivers "nearly instantaneous" and reliable matches).  As materials quoted in the Complaint explain, it can take significant work by Equifax to ingest employment and income history records and prepare them for matching.  *See* Ex. B, Equifax Earnings Call Transcript at 21 (Apr. 18, 2024) ("It's going to take us 2, 3, 4 months of very intense technology and data work in order to bring those records into our environment so then they can be normalized to be delivered in our TWN report.").  The Complaint alleges that some of Equifax's data came from four acquisitions in the last three years with the "ostensible purpose" to "enhance the quality of [Equifax's] product," because the addition of new data makes Equifax's range of services even more desirable for Verifiers.  Compl. ¶ 86, 92–95.

Equifax has contracts with some employers and payroll services used by employers to help match their data to incoming verification requests.  *Id.* ¶¶ 36, 52, 54.  When Equifax matches employment data to a Verifier's request, it often pays a "revenue share" to the Data Provider.  *Id.* ¶ 7.  The Complaint alleges that employers and payroll providers find it convenient to work with Equifax because Equifax has a large pool of Verifiers that use its service, which helps maximize their revenue.  *Id.* ¶¶ 62, 68, 78–79.  As materials relied upon in the Complaint show, other competitors like Experian use the same business model.  *See, e.g.*, Ex. A, Certree Letter to FTC.

The Complaint further alleges that, out of all of the employers in the United States, two supply employment data to Equifax on an exclusive basis.  Compl. ¶ 6.  The Complaint also

alleges that some of Equifax's contracts with payroll providers have provisions committing the provider "to supply payroll data exclusively to Equifax." *Id.* ¶¶ 6, 54–55. Notably, Plaintiffs do not allege that such provisions bind the employers, who remain free to provide the same data to anyone they wish.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As the Third Circuit has explained, this means that "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). To this end, a district court is "not compelled to accept unsupported conclusions and unwarranted inferences." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) (citation and internal quotation marks omitted) (affirming dismissal of antitrust case).

Plaintiffs bring claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. Section 1 of the Sherman Act prohibits agreements in restraint of trade, and Section 2 prohibits monopolization and attempted monopolization.

Sherman Act claims should be reviewed carefully at the pleading stage because antitrust litigation can itself "chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Unsupported claims can impose enormous burden if allowed to proceed to discovery. *Twombly*, 550 U.S. at 558–59; *see also, e.g.*, *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 512 (D.N.J. 2014) ("*Twombly*'s pleading standard was influenced by its practical consideration of whether to

allow an unfounded antitrust complaint to proceed at considerable cost to the courts and the parties"). As the Third Circuit has explained, in performing this important pleading-stage screening and determining whether the plaintiff has provided sufficient factual heft to make its claim plausible, a court should draw on "'judicial experience and common sense,' rather than follow an attenuated chain of assumptions." *Host Int'l*, 32 F.4th at 248 (quoting *Iqbal*, 556 U.S. at 679).

## ARGUMENT

To state a claim under Section 2 of the Sherman Act, a plaintiff must allege that the defendant (1) has monopoly power in a properly defined relevant market, (2) willfully acquired or maintained that power through exclusionary conduct, and (3) thereby caused antitrust injury to the plaintiff. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016) ("Eisai must show both that Sanofi engaged in anticompetitive conduct and that Eisai suffered antitrust injury as a result."). The same elements—anticompetitive conduct and antitrust injury—apply when the same claim is brought under Section 1 of the Sherman Act. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012). Here, Plaintiffs do not properly allege either antitrust injury or anticompetitive conduct, and each failure is independently fatal to their claims.

## I. Plaintiffs Fail to Allege Antitrust Injury

Plaintiffs allege that the relevant market is electronic verification of income and/or employment information ("Electronic VOIE Services"). Compl. ¶ 1. Plaintiffs do not clearly describe the scope of this purported market beyond pointing to a 2008 complaint by the Federal Trade Commission alleging that Electronic VOIE Services "includ[e], but are not limited to, the collection, maintenance, or dissemination of payroll data and other data relating to employment." Compl. ¶ 153. Plaintiffs then flatly assert that there has been "[n]o change" in computing or electronic services in the last 16 years that would affect the scope alleged by the FTC in 2008.

*Id.*  These allegations are threadbare and implausible, but the Court need not reach this issue in order to grant this Motion.[2]  Plaintiffs allege that Equifax provides Electronic VOIE Services by taking requests from Verifiers, matching each request nearly instantaneously with data from Data Providers, and then sharing the Verifier's payment with the Data Provider.  *Id.* ¶¶ 7, 36, 71.  Plaintiffs fail to allege harm to competition in this purported market.

> **A.    Antitrust injury requires harm to overall competition.**

To have standing to bring antitrust claims, a plaintiff must first properly allege and later prove antitrust injury, which is "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018) (noting antitrust standing requirement and affirming dismissal for failure to allege antitrust injury); *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417–18 (3d Cir. 1997) (affirming dismissal of antitrust complaint for failure to allege antitrust injury).  The antitrust laws were intended to prevent harm to competition.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (the antitrust laws are directed not "against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself").

Here, Plaintiffs allege that the relevant market is Electronic VOIE Services, which purportedly involves matching employment data from Data Providers on one side with Verifiers seeking that data on the other.  Compl. ¶¶ 1, 36.  This is what is known as a two-sided market. *Ohio v. American Express Co.*, 585 U.S. 529, 534–35 (2018) ("*Amex*").  As the Supreme Court

---

[2] While the Court need not reach either issue, Equifax denies both Plaintiffs' alleged market definition and allegations of monopoly power.  In addition, for purposes of this Motion Equifax describes the facts alleged in the Complaint but makes no concession as to their accuracy.

explained in *Amex*, "two-sided platforms often exhibit what economists call 'indirect network effects' … where the value of the two-sided platform to one group of participants depends on how many members of a different group participate." *Id.* at 535.  Plaintiffs allege exactly that: They assert that Verifiers value being able to verify more data through a single platform, and employers benefit from being able to reach more Verifiers.  Compl. ¶¶ 2, 155.

Plaintiffs further allege that, when a Verifier sends a request for verification, Equifax matches that request with employer data on the other side of the market in a "nearly instantaneous" transaction, providing a report to the Verifier and a revenue share to the Data Provider.  Compl. ¶ 155.  The Equifax platform thus "(1) offer[s] different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2d Cir. 2019).  And, as in *Amex*, Equifax allegedly "charge[s] one side much more than the other" and even "charg[es] the side with more elastic demand a below-cost (or even negative) price" by making a revenue sharing payment to the Data Provider.  *Amex*, 585 U.S. at 536; Compl. ¶ 7.

In a two-sided transaction market like the one alleged here, the Supreme Court has explained that identifying harm to competition necessarily requires taking into account effects on both sides of the claimed market.  *Amex*, 585 U.S. at 546 ("Evaluating both sides of a two-sided transaction platform is also necessary to accurately assess competition"); *see also Sabre*, 938 F.3d at 56 (analysis of a two-sided transaction platform "must *always* include both sides of the platform").  This is critical because an action may have very different effects on each side of the market.  For example, an action that raises prices to customers on one side of the market may lead to greater benefits to customers on the other side of the market.

8

Failure to grapple with the second side of the market to determine whether there was *net* harm to competition was the central failing the Court identified in *Amex*. There, the plaintiffs argued that American Express was increasing prices to merchants but, at the same time, providing greater rewards to consumers. Plaintiffs urged the Court to focus only on the higher prices to merchants, but the Court rejected this request, explaining that "focus[ing] on only one side of the two-sided [] market … misses the mark." *Amex*, 585 U.S. at 536, 547. Similarly, in *Sabre*, a travel-booking platform allegedly overcharged airlines, but offered substantial incentives to travel agents. 938 F.3d at 50. The Second Circuit in *Sabre*, like the Supreme Court in *Amex*, held that plaintiffs could not show harm to overall competition because they had failed to account for effects on the other side of the market. *Id.* at 59–60.

In sum, for a plaintiff challenging conduct in a two-sided transaction market to allege that overall competition suffered, as required for antitrust injury, the plaintiff *must* take into account purported competitive effects of the challenged action on both sides of the market. *Amex*, 585 U.S. at 548; *Coronavirus Rep. v. Apple, Inc.*, 2021 WL 5936910, at *14 (N.D. Cal. Nov. 30, 2021), *aff'd*, 85 F.4th 948 (9th Cir. 2023) ("Failure to allege injury that harmed overall competition in the relevant market—here, a two-sided market of transactions—undermines Plaintiffs' theory of antitrust injury.").

### B.    Plaintiffs do not allege net harm to competition here.

Plaintiffs offer some conclusory assertions about harm to competition, but this falls short. For example, Plaintiffs claim that Equifax harms competition by "rais[ing] rivals' costs" because Equifax shares revenue with Data Providers, thereby putting pressure on Equifax's competitors to do the same to compete. Compl. ¶ 83. But forcing a competitor to compete more aggressively is not *harm* to competition—it *is* competition. *Brunswick*, 429 U.S. at 487–88 (competitors

suffering "loss of income" due to increased competition is *not* harm to competition, and it would be "inimical" to the purposes of the antitrust laws to hold otherwise).

Plaintiffs and Equifax's competitors might prefer that Equifax offer data owners less money and compete less aggressively, but this is precisely the kind of purpose the Supreme Court has warned is *not* an appropriate use of the antitrust laws. *See, e.g.*, *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (it would be "perverse" to use antitrust law to "protect competitors from the loss of profits" caused by "any decision by a firm to cut prices in order to increase market share"). As the Supreme Court has repeatedly explained, "the antitrust laws were passed for the protection of *competition*, not *competitors*." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (internal quotation marks omitted). Equifax competing to win business might be frustrating to competitors, but it is not harm to competition.

Plaintiffs also allege that the conduct they challenge harmed competition because it caused Verifiers to pay higher prices. Compl. ¶¶ 55, 143. But Plaintiffs further allege that Verifiers received a higher-quality offering, allowing them quickly to verify a wider range of data. *See id.* ¶¶ 27, 112–13, 136–37. And Plaintiffs allege no harm, and in fact multiple benefits, to Data Providers: Plaintiffs say that Equifax helps data owners resolve incoming requests for verification and receive higher revenue with less burden. *Id.* ¶¶ 7, 36. Plaintiffs further allege that these benefits have increased over time, as revenue sharing has grown and burden on employers has been further reduced. *Id.* ¶ 78; *see also id.* ¶¶ 36, 100–01. "[F]ail[ing] to grapple with the second side of the transaction market" by definition means that Plaintiffs have failed to allege conduct that "harmed overall competition in the relevant market." *Coronavirus Rep.*, 2021 WL 5936910, at *14.

Because Plaintiffs fail to allege net harm to competition, they have not alleged antitrust injury.  Plaintiffs lack standing to bring these claims, and their Complaint should be dismissed.

## II.  Plaintiffs Fail to Allege Anticompetitive Conduct

The Complaint should be dismissed for an independent reason:  It fails to allege anticompetitive conduct.  Put simply, "[a]nticompetitive conduct is the hallmark of an antitrust claim."  *Phila. Taxi*, 886 F.3d at 338.  As the Supreme Court has explained:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts "business acumen" in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*.

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original).

Here, Plaintiffs attack two types of alleged conduct: allegedly exclusive contracts and prior acquisitions.  The allegations in the Complaint, however, are insufficient to support either type of conduct as anticompetitive.  As discussed below, Plaintiffs attack this same conduct using five different labels, but no label changes the conclusion:  Because Plaintiffs have not plausibly alleged anticompetitive conduct, their claims should be dismissed.

### A.    Plaintiffs' allegations of exclusive contracts do not support a Section 2 claim.

In Count 1 of their Complaint, Plaintiffs assert that Equifax has exclusive contracts with certain data suppliers, and that these contracts violate Section 2 of the Sherman Act.  Compl. ¶¶ 186–98.  As a threshold matter, exclusive contracts are generally procompetitive:  Exclusive contracts generally "pose very little threat to competition even when utilized by a monopolist."  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959,

983 (10th Cir. 2022); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57,

83 (3d Cir. 2010); *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 110 (2d Cir. 2002).

      Simply alleging that a successful supplier like Equifax uses exclusive contracts is a far

cry from stating a claim for monopolization. To hold otherwise would be to deprive suppliers of

the option to generate revenue by offering to sell exclusively to the highest bidder if they wish.

In some cases, the use of exclusive contracts can state a claim under Section 2, but there are

important conditions that a plaintiff must allege to support such a claim, which Plaintiffs do not

allege here. Among other things, a plaintiff challenging exclusive contracts must allege that the

exclusivity provisions at issue result in foreclosure of a "substantial share of the relevant

market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). Courts in this

circuit and elsewhere have generally required a plaintiff to show that at least 40% of the market

is foreclosed by exclusive contracts as a minimum threshold for a finding of "substantial

foreclosure." *Eisai*, 821 F.3d at 404 n.31 (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th

Cir. 2015)). In addition, even where exclusive contracts cover a substantial portion of the

market, this alone is insufficient. Courts also consider other factors about the purported

exclusive contracts, including whether the contracts are alleged to be long term and difficult to

terminate. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 507

F. Supp. 3d 1289, 1353–54 (D. Kan. 2020) (applying Third Circuit law). Here, Plaintiffs' factual

allegations as to exclusive contracts fail to state a claim for anticompetitive conduct for multiple

reasons.

      ***First***, **Plaintiffs do not clearly allege what universe is supposedly subject to**

**exclusivity and why this forecloses competitors from competing in the alleged market**. As

noted, in this Circuit an exclusive dealing claim must allege that exclusivity provisions

substantially foreclose the relevant market, which generally requires competitors being locked out of dealing with at least 40% of customers. *Eisai*, 821 F.3d at 404 n.31. Plaintiffs here recite a 40% allegation in their Complaint, but do not say that this is a share of Verifiers bound by exclusive contracts. Indeed, Plaintiffs do not allege *any* exclusive contracts between Equifax and Verifiers. Instead, Plaintiffs seem to be focused on the Data Provider side of the market: They allege that "on information and belief" Equifax is the only competitor receiving around 40% of "payroll records." Compl. ¶¶ 54, 56. Plaintiffs do not articulate what exactly "payroll records" entail, how many "payroll records" a competitor needs to compete, or why competitors cannot obtain enough "payroll records." Elsewhere in the Complaint Plaintiffs throw out various other numbers, for example alleging that Equifax has "access" to "75% of US non-farm payroll records." *Id.* ¶ 72. Again, Plaintiffs do not explain why any of this is necessary to compete in the alleged Electronic VOIE Services market.[3] Plaintiffs do not allege that Equifax has data to fulfill any specified percentage of requests for Electronic VOIE Services, much less that Equifax has that data by way of exclusive contracts. Before proceeding with a massive fishing expedition based on purported exclusive contracts, Plaintiffs must allege that the contracts being challenged substantially foreclose competitors from the relevant market.

**Second**, **the Complaint acknowledges that the same data is available from multiple sources, so an "exclusive" contract with a Data Provider does not convey exclusive access to the data.** Plaintiffs allege that, out of all of the employers in the United States, only two supply employment data to Equifax on an exclusive basis. Compl. ¶ 6. The Complaint does allege that

---

[3] Plaintiffs also fail to allege access or lack thereof to other data that would seem to be at issue in their vaguely defined "Electronic VOIE Services" market—for example, access to data regarding self-employed individuals, individuals who receive income from non-W-2 sources, and individuals who are employed by a government entity.

some of Equifax's contracts with payroll providers have provisions committing the provider "to supply payroll data exclusively to Equifax." *Id.* ¶¶ 6, 54–55. But the Complaint acknowledges that these payroll services companies receive the employment data at issue *from employers*. *See, e.g.*, *id.* ¶ 54 (alleging that payroll software providers receive "vast quantities of payroll data" from employers). That is, payroll providers have data only because employers send the data to them for processing, and the same data thus exists in multiple places. *Id.* Accordingly, as the face of the Complaint shows, an exclusive contract with a payroll provider does not convey exclusive control over the data, which remains available from at least the employer. Plaintiffs have not alleged the type of exclusivity that is even potentially of concern under the antitrust laws. *See, e.g., Tampa Elec.*, 365 U.S. at 327–28 ("In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.").

**Third**, Plaintiffs admit that they are challenging **nonexclusive** contracts where the **Data Provider is just not actively selling to others beyond Equifax.** Plaintiffs allege that 40% is the share of data as to which Equifax has "*de facto*"—not contractual—exclusivity. Compl. ¶ 51 (alleging "*de facto*" exclusivity), ¶ 56 (alleging that Equifax is the only competitor receiving more than 40% of payroll records). Plaintiffs say the contracts at issue are "either expressly or *de facto* exclusive." *Id.* ¶ 51. That is, the data that Plaintiffs call "exclusive" comes from Data Providers that have an exclusive contract with Equifax *and* from ones that have simply chosen not to sell to anyone else. But there is an important difference between these two groups. If a Data Provider chooses to sell to Equifax only, but is under no requirement to do so, then there is no exclusive dealing to be challenged. *Cf. ZF Meritor*, 696 F.3d at 282–84 (finding exclusive

dealing where the contracts at issue, the so-called Long Term Agreements, required purchase of 90% of requirements from defendant).  "[I]n the absence of any exclusive requirements on which [pricing] is conditioned, the sale remains nonexclusive."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).

Plaintiffs complain that many Data Providers have made a "*de facto*" choice to work with Equifax only, but that is Data Providers' choice to make, and competitors are left needing to compete aggressively to persuade Data Providers (or other holders of the data) to provide the same data to them as well or instead.  "Competition is at the heart of the antitrust laws."  *Phila. Taxi*, 886 F.3d at 338; *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1360 (Fed Cir. 1999) ("[T]he purpose of the antitrust laws is to foster competition in the public interest, not to protect others from competition, in their private interest.").  Plaintiffs' reliance on nonexclusive arrangements is fatal to their claims.

**Fourth**, **Plaintiffs do not allege that the contracts at issue have other elements supporting foreclosure**.  Even if employment data were available from only one source, and even if Plaintiffs had alleged exclusive contracts with these data sources, and even if Plaintiffs had explained why this forecloses competitors from competing in the alleged Electronic VOIE Services market, all of this would still be a static snapshot.  Plaintiffs do not explain why Equifax's competitors are unable to pitch Data Providers to switch partners, either by terminating, revising, or not renewing their contracts. *See, e.g.*, *In re EpiPen*, 507 F. Supp. 3d at 1353 (applying Third Circuit law and noting that, when evaluating alleged foreclosure, a court must consider not just the fact of exclusive contracts but also whether those contracts are coming up for renewal over a reasonable time horizon, or whether they might be readily terminable);

15

*Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (no foreclosure where three-year contracts could be cancelled on six months' notice).

In sum, the allegation that Equifax has won partnerships with many Data Providers is not the same thing as alleging that competition has been substantially foreclosed. *See Aerotec*, 836 F.3d at 1181 (market share insufficient to show foreclosure); *Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, 638 F. Supp. 3d 430, 440 (M.D. Pa. 2022), *aff'd*, 2023 WL 8866555 (3d Cir. Dec. 22, 2023) (dismissing complaint because allegation of market share is not "sufficient factual content that would allow the court to draw the reasonable inference that there was substantial foreclosure"). Plaintiffs' formulaic assertion that Equifax's competitors were foreclosed by *de facto* exclusive sales is not sufficient to state an antitrust claim. *Twombly*, 550 U.S. at 555.

### B. Adding allegations of prior acquisitions still does not support a Section 2 claim.

Next, Plaintiffs take their insufficient exclusive dealing allegations and try to save them by adding allegations that Equifax made four acquisitions of other companies and suggesting that, combined, these add up to a Sherman Act Section 2 violation. Compl. ¶¶ 199–211 (Count Two). This does not follow.

Plaintiffs allege that Equifax monopolized the "Electronic VOIE Services" market. But three of the four acquired companies do not provide VOIE services. According to the Complaint:

- Appriss Insights was "a provider of comprehensive risk and *criminal justice intelligence products* and solutions." Compl. ¶ 94 (emphasis added). By acquiring Appriss, Equifax acquired criminal justice data. *Id.*

- HIREtech was a "technology-focused human capital management and employer tax incentive firm."*Id.* ¶ 92.  The press release quoted in the Complaint explains that Equifax acquired HIREtech "to help support the HR and Payroll industry with more automated and better data-driven services that help simplify complex, manual HR tasks."  Ex. C, Press Release: Equifax Announces Acquisition of HIREtech (Mar. 9, 2021).  Plaintiffs do not allege that HIREtech allowed Equifax to acquire more income and employment verification data.

- Efficient Hire "offered 'E-Verify' software," Compl. ¶ 95, which confirms employees' eligibility to work in the United States.  Plaintiffs do not explain the connection between E-Verify software and their claims that Equifax has supposedly blocked competitors from accessing income and employment data.[4]

The fourth acquired company, i2Verify, is alleged to be "an income and employment verification provider … with a concentration in the healthcare and education sectors."  Compl. ¶ 93.  This is the *only* fact that Plaintiffs allege about this acquisition.  If acquiring a company that could be described as a competitor were sufficient to state a claim for monopolization, courts would be inundated with private plaintiffs seeking to cash in on every acquisition.  With no allegations of how Equifax's acquisition of i2Verify *excluded competition*, this tacked-on allegation of a prior acquisition does nothing to save Plaintiffs' deficient exclusive dealing claim.

---

[4] While it is not necessary to do so, the Court may take judicial notice of the fact that E-Verify is a federal program managed by the United States Citizenship and Immigration Services requiring employers to confirm new employees' eligibility to work in the United States.  *See* Ex. D, U.S. Dept. of Homeland Security, *What is E-Verify*, https://www.e-verify.gov/about-e-verify/what-is-e-verify; *see also Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 600 & n.3 (3d Cir. 2000) ("Under Federal Rule of Evidence 201, we may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.").

In fact, the Complaint alleges the precise opposite of harm from the four acquisitions: It alleges that these acquisitions improved Equifax's offerings by adding services and data complementary to The Work Number's VOIE services. Compl. ¶¶ 92–95. Plaintiffs allege that each acquisition brought new capabilities that improved the value Equifax provided to customers outside of the Electronic VOIE Services market that Plaintiffs have defined. *See, e.g., id.* ¶ 94 (acquisition of Appriss Insights "broadened the Equifax suite of complementary verification capabilities" with "criminal justice and incarceration data"). Winning business by improving quality is not anticompetitive. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997); *Trinko,* 540 U.S. at 407 (anticompetitive conduct does not include winning sales through superior business acumen and innovation); *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

### C.   Relabeling the same alleged exclusive contracts as a "conspiracy to monopolize" also fails.

Next, Plaintiffs take the same purported exclusive dealing claims and relabel them as a "conspiracy to monopolize." Compl. ¶¶ 212–26 (Count Three). This is simply a repackaging of Plaintiffs' same claim under yet another label. Courts have repeatedly rejected similar attempts by plaintiffs to disguise faulty antitrust claims as "conspiracies to monopolize." For example, in *NYNEX Corp. v. Discon, Inc*., 525 U.S. 128 (1998), the Supreme Court explained that the plaintiff could not proceed on its conspiracy to monopolize claim after having failed to state a claim under Section 1 of the Sherman Act. *Id.* at 139; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 211–12 (4th Cir. 2002) (holding that the same flaws in Section 1 claims rendered Section 2 conspiracy to monopolize claim implausible); *Credit Chequers Info. Servs., Inc. v. CBA, Inc.*, 1999 WL 253600, at *12 (S.D.N.Y. Apr. 29, 1999), *aff'd*, 205 F.3d 1322 (2d Cir.

2000) (dismissing conspiracy to monopolize claim for same reasons as monopolization claim).

Similarly, in cases initially brought under Section 2 of the Sherman Act, courts have rejected

attempts to disguise faulty claims as "conspiracies to monopolize."  *See, e.g.*, *Levitch v.*

*Columbia Broad. Sys., Inc.*, 495 F. Supp. 649, 673 (S.D.N.Y. 1980), *aff'd*, 697 F.2d 495 (2d Cir.

1983) ("[W]hen stripped of the bald charge of conspiracy, [the] charge amounts to nothing more

than a reassertion of plaintiffs' [unilateral] monopolization claims.").

That is precisely the case here:  Plaintiffs simply take their insufficient exclusive dealing

claims and reassert them with a bald charge of conspiracy tacked on.  Plaintiffs do not—and

cannot—allege a "hub and spoke" conspiracy in which Data Providers agreed with one another

that they will all work with Equifax.  Instead, Plaintiffs simply allege normal supply contracts

between particular Data Providers and Equifax.  That is, Plaintiffs allege a set of "spokes" with

no "rim."  Without allegations of an agreement among the Data Providers, Plaintiffs have not

properly alleged a conspiracy claim.  *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602

F.3d 237, 255–56 (3d Cir. 2010) (dismissing "conspiracy to monopolize" claim for lack of a

"rim" connecting the spokes and noting "simply because each Dealer, on its own, might have

been economically motivated to [support Defendant] does not give rise to a plausible inference

of an agreement among the Dealers themselves.").

### D.    Plaintiffs cannot save their claims by relabeling them.

Plaintiffs make two last-ditch attempts to take the same conduct and relabel it in an effort

to avoid dismissal.  First, Plaintiffs take the *de facto* exclusive data purchases plus the four

acquisitions and try to relabel them as an *attempt* to monopolize in violation of Section 2 of the

Sherman Act, Compl. ¶¶ 227–41 (Count Four).  Second, Plaintiffs try to relabel the purported

exclusive data purchases as a violation of *Section 1* of the Sherman Act.  *Id.* ¶¶ 242–55 (Count

Five).  Both efforts fail.

In an attempted monopolization claim, rather than showing that the defendant already has monopoly power, the plaintiff must show that the defendant has a "dangerous probability" of attaining monopoly power. *Spectrum Sports*, 506 U.S. at 456. But the other two elements of the Section 2 claim that are the subject of this motion—anticompetitive conduct and antitrust injury—remain exactly the same in an attempted monopolization claim. *See, e.g.*, *Phila. Taxi*, 886 F.3d at 338 ("An allegation of anticompetitive conduct is necessary both to: (1) state a claim for attempted monopolization; and (2) aver that a private plaintiff has suffered an antitrust injury."); *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 902 (E.D. Pa. 2020), *aff'd*, 2022 WL 2356730 (3d Cir. June 30, 2022) (granting motion to dismiss attempted monopolization claim where plaintiff failed to plead antitrust injury); *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1172 (10th Cir. 2021) (monopolization and attempted monopolization have "sufficient overlap that anticompetitive conduct under either claim can be evaluated together"). Because Plaintiffs have not properly alleged antitrust injury or anticompetitive conduct, relabeling the same conduct as "attempted monopolization" rather than "monopolization" does nothing to save the claim.

Finally, Plaintiffs take the alleged exclusive data purchases and relabel them as a violation of Section 1 of the Sherman Act rather than Section 2 of the Sherman Act. Again, the relabeling does nothing to save the deficient claim: An exclusive dealing claim is analyzed in the same way whether it is brought under Section 1 or Section 2 of the Sherman Act. *See, e.g.*, *Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *33 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016) (essence of exclusive dealing is the same under Sections 1 and 2 of the Sherman Act). This count therefore fails for the reasons noted in Part II.A above.

20

**CONCLUSION**

For the forgoing reasons, Equifax respectfully requests that the Complaint be dismissed in its entirety.

Dated:  August 9, 2024

Respectfully Submitted,

*/s/ Leah Brannon*
Leah Brannon (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Alan B. Freedman (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974 1500
lbrannon@cgsh.com
dgelfand@cgsh.com
afreedman@cgsh.com


Christopher H. Casey (50625)
Joseph R. Welsh (329626)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979 1000
chcasey@duanemorris.com
jrwelsh@duanemorris.com

*Counsel for Defendants
Equifax Workforce Solutions LLC
and Equifax Inc.*

22