**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREYSTONE MORTGAGE, INC., and FIRST FINANCIAL LENDING LLC, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>EQUIFAX WORKFORCE SOLUTIONS LLC and EQUIFAX, INC.,<br><br>Defendants. | Case No. 2:24-cv-02260-JFM |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

ARGUMENT ................................................................................................................................. 1

I.  Plaintiffs Have Not Alleged Antitrust Injury ...................................................................... 1

   A.  The Complaint Alleges a Two-Sided Transaction Market as Defined by Controlling Law
   ……………………………………………………………………………………………..2

   B.  Plaintiffs' Alternative Definition of Two-Sided Transaction Markets Does Not Save the Complaint ..................................................................................................................... 4

II. Plaintiffs Fail to Allege Anticompetitive Conduct ............................................................. 5

   A.  Plaintiffs Fail to Properly Allege Exclusive Dealing ............................................................ 5

   B.  Plaintiffs' Allegations Regarding Acquisitions Do Not State a Claim ............................... 8

   C.  Plaintiffs' Conspiracy Theory Fails to State a Claim ......................................................... 9

   D.  Plaintiffs' Attempted Monopolization Claim Fails for the Same Reasons ....................... 10

CONCLUSION ............................................................................................................................ 10

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                              **Page(s)**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ...................................................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................................6

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*,
   49 F. Supp. 2d 750 (D.N.J. 1999) ..............................................................................................9

*CarePoint Health Sys. Inc. v. RWJ Barnabas Health, Inc.*,
   2023 WL 7986429 (D.N.J. Nov. 17, 2023) ................................................................................9

*City of Groton v. Conn. Light & Power Co.*,
   662 F.2d 921 (2d Cir. 1981).......................................................................................................9

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)....................................................................................................................9

*Coronavirus Rep. v. Apple Inc.*,
   2021 WL 5936910 (N.D. Cal. 2021), *aff'd*, 85 F.4th 948 (9th Cir. 2023).................................5

*Dreibelbis v. Scholton*,
   274 F. App'x 183 (3d Cir. 2008) ...............................................................................................8

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
   111 F.4th 337 (4th Cir. 2024) ....................................................................................................9

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
   826 F. Supp. 2d 705 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012).........................9

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016).......................................................................................................7

*FTC v. Vyera Pharms., LLC*,
   479 F. Supp. 3d 31 (S.D.N.Y. 2020)..........................................................................................8

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
 602 F.3d 237 (3d Cir. 2010)..................................................................................................10

*In re Delta Dental Antitrust Litigation*,
 484 F. Supp. 3d 627 (N.D. Ill. 2020) ........................................................................................3

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010)....................................................................................................10

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
 2024 WL 2861865 (D.N.J. June 6, 2024) ................................................................................8

*Insight Equity A.P. X, LP v. Transitions Optical, Inc.*,
 2016 WL 3610155 (D. Del. July 1, 2016) ...............................................................................6

*Interstate Cir., Inc. v. United States*,
 306 U.S. 208 (1939)..................................................................................................................9

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)......................................................................................................6

*Nuance Commc'ns, Inc. v. Omilia Nat. Language Sols., Ltd.*,
 2020 WL 2198362 (D. Mass. May 6, 2020) ............................................................................8

*Ohio v. Am. Express Co.*,
 585 U.S. 529 (2018) ............................................................................................................ 2-5

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
 32 F.4th 824, 839 (9th Cir. 2022) .............................................................................................5

*SC Innovations, Inc. v. Uber Techs., Inc.*,
 2020 WL 2097611 (N.D. Cal. May 1, 2020) ...........................................................................5

*Tampa Elec. Co. v. Nashville Coal Co.*,
 365 U.S. 320 (1961)..................................................................................................................5

*United States v. Am. Express Co.*,
 88 F. Supp. 3d 143 (E.D.N.Y. 2015) ........................................................................................3

*United States v. Dentsply Int'l, Inc.*,
 399 F.3d 181 (3d Cir. 2005)......................................................................................................6

*US Airways, Inc. v. Sabre Holdings Corp.*,
   105 F. Supp. 3d 265 (S.D.N.Y. 2015)...................................................................................3

*US Airways v. Sabre Holdings Corp.*,
   938 F.3d 43 (2019)..............................................................................................................2, 5

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)............................................................................................. 6-7

Plaintiffs' response brief, like their Complaint, fails to articulate two elements required to state an antitrust claim: (1) antitrust injury in a properly defined relevant market, and (2) anticompetitive conduct. Mot. at 7, ECF No. 36-1.

## ARGUMENT

**I.     Plaintiffs Have Not Alleged Antitrust Injury**

Plaintiffs acknowledge that, to state an antitrust claim in a two-sided transaction market, a complaint must allege harm to the market "as a whole" taking into account both sides of the platform. Opp. at 18, ECF No. 40; *see also* Mot. at 2. And Plaintiffs do not deny that they cannot satisfy this test: they allege that Verifiers supposedly paid "overcharges" to Equifax to receive employment data, but they also allege that Data Providers on the other side of the platform who supply that data affirmatively *benefit*, so Plaintiffs have not claimed overall net harm in the alleged market. Compl. ¶ 7; *see also* Opp. at 17.

Recognizing that they have not alleged antitrust injury in a two-sided transaction market, Plaintiffs try to avoid the test entirely. First, Plaintiffs argue that the Supreme Court's framework for two-sided markets should apply to a "vanishingly small" universe of conduct. Opp. at 2. But Plaintiffs cannot essentially tell this Court to ignore recent Supreme Court precedent. Second, Plaintiffs cobble together a different definition of a two-sided transaction market and suggest that the market they have alleged does not qualify. Opp. at 19. But whether analyzed under the Supreme Court's test or Plaintiffs' version, the factual allegations in the Complaint show that this is a two-sided transaction market. And Plaintiffs do not deny that, in such a market, they have failed to allege antitrust injury as required to state a claim.

      **A.**      **The Complaint Alleges a Two-Sided Transaction Market as Defined by Controlling Law**

Under the Supreme Court's decision in *Amex*, a two-sided transaction platform is one that "(1) offer[s] different products or services, (2) to different groups of customers, (3) whom the 'platform' connects, (4) in simultaneous transactions." *US Airways v. Sabre Holdings Corp.*, 938 F.3d 43, 58 (2019) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 566 (2018) ("*Amex*") (Breyer, J., dissenting)); *see also* Mot. at 8. Plaintiffs do not deny that the market they have alleged has at least three of these four elements, including: (1) different products; (2) different groups of customers; and (3) a platform that connects the two sides. The only element that Plaintiffs attempt to dispute is simultaneity. *See* Opp. at 20. This element means that businesses "cannot make a sale unless both sides of the platform simultaneously agree to use their services." *Amex*, 585 U.S. at 545. And the Complaint alleges this element directly: just like a credit card company, Equifax cannot sell verification services unless a Data Provider and a Verifier both agree to transact through the platform. Compl. ¶¶ 7, 75, 155–56. When a Verifier requests employment data, Equifax needs to provide data from a Data Provider. Compl. ¶¶ 7, 75. In the days before Equifax began offering The Work Number service to handle these transactions, Verifiers would call employers directly to get this information. Compl. ¶ 2. Now, however, a Verifier can simply send a request for verification to Equifax, which can match the request with data from a Data Provider in a "nearly instantaneous" transaction. Compl. ¶ 155.

      Plaintiffs argue that when they alleged a "nearly instantaneous" transaction, they were just focusing on the transaction part, and Equifax also puts in a lot of work up front to collect and format data from Data Providers to be ready to handle incoming requests. Opp. at 20-21. But this kind of onboarding and preparation occurs in any two-sided transaction market and has nothing to do with simultaneity *of the transaction*. For example, in *Amex,* providers like

2

American Express needed to sign up merchants to terms, provide point-of-sale technology, and collect banking information so that the merchants were ready to engage in simultaneous transactions later. *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 156 (E.D.N.Y. 2015). In fact, American Express needed to "continually invest" to ensure that its platform was ready for use when its customers needed it. *Amex*, 585 U.S. at 539. And, in the case of another two-sided transaction platform, the travel distribution system Sabre obtained data from airlines in advance so that *later* it could match up a traveler with a trip and facilitate a simultaneous transaction. *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 273 (S.D.N.Y. 2015). In short, Plaintiffs' attempted distinction is no distinction at all.

Finally, Plaintiffs argue that employment verification transactions are actually more like dental insurance than credit card transactions. Opp. at 20. Specifically, Plaintiffs cite *In re Delta Dental Antitrust Litigation*, 484 F. Supp. 3d 627, 637 (N.D. Ill. 2020), in which the district court distinguished insurance from a simultaneous transaction like a credit card sale because, among other things, one side of the dental insurance market (patients) pays fixed premiums at regular intervals, while the other side (dentists) is paid based on care provided. According to Plaintiffs' Complaint, however, an income verification transaction lines up neatly with a credit card transaction: in both, a customer pays a fee on a transaction, and a counterparty on the other side receives a payment as a result of that transaction. *See* Compl. ¶ 216 ("[R]evenue shares,' *i.e.*, a payment to a Data Contributor of a portion of the fee that Equifax receives for a VOIE request for a particular individual, whose data the Data Contributor sent to Equifax for addition to the TWN database"). The market Plaintiffs allege fits the definition of a two-sided transaction market articulated by the Supreme Court in *Amex*.

3

### B. Plaintiffs' Alternative Definition of Two-Sided Transaction Markets Does Not Save the Complaint

Next, Plaintiffs try to evade *Amex* by offering their own alternative description of two-sided platforms. According to Plaintiffs, a two-sided transaction market requires: (1) a simultaneous transaction, (2) where each side is jointly consuming a single product, and (3) there are "pronounced indirect network effects and interconnected pricing and demand." Opp. at 19. Plaintiffs then cite *Amex* specifically explaining the credit card market. *See Amex*, 585 U.S. at 545 (citing academic literature explaining how credit card transactions work).

Plaintiffs may not craft their own test to replace the one articulated by the Supreme Court. But even Plaintiffs' test is satisfied based on the allegations in the Complaint. Plaintiffs argue that Verifiers and Data Providers do not "jointly consume a single product" because Data Providers send Equifax more data than any individual Verifier needs. Opp. at 21. Again, this is no distinction: a point-of-sale terminal could process a transaction for any item in a merchant's store, and an airline booking system scrapes all available routes so that it can match a consumer to any flight. But, when it comes time to execute a particular transaction, the platform executes a particular match—a consumer buying an item for a particular amount, a traveler booking a particular flight, or a Verifier receiving data on a particular employee.

Next, Plaintiffs argue that The Work Number does not exhibit indirect network effects, Opp. at 22-23, which exist where the value of the platform "to one group of participants depends on how many members of a different group participate," *Amex*, 585 U.S. at 535. But the Complaint pleads the opposite: it alleges that Data Providers work with Equifax because of its large network of Verifiers, and Verifiers work with Equifax because of its large network of Data Providers. Compl. ¶¶ 78-80, 100. This is a textbook allegation of network effects. Indeed, Plaintiffs cannot keep their new argument straight even in their brief. Although they argue there

4

are no network effects in this business, Plaintiffs also argue the opposite, asserting that "scale and scope" of data are "essential to offering a viable electronic VOIE service" because larger scale makes Verifiers more interested in the service. Opp. at 2.

Plaintiffs' efforts to recharacterize the two-sided transaction market they alleged are unavailing. As the Supreme Court has explained, antitrust injury in a two-sided transaction market requires harm to the market as a whole, including both sides of the platform. *Amex*, 585 U.S. at 544 ("Price increases on one side of the platform ... do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services."); *see also Sabre*, 938 F.3d at 59 (similar); *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *14 (N.D. Cal. 2021) (dismissing complaint because "in a two-sided transaction market, there must be consideration of the 'effects on both sides of the market'"), *aff'd*, 85 F.4th 948 (9th Cir. 2023). Unlike the cases they rely on, Plaintiffs here allege only *benefits* to Equifax's Data Providers. *See SC Innovations, Inc. v. Uber Techs., Inc.*, 2020 WL 2097611, at *9 (N.D. Cal. May 1, 2020) (plaintiff "addressed both sides of the market" by alleging that Uber harmed both riders and drivers); *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022) (after rejecting plaintiff's argument that *Amex* does not apply on a motion to dismiss, finding that plaintiff alleged injury to "*both* sellers' agents *and* buyers' agents"). Plaintiffs do not deny that in a two-sided transaction market they have failed to state a claim because they have not alleged injury to the market as a whole. Opp. at 18, 22-24 & n.18.

## II. Plaintiffs Fail to Allege Anticompetitive Conduct

### A. Plaintiffs Fail to Properly Allege Exclusive Dealing

Plaintiffs claim that Equifax engaged in exclusive dealing, but the Complaint does not properly allege that Equifax used exclusive contracts that foreclosed a "substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). In their

opposition, Plaintiffs argue that contracts without express exclusivity can potentially be "de facto exclusive," and they point to their own use of the "de facto exclusive" label in their complaint. Opp. at 10. But offering a label is not the factual heft required to support a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Plaintiffs must plead sufficient facts about *these contracts* for the Court to be "satisfied that specific features of the agreement required exclusivity." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016). Plaintiffs fail to do so here, and this is fatal to their claim.

The only allegation Plaintiffs identify in support of their "de facto exclusivity" label is that Equifax offers Data Providers revenue shares, which Plaintiffs vilify as "kickbacks." Opp. at 11, 16. But Plaintiffs *do not allege* that Equifax conditioned revenue shares on anything other than a single completed verification request. By contrast, all of the cases that Plaintiffs cite involve allegations that a defendant structured its pricing or sales to penalize customers for working with competitors:

- In *ZF Meritor, LLC v. Eaton Corp.*, the contracts at issue were of "unprecedented length" and, among other things, provided that, if a customer did not purchase at least 85% of its requirements from the defendant, the customer was forced to repay "all contractual savings" and rebates it had received. 696 F.3d 254, 265 & n.8, 287 (3d Cir. 2012).

- In *LePage's Inc. v. 3M*, the defendant offered "all-or-nothing" rebates across six products that caused customers to be "severely penalized financially for failing to meet their quota in a single product line." 324 F.3d 141, 154, 158-59 (3d Cir. 2003). These and other terms collectively led customers to feel forced to "deal[] exclusively" with the defendant. *Id.*

- In *United States v. Dentsply Int'l, Inc.*, the defendant repeatedly threatened to "sever access" for customers who purchased anything from the defendant's competitors. 399 F.3d 181, 190 (3d Cir. 2005).

- In *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, the contracts required customers to make the defendant their "preferred" supplier as a condition for receiving any financial incentives, and the defendant "strictly policed" its customers' engagement with competitors. 2016 WL 3610155 at *6-7 (D. Del. July 1, 2016).

6

Not one of these facts is alleged here. The Complaint alleges only that Equifax compensates Data Providers for data: it does not allege that Equifax imposes penalties on Data Providers that share data with competing verification services. *Cf. Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 406-07 (3d Cir. 2016) (distinguishing *ZF Meritor*, *LePage's*, and *Dentsply* because "customers did not risk penalties or supply shortages for … violating [the contract's] terms").

As noted in Equifax's opening brief, Plaintiffs' exclusive dealing claims fail for an additional, independent reason: the contracts are not simply nonexclusive as to the Data Providers, they are also *not exclusive as to the data*. The same employment data typically resides in several places, including with the employer and the employer's payroll processor. *See, e.g.*, Compl. ¶ 54; *see also* Mot. at 14. Plaintiffs argue that it is impractical for a *Verifier* to acquire data directly from employers. Opp. at 10. But this misses the point: Plaintiffs' claim is that Equifax's contracts exclude its *competitors* from accessing data to create a competing verification service. Plaintiffs do not and cannot seriously allege that *verification services* are unable to acquire data from employers. *See* Mot. at 13. In fact, they argue the opposite. Opp. at 3 ("Equifax adds to the TWN database by pulling in data from the Data Contributors (payroll software providers, *large employers and small employers*….") (emphasis added)).

Instead, Plaintiffs focus on whether they must "allege a specific foreclosure percentage." Opp. at 7-8. But their own cases confirm that they have skipped a critical step: they have not alleged foreclosure because they have not alleged exclusivity. *See, e.g.*, *ZF Meritor*, 696 F.3d at 282 ("A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing."). Plaintiffs have not offered allegations that Equifax's contracts substantially foreclose competing verification services from the alleged market. Plaintiffs say that courts consider the effect of automatic renewal provisions and other factors to evaluate exclusive

7

dealing claims, *see* Opp. at 12, but those cases involve renewals *of exclusive contracts*. *See FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 48 & n.9 (S.D.N.Y. 2020) (describing "exclusive supply agreements"). Plaintiffs' failure to allege exclusivity is dispositive.

### B. Plaintiffs' Allegations Regarding Acquisitions Do Not State a Claim

Plaintiffs allege that Equifax acquired four companies over the years, but Plaintiffs acknowledge that this does not state a Sherman Act claim. Opp. at 16 ("Plaintiffs do not allege that the acquisitions noted in the Complaint 'add up to a Sherman Act Section 2 violation' by themselves."). The Complaint establishes that three of these acquisitions were unrelated to the alleged Electronic VOIE services market, and the fourth is not alleged to have had any effect on competition. Mot. at 16-18. Plaintiffs *do not dispute these points* and have waived any opportunity to do so. *See Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008) (party's failure to oppose an argument raised in a motion to dismiss constitutes waiver). Plaintiffs' lack of any argument to explain their theory of how the acquisitions are relevant distinguishes the cases they cite. *See* Opp. at 15-16. In those cases, the plaintiffs offered specific allegations that connected challenged acquisitions to anticompetitive effects. *See, e.g.*, *Nuance Commc'ns, Inc. v. Omilia Nat. Language Sols., Ltd.*, 2020 WL 2198362, at *4 (D. Mass. May 6, 2020).

Plaintiffs' only argument about these lawful acquisitions is that, if they are repackaged with Plaintiffs' deficient exclusive dealing claims, together they constitute a "course of conduct" that is somehow unlawful. Plaintiffs are mistaken: as one court in this Circuit observed, "[w]hen faced with allegations of a broad antitrust scheme, multiple courts, including within our Circuit, have found that it is appropriate to consider the *individual* components of the scheme and whether those components can substantiate a claim of anticompetitive conduct *on their own*, as long as the larger scope of the scheme is kept in context." *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *39 (D.N.J. June 6, 2024) (emphasis added).

The cases Plaintiffs cite, Opp. at 15-16 & n.11, do not suggest a different result. Plaintiffs rely on various references to *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, but the Court there analyzed each theory separately. 370 U.S. 690, 699 (1962); *see also, e.g., Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024) (for claims like exclusive dealing where the case law is well developed, "0 + 0 = 0 is a proper approach"); *CarePoint Health Sys. Inc. v. RWJ Barnabas Health, Inc.*, 2023 WL 7986429, at *5, 7 (D.N.J. Nov. 17, 2023) (allegations of harm to plaintiffs from bad-faith misappropriation of information and spreading of false information were sufficiently plausible). Simply put, adding one type of lawful conduct to another type of lawful conduct does not create an illegal course of conduct. *See, e.g.*, *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) ("[W]e reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fractions is one or more, the plaintiffs have proved a violation."); *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) ("[T]he sum of zero and zero is zero."); *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 760 (D.N.J. 1999) (observing that many courts, including the Supreme Court in *Continental Ore*, "have addressed the allegations separately" where "numerous claims of anticompetitive conduct are set forth in support of a Sherman Act claim").

### C. Plaintiffs' Conspiracy Theory Fails to State a Claim

Plaintiffs acknowledge that they have not pleaded a "hub and spoke" conspiracy. Opp. at 25. They argue they are trying to plead a conspiracy that has only spokes, no rim. *Id.* But it has been black letter law for nearly a century that vertical antitrust conspiracies must have a rim connecting the spokes to be unlawful—otherwise the "conspiracy" is just a set of lawful bilateral contracts between the defendant and different counterparties. *Interstate Cir., Inc. v. United States*, 306 U.S. 208 (1939) (vertical agreements between movie distributors and theaters

9

supported conspiracy claim only because distributors had agreed among themselves). Without any agreement *among* the horizontal competitors—here the Data Providers—there simply is no conspiracy. And Plaintiffs concede that they do not allege any agreement among Data Providers and do not believe there was one. Opp. at 26.

Plaintiffs cite no case that supports their "spokes only" conspiracy concept. Instead, they offer two cases that reject it. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) (affirming dismissal of complaint where plaintiffs had not adequately alleged a hub-and-spoke conspiracy because the complaint did not adequately allege a conspiracy among horizontal competitors); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (affirming dismissal of complaint where claim of hub-and-spoke conspiracy "lack[ed] any allegation of an agreement" among the alleged horizontal conspirators). Plaintiffs have not stated a conspiracy claim.

### D.    Plaintiffs' Attempted Monopolization Claim Fails for the Same Reasons

Plaintiffs do not dispute that there is no difference in how courts analyze the anticompetitive conduct and antitrust injury requirements for a monopolization claim as compared to an attempted monopolization claim. *See* Opp. at 26. Because Plaintiffs have failed to allege antitrust injury and anticompetitive conduct sufficient to support a monopolization claim under Section 2 of the Sherman Act, their attempted monopolization claim under Section 2 of the Sherman Act also fails.

### CONCLUSION

For the forgoing reasons, Equifax respectfully requests that the Complaint be dismissed in its entirety.

Dated:  November 7, 2024

Respectfully Submitted,

*/s/ Leah Brannon*
Leah Brannon (*pro hac vice*)
David I. Gelfand (*pro hac vice*)
Alan B. Freedman (*pro hac vice*)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974 1500
lbrannon@cgsh.com
dgelfand@cgsh.com
afreedman@cgsh.com

Christopher H. Casey (50625)
Joseph R. Welsh (329626)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979 1000
chcasey@duanemorris.com
jrwelsh@duanemorris.com

*Counsel for Defendants
Equifax Workforce Solutions LLC
and Equifax Inc.*