IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GREYSTONE MORTGAGE, INC.,** | : | **CIVIL ACTION** |
| **FIRST FINANCIAL LENDING LLC** | : | |
| | : | |
| **v.** | : | **NO.  24-2260** |
| | : | |
| **EQUIFAX WORKFORCE SOLUTIONS** | : | |
| **LLC, EQUIFAX, INC.** | : | |

## MEMORANDUM

**MURPHY, J.**                                                                                          February 18, 2025

This is an antitrust case centered around Equifax's Work Number service. The Work Number provides verification of income and employment (VOIE) information to landlords, employers, and others seeking to verify their applicants' backgrounds. The idea of the Work Number is to save everyone involved some time and energy by collecting all that data in advance and acting as a single point of contact for as many verification inquiries as possible. According to the complaint, Equifax works aggressively to collect and lock up those data sources to maintain its market-leading position.

Greystone — a mortgage company that has purchased VOIE reports from Equifax — says that Equifax's tactics are driving up the cost of using the Work Number and have crossed the line into a violation of the antitrust laws. In particular, Greystone alleges that Equifax made exclusive deals with a substantial share of data providers, barring them from sharing data with Equifax's competitors. Greystone also alleges that Equifax acquired potential new competitors rather than compete against them. The result, according to Greystone, is fewer options and higher prices for verifiers. Equifax moves to dismiss the complaint for failure to state a claim

upon which relief can be granted. Because we find that Greystone stated plausible claims for relief, we deny Equifax's motion and send this case into discovery.

**I.     Factual Background**

Greystone filed suit against Equifax over its service, the "Work Number." DI 1 ¶ 3. The Work Number is a service for lenders, landlords, employers, and the like (together, "verifiers") to "electronically verify applicants' income and employment" information. *Id.* Greystone calls this the Electronic VOIE Services market. *Id.* ¶ 1. While verifiers could get the information themselves (e.g., calling an employer directly), "that process is slower and more expensive, and thus not a reasonable economic substitute for Electronic VOIE Services." *Id.* ¶ 2.

Equifax gets its data from what the complaint calls Data Contributors: payroll providers — such as ADP, Paychex, and Intuit Quickbooks — and large employers like Walmart and Home Depot. *Id.* ¶ 6. Equifax then compiles the data and sells it to verifiers in a "comprehensive view" called a VOIE report. *Id.* ¶ 156. To reduce the likelihood that "a verifier would purchase VOIE services from other rivals," *id.* ¶ 100, Equifax has "built a moat around this valuable data," *id.* ¶ 104.[1] The moat comprises exclusive deals with data providers where they agree to not sell to Equifax's competitors, *id.* ¶ 60, and a series of acquisitions in which Equifax has bought "smaller companies that are potential competitors in the same line of business," *id.* ¶ 86. Some of the exclusive deals explicitly prohibit data providers from selling to

---

[1] The complaint provides some helpful imagery: Equifax wants to collect as much data as possible because of the so-called "Data Waterfall," which is the priority order that "available VOIE services are utilized" by verifiers. DI 1 ¶ 100. "As a verifier seeks to obtain information on a borrower, the first service utilized to check the borrower sits at the top of the Waterfall. If the borrower's information is not found there, rival service providers further down the Waterfall are checked until there is a hit . . . . And the more comprehensive the data set of the VOIE service at the top of the waterfall, the less likely a verifier would purchase VOIE services from other rivals further down in the waterfall." *Id.* According to the complaint, Equifax's Work Number is at the top of the Data Waterfall. *Id.* ¶ 101.

competitors for multiple years, *id.* ¶ 6, while others involve Equifax providing payment to data providers "to induce them to provide their data exclusively," *id.* ¶ 7.

As Greystone tells it, "there is no reason why Data Contributors could not provide their data to both Equifax and rivals. Data is not a finite resource in that each piece of data provided to Equifax cannot also be provided to others. The only economic justification for maintaining the exclusivity for rivals is the [payment] they receive from Equifax." *Id.* ¶ 105. Greystone tells us that this violates Sherman Act because it is unlawful monopolization, conspiracy to monopolize, and attempted monopolization — all in violation of Sherman Act § 2 — as well as exclusive dealing in violation of Sherman Act § 1. 15 U.S.C. §§ 1-2. Equifax moves for dismissal under Rule 12(b)(6). For the reasons described below, we hold that Greystone plausibly stated claims upon which relief can be granted, and therefore deny Equifax's motion.

## II.   Analysis

Federal Rule of Civil Procedure 12(b)(6) requires that a complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We must "accept as true all factual allegations in the complaint and view those facts in the light most favorable to" plaintiffs. *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021). But conclusory allegations are not entitled to the same presumption of truth. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

Equifax's motion raises two arguments, each of which is dispositive if successful. First, Equifax argues that Greystone fails to plead antitrust injury. DI 36-1 at 11. This argument centers on whether the VOIE services market is one-sided or two-sided. Second, Equifax argues that Greystone has not alleged anticompetitive conduct. *Id.* at 16. Equifax says that its deals

with data providers — the alleged anticompetitive conduct — are unquestionably lawful competitive activity. Greystone must defeat both of these arguments to survive the motion to dismiss. And all the claims rise and fall together: if Greystone overcomes both arguments, then all of its claims will survive. DI 52 at 11:5-12:9. We address antitrust injury first and then turn to anticompetitive conduct.

### A.    Greystone pleads facts from which we can plausibly infer antitrust injury.

An antitrust plaintiff must properly allege, and later prove, antitrust injury, which is "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff "being made to pay higher prices 'is of the type for which the antitrust laws were intended to provide redress.'" *In re Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 275 (3d Cir. 2018).

Greystone sufficiently alleges that Equifax charged "supracompetitive prices" to verifiers. DI 1 ¶ 117. In particular, that the prices charged to verifiers were "more . . . than [Equifax] could charge if it had not undertaken an anticompetitive [s]cheme to exclude competitors from the market." *Id.* ¶ 119. Paragraphs 121 through 129 allege specific price increases from which we can plausibly infer supracompetitive pricing. Equifax responds that increased prices may be offset by verifiers "receiv[ing] a higher-quality offering," making antitrust injury to verifiers speculative. DI 36-1 at 15. That may be a fair counterpoint, but all Greystone must do at this stage is "plausibly allege[] that [the] anticompetitive effects outweigh [the] procompetitive virtues." *FTC v. AbbVie Inc.,* 976 F.3d 327, 356 (3d Cir. 2020). And Greystone does that — Greystone alleges that Equifax "hobble[d] rivals," hampered competition, and did not make "its product better." DI 1 ¶ 145. Accordingly, we find that Greystone plausibly alleges antitrust injury to verifiers.

Next, Equifax says we cannot analyze injury to verifiers in isolation. Instead, we must consider the impact of Equifax's actions on data providers too. DI 36-1 at 13-14. According to Equifax, the pleadings portray the VOIE services market as two-sided, with Equifax acting as an intermediary between data providers and verifiers. This argument relies on *Ohio v. American Express* ("*Amex*"), which instructs that a two-sided platform should be treated as a single market when: (1) both sides of the platform "simultaneously choose to use the network," (2) both sides of the platform "jointly consume a single product," and (3) there are significant indirect market effects such that the platform "cannot raise prices on one side without risking a feedback loop of declining demand." 585 U.S. 529, 544-45 (2018).

Equifax argues that the VOIE services market is two-sided because "when a Verifier sends a request for verification, Equifax matches that request with employer data on the other side of the market in a 'nearly instantaneous' transaction." DI 36-1 at 13. Data providers and verifiers — both sides of the platform — "simultaneously choose to use the network" and "jointly consume a single product," as required by *Amex*. 585 U.S. at 544-45. Greystone disagrees, pointing to the allegations that Equifax acquires "vast quantities of payroll data . . . from the largest [p]ayroll [p]roviders in the country" as well as "income and employment data from many of the country's largest employers," compiles the data into a "VOIE database," and sells a "comprehensive view" of the data to verifiers in the form of a VOIE report. DI 1 ¶¶ 54, 68, 156-57. Under Greystone's theory, the comprehensive "VOIE report" sold by Equifax to verifiers is a different product than what Equifax buys from data providers. *Id.* ¶¶ 36-38, 100, 156-57. This plausibly suggests that data providers and verifiers do not "jointly consume a single product," a key part of the two-sided market analysis in *Amex*. 585 U.S. at 544-45.

5

Equifax may be correct that the VOIE services market is two-sided. But for Equifax to prevail on its motion to dismiss, the allegations must unequivocally support Equifax's interpretation — as counsel for Equifax put it during the hearing, the question is whether Greystone pled itself out of a one-sided market. DI 52 at 39:23-40:4. We think Greystone said enough to avoid that fate. Taking the facts alleged in the complaint as true, as we must during this phase, Equifax is not merely an intermediary — it provides a materially different product to verifiers than it receives from data providers. Accordingly, we find that Greystone plausibly alleges a one-sided market. Therefore, we do not analyze whether Greystone has pled harm to data providers, rather than just harm to verifiers, for the purposes of this motion.[2] As discussed above, Greystone plausibly alleges antitrust injury to verifiers.

### B. Greystone plausibly pleads anticompetitive conduct.

Greystone alleges that Equifax's anticompetitive conduct includes exclusive deals and a combination of exclusive deals and serial acquisitions. DI 1 ¶¶ 186-211. A plaintiff challenging exclusive deals must allege that the exclusivity provisions at issue result in foreclosure of a "substantial share of the relevant market." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). Substantial foreclosure generally means around 40% or more of a market. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 404 n.31 (3d Cir. 2016); *see also McWane, Inc. v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015) ("Traditionally a foreclosure percentage of at least 40%

---

[2] We note that the alleged market for VOIE services seems to have some qualities of a two-sided market. For example, indirect network effects. If Equifax raises the price to verifiers so significantly that many stop using Equifax, data contributors would get reduced revenue shares, creating a "feedback loop of declining demand," *Amex*, 585 U.S. at 544. These indirect network effects could encourage Equifax to "find the balance of pricing that encourages the greatest number of matches between [verifiers] and [data providers]." *See id.* at 545. But the existence of indirect network effects alone is not sufficient for us to foreclose plaintiff from proving a one-sided market. *Id.* at 544. ("A market should be treated as one sided when the impacts of indirect network effects and relative pricing in that market are minor.").

has been a threshold for liability in exclusive dealing cases."); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (en banc) (per curiam) ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required . . . .").

Greystone alleges two types of exclusive deals between Equifax and data providers: "multiyear exclusive deals," DI 1 ¶ 6, and de facto exclusive deals — where "Equifax shares a portion of its monopoly profits . . . to induce [data providers] to provide their data exclusively," *id.* ¶ 7. Greystone states that these deals, taken together, foreclose at least 40% of the market. *Id.* ¶ 72.

Equifax recognizes that the first type, multiyear exclusive deals, could constitute anticompetitive conduct, but argues that de facto exclusive deals cannot (at least under these circumstances). DI 36-1 at 19-21. The complaint does not separate out the portion of the market purportedly foreclosed by each type of exclusive dealing, which Equifax says is "fatal." *Id.* at 20. Equifax points us to *Weyerhaeuser v. Ross-Simmons Hardwood Lumber*, 549 U.S. 312 (2007), in which the Supreme Court concluded that the test for "predatory pricing" also applied to "predatory bidding." Under this rule, "only higher bidding that leads to below-cost pricing in the relevant output market will suffice as a basis for liability for predatory bidding." *Id.* at 325. And the predatory bidder must have "a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power." *Id.* Assuming that the *Weyerhaeuser* test applies here, Greystone would need to plead that Equifax's de facto exclusive deals to data providers (input market) lead to below-cost pricing for verifiers (output market), and that Equifax had a dangerous probability of recouping its losses (due to its market power). Otherwise, the "strategy of predatory bidding makes no economic sense because it would involve

7

short-term losses with no likelihood of offsetting long-term gains." *Id.* This is the "price-cost test." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 280-81 (3d Cir. 2012).

We are not convinced that the price-cost test requires granting Equifax's motion. *ZF Meritor*, analyzing *Weyerhaeuser*, tells us that "exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing." 696 F.3d at 281. This is "because [the rivals] are never given an opportunity to compete." *See id.* (explaining the logic of this principal as applied to exclusive deals with customers). Accordingly, an "attempt to characterize this case as a pricing practices case, subject to the price-cost test, is unavailing." *Id.*

"[T]he law is clear that . . . de facto exclusive dealing may be unlawful." *Id.* at 282. And "an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing." *Id.* at 283. Greystone plausibly alleges that Equifax's conduct foreclosed at least 40% of the market through multiyear exclusive deals and de facto exclusive deals.[3] There are a variety of reasons that these deals, on balance, may be more procompetitive than anticompetitive. But that is dispute for a different day.

### III. Conclusion

For the foregoing reasons, we find Greystone has stated plausible claims for relief, and we deny Equifax's motion to dismiss.

---

[3] Both Count I and II rely on exclusive deals. DI 1 ¶¶ 186-211. Count II adds acquisitions as anticompetitive conduct. *Id.* ¶ 204. Because we find Equifax plausibly alleges anticompetitive conduct through exclusive deals, Claim II states a claim for relief regardless of whether the acquisitions are also anticompetitive conduct. Accordingly, we do not separately analyze the acquisitions.