**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREYSTONE MORTGAGE, INC., and FIRST FINANCIAL LENDING LLC, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>EQUIFAX WORKFORCE SOLUTIONS LLC and EQUIFAX, INC.,<br><br>Defendants. | Case No. 2:24-cv-2260-JFM |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

I. Plaintiffs' Lawsuit ..........................................................................................................3

II. Plaintiffs Agreed to Binding Arbitration in March and June 2025, Respectively ..............4

III. Plaintiffs' Agreement to Arbitrate Comes to Light ..........................................................8

LEGAL STANDARD ...........................................................................................................9

ARGUMENT ....................................................................................................................11

I. Plaintiffs Agreed To Arbitrate by Reviewing, Acknowledging, and Consenting to Equifax's Terms & Conditions ..........................................................................11

II. The Agreements Delegate Issues of Arbitrability to an Arbitrator ..................................14

III. Even if Threshold Issues of Arbitrability Were Not Delegated to an Arbitrator, All of Plaintiffs' Claims Are Plainly Arbitrable ........................................................16

   A. Plaintiffs' Claims Fall Within the Scope of the Agreements ................................16

   B. The Parties Agreed That the Arbitration Provision Applies Retroactively ...........18

   C. Equifax Timely Moved To Compel Arbitration ...................................................21

CONCLUSION ..................................................................................................................21

# TABLE OF AUTHORITIES

## CASES


*Adibzadeh v. Best Buy, Co.*, 2021 WL 4440313 (N.D. Cal. Mar. 2, 2021) ....................................12

*Albert v. Glob. Tel*Link Corp.*, 2025 WL 974530 (D. Md. Apr. 1, 2025)....................................12

*Apollo Comput., Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989)..........................................................15

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ............................................................9

*Black v. JP Morgan Chase & Co.*, 2011 WL 3940236 (W.D. Pa. Aug. 25, 2011) .......................17

*Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842 (6th Cir. 2020)...............................15

*Bull v. Torbett*, 529 S.W.3d 832 (Mo. App. 2017) .......................................................................13

*Century Indemn. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513 (3d Cir. 2009) ..........................................................................................................................10

*Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291 (3d Cir. 2016).......................................................17

*Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205 (2d Cir. 2005) ....................................................15

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)............................................................10

*Deardorff v. Cellular Sales of Knoxville, Inc.*, 2022 WL 407396 (E.D. Pa. Feb. 9, 2022) .....14, 15

*Fallo v. High–Tech Inst.*, 559 F.3d 874 (8th Cir. 2009) ..............................................................15

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (E.D. Pa. 2007) ....................................................12

*Foresta v. Airbnb, Inc.*, 2024 WL 329524 (E.D. Pa. Jan. 29, 2024).................................... passim

*Foster v. Walmart, Inc.*, 15 F.4th 860 (8th Cir. 2021) ..................................................................13

*Gay v. CreditInform*, 511 F.3d 369 (3d Cir. 2007) .........................................................................9

*Goetsch v. Shell Oil Co.*, 197 F.R.D. 574 (W.D.N.C. 2000) ........................................................20

*Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, 101 F.4th 272 (3d Cir. 2024) ..........................................................................................................................10

*Gruchacz v. Coventry Res. LLC*, 2024 WL 4350327 (E.D. Pa. Sept. 30, 2024) ...........................15

*H.K. Porter Co. v. Transit Cas. Co.*, 215 S.W.3d 134 (Mo. Ct. App. 2006)................................11

*Hamilton v. Dean Witter Reynolds, Inc.*, 1989 WL 89434 (W.D. Pa. July 19, 1989) ....................19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019) ..................................10, 14

*Hillow v. E*Trade Sec., LLC*, 2022 WL 1165791 (E.D. Mo. Apr. 20, 2022) ...............................13

*In Re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385 (S.D.N.Y. 2003).............16

*In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515 (3d Cir. 2019) ........................17

*In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840 (D. Md. 2013)...............................20

*Jaludi v. Citigroup,* 933 F.3d 246 (3d Cir. 2019) .........................................................................18

*Kan. City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7 (Mo. Ct. App. 2008)....16, 17

*Kruzits v. Okuma Mach. Tool*, 40 F.3d 52 (3d Cir. 1994) ............................................................11

*Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691 (S.D.N.Y. 2017) ...........................................19

*Lai Chan v. Chinese-Am. Plan. Council Home Attendant Program, Inc.*, 180 F. Supp. 3d 236 (S.D.N.Y. 2016) ..................................................................................................19, 20

*Laster v. T-Mobile USA, Inc.*, 2012 WL 1681762 (S.D. Cal. May 9, 2012) ................................20

*Major v. McCallister*, 302 S.W.3d 227 (Mo. Ct. App. 2009)........................................................12

*Mayer v. Verizon New Jersey, Inc.*, 2014 WL 12789832 (D.N.J. May 6, 2014)...........................19

*McCarney v. Nearing, Staats, Prelogar & Jones*, 866 S.W.2d 881 (Mo. App. 1998) ..................18

*McIntosh v. Tenet Health Sys. Hosps., Inc.*, 48 S.W.3d 85 (Mo. Ct. App. 2001).........................12

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44 (3d Cir. 2001) ...........10

*Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022) ...........................................................................21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1 (1983)...................................9

*Newhall v. Chase Home Fin. LLC*, 2010 WL 4387517 (D.N.J. Oct. 28, 2010) ......................19, 20

*Oracle Am., Inc. v. Myriad Grp. A.G.,* 724 F.3d 1069 (9th Cir. 2013).........................................15

*Perficient, Inc. v. Palfery*, 2022 WL 1102117 (E.D. Mo. Apr. 13, 2022) ....................................13

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.,* 687 F.3d 671 (5th Cir. 2012) ........15

*Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537 (S.D.N.Y. 2018).......................................................19

*Pricharda v. Checkr, Inc.*, 2022 WL 16749033 (E.D. Pa. Nov. 7, 2022).....................................12

*Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505 (Mo. 2001) .......................18

*Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006) .................................................15

*Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100 (3d Cir. Apr. 28, 2020)......................2, 15

*Robinson-Simms v. Best Deal Auto Sales, LLC*, 2024 WL 5135841 (D. Del. Dec. 17, 2024) ....................................................................................................................................9

*Runner v. Fleming Cos.*, 2001 WL 541089 (E.D. Pa. May 18, 2001)............................................9

*Siebert v. Amateur Athletic Union of U.S., Inc.*, 422 F. Supp. 2d 1033 (D. Minn. 2006) ............12

*Singh v. Uber Techs., Inc.*, 67 F.4th 550 (3d Cir. 2023).............................................................10

*Smith v. The Equitable*, 209 F.3d 268 (3d Cir. 2000) ....................................................................9

*Sunline USA LLC v. Ezzi Grp., Inc.*, 708 F. Supp. 3d 585 (E.D. Pa. 2023).................................13

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327 (11th Cir. 2005) ................15

*Vargison v. Paula's Choice, LLC*, 2025 WL 346197 (W.D. Wash. Jan. 30, 2025) ......................20

*VR Consultants, Inc. v. J.P. Morgan Chase & Co.*, 2021 WL 5494373 (D.N.J. Nov. 23, 2021) ..................................................................................................................................15

**STATUTES**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ..............................................................2, 9, 14, 19

Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* ...................................................................3

## INTRODUCTION

Plaintiffs First Financial Lending LLC and Greystone Mortgage, Inc. are two mortgage companies who brought this lawsuit against Defendants Equifax Workforce Solutions LLC and Equifax, Inc. (collectively, "Equifax") last year alleging antitrust violations based on Equifax's sales of electronic income and employment verification services ("Verification Services"). But recently—after the close of pleadings and at the outset of discovery—both Plaintiffs agreed to arbitration provisions requiring them to arbitrate in Missouri all claims "arising out of or relating to" arrangements governing past and future purchases of such Verification Services from Equifax. In connection with orders they placed on Equifax's web portal in March and June 2025, each Plaintiff's most senior executive agreed to Equifax's Online Universal Membership Agreement. Those Agreements require "binding arbitration" under the rules of the American Arbitration Association ("AAA"). Ex. C ¶ 14.

Each Agreement states in capital letters at both the top and bottom: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." *Id.* That arbitration provision requires "binding arbitration" of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof" by the AAA under its Commercial Arbitration Rules in St. Louis, Missouri. *Id.* The provision applies to any "controversy or claim," including past controversies—which includes this litigation—because each Agreement states: "This Agreement specifically supersedes and replaces any agreement that predates this Agreement and which relates to the Service as provided in each Schedule A, even if the prior agreement contains an 'entire agreement' or 'merger' clause, and any such agreements are terminated." *Id.* ¶ 1. And each Agreement states that a user's acceptance indicates the user "is authorized to execute this Agreement" and that "this Agreement is a binding obligation of User and any person or company that User represents." *Id.* ¶ 17. To proceed with purchasing a

verification, Plaintiffs first had to certify, "I have reviewed and agree to the above Terms and Conditions," and then had to click "Agree & Continue." Ex. A (Declaration of S. Nonnenkamp, "Nonnenkamp Decl.") ¶ 9. Plaintiff First Financial Lending LLC's Principal did so on March 12, 2025, and Plaintiff Greystone Mortgage, Inc.'s President did so on June 3, 2025. *Id.* ¶ 7; Ex. K.

Plaintiffs' agreements to arbitrate require a stay of the action pending arbitration under the Federal Arbitration Act. 9 U.S.C. § 3. Courts routinely recognize that terms and conditions containing arbitration provisions such as those at issue here constitute binding agreements to arbitrate. That is particularly true outside the consumer context, as in this case. That Plaintiffs agreed to arbitrate after filing their complaint makes no difference because the Federal Arbitration Act applies equally to any "agreement in writing to submit to arbitration an ***existing controversy*** arising out of" "a contract evidencing a transaction involving commerce." 9 U.S.C. § 2 (emphasis added).

Furthermore, as the Supreme Court, Third Circuit, and many other courts have held, incorporating the Commercial Arbitration Rules of AAA constitutes "clear and unmistakable evidence" of an intent to delegate to the arbitrator any threshold question regarding whether the Plaintiffs' claims are arbitrable. *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 (3d Cir. Apr. 28, 2020) (incorporation of AAA Commercial Arbitration Rules "is about as 'clear and unmistakable' as language can get" (citation omitted)); *Foresta v. Airbnb, Inc.*, 2024 WL 329524, at *7-8 (E.D. Pa. Jan. 29, 2024) (Murphy, J.) (enforcing delegation provision in arbitration agreement contained in online Terms of Service). Any questions concerning the scope of arbitrable issues under the arbitration agreements must be resolved by the arbitrator in the first instance. But on their face, the arbitration agreements plainly encompass claims relating to the arrangements by which Plaintiffs purchased verification services from Defendants.

Accordingly, Equifax respectfully requests the Court stay the action pending arbitration pursuant to the Federal Arbitration Act. 9 U.S.C. § 3.

## FACTUAL BACKGROUND

### I. Plaintiffs' Lawsuit

Equifax sells services to companies that verify an individual's income and employment for certain legitimate business purposes, such as providing mortgages to individuals. On May 28, 2024, Greystone Mortgage, Inc. and First Financial Lending LLC, mortgage companies represented by prominent plaintiffs' antitrust counsel, filed suit under Sections 1 and 2 Sherman Act, 15 U.S.C. §§ 1, 2, on behalf of a putative class of purchasers of Equifax's Verification Services. ECF No. 1. Named Plaintiffs alleged they purchased Verification Services from Equifax and overpaid for such services because of allegedly anticompetitive conduct. One of Equifax's Verification Services is known as "The Work Number®" or "TWN." *Id.* ¶ 36.

Plaintiffs allege those purchases gave them the ability to pursue antitrust claims on behalf of a putative class of all purchasers of Verification Services from Equifax from May 28, 2020 through trial, excluding only Equifax and federal government entities. ECF No. 1 ¶¶ 21, 22, 178. As described below, all of Plaintiffs' allegedly actionable purchases were subject to the Agreement that forms the basis for this Motion.

On August 9, 2024, Equifax filed a motion to dismiss. ECF No. 36. On February 18, 2025, the Court denied the motion to dismiss. ECF No. 54. Equifax filed an answer on March 4, 2025. ECF No. 58. The parties began to engage in discovery, including by serving discovery requests on one another and serving document subpoenas on third parties. Ex. H (Declaration of E. Bennett, "Bennett Decl.") ¶ 3. No depositions have been noticed or taken. Bennett Decl. ¶ 3. Plaintiffs also did not produce any documents until yesterday, July 24, 2025, when Plaintiffs sent Equifax's counsel their first production totaling sixty pages. Bennett Decl. ¶ 3.

## II. Plaintiffs Agreed to Binding Arbitration in March and June 2025, Respectively

After Equifax filed its answer, both Plaintiffs visited Equifax's web portal to purchase Verification Services. As shown below, in connection with the purchases, Plaintiffs reviewed, acknowledged, and agreed to a version of Equifax's Online Universal Membership Agreement that has continuously appeared on Equifax's web portal to mortgage company customers like Plaintiffs since August 13, 2024 ("Agreement"). *See* Nonnenkamp Decl. ¶¶ 8-10.

The Agreements state each is an "Agreement" between Equifax, provider of a "Service," and each "Company" that "wishes to use the Service to verify certain Consumer information." Ex. C at 1. The first line of the Agreements, which is displayed prominently on the screen shown to every user, reads in all capital letters: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." *Id*. The first numbered paragraph of the Agreements, titled "Scope of the Agreement," specifies: "This Agreement specifically supersedes and replaces any agreement that predates this Agreement and which relates to the Service as provided in each Schedule A, even if the prior agreement contains an 'entire agreement' or 'merger' clause, and any such agreements are terminated." *Id.* ¶ 1.

The Agreements include the following arbitration provision:

> ARBITRATION. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in St. Louis, Missouri, administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgement of the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Additionally, each of the parties hereby waive, to the fullest extent permitted by applicable laws, the right to bring or join any class action proceedings.

*Id*. ¶ 14.

The Agreements provide that each "shall be governed by the laws of the State of Missouri, without giving effect to the principles of conflict of laws thereof." *Id.* ¶ 13. The Agreements also contain a "Modification" provision stating Equifax "may change the price of the Service and/or

the Service Description by updating the pricing, Service Description, and/or terms and conditions on the web interface for ordering verifications, which Company shall acknowledge and agree to in order to continue receiving the Service." *Id.* ¶ 9. This provision has appeared in Equifax's terms and conditions for years, including in terms and conditions to which Plaintiffs agreed when they made every purchase at issue in this litigation. Nonnenkamp Decl. ¶ 8. The Agreements further state in a "Miscellaneous" provision:

> By clicking to agree to these terms and conditions, User certifies that (i) User is authorized to execute this Agreement on behalf of User and any person or user that User represents, (ii) Equifax Workforce Solutions LLC (provider of Equifax Verification Services, including The Work Number) has reasonable grounds to assume and deem it apparent that User has such authority, (iii) this Agreement is a binding obligation of User and any person or company that User represents, (iv) User has carefully reviewed to user's complete satisfaction and understands and agrees to all of the terms and conditions above and accessible below by scrolling down, and intend this to be a binding agreement signed by User accepting and agreeing to all such terms and conditions. User may print these terms and conditions. Equifax Workforce Solutions LLC (provider of Equifax Verification Services including The Work Number) recommends that User print these terms and conditions, and save them for User's files.

Ex. C ¶ 17. And the last line of the Agreements repeats in all capital letters: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." *Id.* at 5.

To purchase Verification Services, a user first must create an account and navigate to the log-in screen showed below:



Nonnenkamp Decl. ¶ 9; Ex. D. After entering credentials, the user is asked to "review and acknowledge" the "applicable terms and conditions," and sees a portion of the first page of the Agreement that the user can scroll through, with the visible portion including the following text in all capital letters at the top: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." Nonnenkamp Decl. ¶ 9; Ex. D. To accept the Agreement, the user must check a box stating "I have reviewed and agree to the above Terms and Conditions" and to click the red "Agree & Continue" button; otherwise the user can click the "Disagree & Logout" button:




Nonnenkamp Decl. ¶ 9; Ex. D. An icon at the top-right of the pane also allows a user to "Print Terms and Conditions," meaning that the user can download and print a copy of the Agreement to save for their files:




Nonnenkamp Decl. ¶ 9; Ex. D. The Agreement expressly "recommends that User print these terms and conditions, and save them for User's files." Ex. C ¶ 17. Only upon agreeing can a user proceed to purchase Verification Services on the web portal. Nonnenkamp Decl. ¶ 9.

Both Plaintiffs placed orders for Verification Services from Equifax in 2025 after reviewing, acknowledging, and accepting the Agreements. Plaintiff First Financial Lending LLC's Principal, Robert Salotto, entered into its Agreement on March 12, 2025, and ordered Verification Services on March 13 and March 19, 2025. *Id.* ¶ 7; Ex. B. Plaintiff Greystone Mortgage, Inc.'s President, Marc D'Ambrosio, entered into its Agreement on June 3, 2025, and ordered Verification Services the same day. Nonnenkamp Decl. ¶ 7; Ex. B. Plaintiffs previously purchased Verification Services in 2023 and 2024 under previous terms and conditions that did not contain an arbitration provision, but which did contain the language from the "Scope of the Agreement," "Applicable Law," "Modification," and "Miscellaneous" provisions above. Nonnenkamp Decl. ¶ 10-11; Exs. B-C, E-F. As set forth in the Agreements Plaintiffs accepted in

March and June 2025, the Agreement "specifically "supersede[d] and replace[d]" every prior version. Ex. C ¶ 1.

### III. Plaintiffs' Agreement to Arbitrate Comes to Light

On June 24, 2025, Equifax employees were instructed to assist in investigating the location of certain documents responsive to one of Plaintiffs' pending discovery requests, Nonnenkamp Decl. ¶ 3, namely, a request for production of "Documents sufficient to show all Agreement(s) . . . You have with a person for the purchase or provision of Your eVOIE product(s) or service(s), including but not limited to any 'Universal Membership Agreement for The Work Number' or any similar 'Universal Service Agreement' or standard or form agreements . . . ." Ex. I. Among other things, Equifax employees were instructed to collect documents reflecting responsive agreements by web portal customers to terms and conditions. Nonnenkamp Decl. ¶ 3.

Only upon reviewing the output of data compiled by those employees (among the hundreds of thousands of other pages of documents gathered as part of efforts to respond to Plaintiffs' requests) did Equifax discover that in recent months, both Plaintiffs had agreed to binding arbitration provisions via the web portal. Nonnenkamp Decl. ¶ 5. Within two days of learning this fact from Equifax's employees, Equifax's counsel alerted Plaintiffs' counsel on Wednesday, July 16, 2025, and requested Plaintiffs' consent either to arbitrate their claims or to stay discovery pending a motion to compel arbitration; or, alternatively, to agree that discovery could proceed without constituting a waiver of any right to arbitrate. Ex. J; *see also* Nonnenkamp Decl. ¶ 6. Counsel conferred on Friday, July 18, 2025, but Plaintiffs refused to consent to any of these requests. Bennett Decl. ¶ 7. Plaintiffs' counsel provided no reason for their refusal to consent even to an agreement not to argue that responding to Plaintiffs' discovery requests would constitute waiver.

On Monday, July 21, 2025, in light of Plaintiffs' refusal to agree not to use against Equifax any further participation in discovery, Equifax filed a motion to stay discovery pending the filing of this Motion. ECF No. 112. The Court denied that motion without prejudice, noting Equifax could request a stay as part of any forthcoming motion to compel. ECF No. 113. This motion followed.[1]

## LEGAL STANDARD

The FAA establishes that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA manifests a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24 (1983), the purpose of which is to "ensure that private arbitration agreements are enforced according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347 n.6 (2011). In determining whether a matter should be arbitrated, "there is a strong presumption in favor of arbitration, and doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Gay v. CreditInform*, 511 F.3d 369, 387 (3d Cir. 2007); *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25 ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). "An order to arbitrate 'should not be denied unless it may be

[1] Equifax recognizes that the arbitration provision requires arbitration to occur in Missouri, Ex. C ¶ 14, and "the Third Circuit has held a district court lacks the authority to compel arbitration outside of its district." *Robinson-Simms v. Best Deal Auto Sales, LLC*, 2024 WL 5135841, at *3 (D. Del. Dec. 17, 2024) (citing *Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir. 1974)). Thus, Equifax has requested a stay pursuant to the Federal Arbitration Act. 9 U.S.C. § 3. In the event the Court agrees dismissal is the appropriate remedy, Equifax would request in the alternative that the Court dismiss the action under Federal Rule of Civil Procedure 12(b)(1) or 12(c). *See Smith v. The Equitable*, 209 F.3d 268, 272 (3d Cir. 2000) ("when 'all the claims involved in an action are arbitrable, a court may dismiss the action instead of staying it.'" (quoting *Seus v. John Nuveen & Co.*, 146 F.3d 175, 179 (3d Cir. 1998))); *see also Runner v. Fleming Cos.*, 2001 WL 541089, at *2 (E.D. Pa. May 18, 2001) (dismissing complaint where "all the issues raised" were "covered by the arbitration agreement").

said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) (*quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co*., 363 U.S. 574, 582-83 (1960)).

Before compelling a party to arbitrate pursuant to the FAA, a court must determine "that an arbitration agreement exists." *Foresta*, 2024 WL 329524, at *7; *Century Indemn. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 523 (3d Cir. 2009). Under the FAA, parties may agree to have an arbitrator decide all other "'gateway' questions of 'arbitrability,'" such as "whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)); *Foresta*, 2024 WL 329524, at *7. "As 'the party resisting arbitration,' Plaintiffs bear the burden of showing 'that the claims at issue are unsuitable for arbitration.'" *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 556 n.3 (3d Cir. 2023) (quoting *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)).

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *see also Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, 101 F.4th 272, 281 (3d Cir. 2024) ("When a movant sufficiently establishes that a claim is subject to a valid arbitration agreement, district courts have no discretion and must send it to arbitration.").

In determining the existence of agreements to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts." *Century Indem. Co.*, 584 F.3d at 532. Here, the Agreement contains a choice-of-law provision requiring application of Missouri law. Ex. C

¶ 13. Pennsylvania's choice-of-law rules require courts to "generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool*, 40 F.3d 52, 55 (3d Cir. 1994). There are only two scenarios in which Pennsylvania courts will not apply a choice-of-law provision: (1) the chosen state lacks a substantial relationship to the parties or the transaction, or (2) the chosen state's law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." *Id.* (quoting Restatement 2d of Conflict of Laws, § 187). Neither exception applies here. Equifax Workforce Solutions LLC is headquartered and incorporated in Missouri. ECF No. 1 ¶ 23. Missouri thus has a substantial relationship to the parties and transaction and no other state has a materially greater interest in the enforcement of the Agreement (and thus no public policy interest can conflict). Missouri law applies.[2]

## ARGUMENT

### I. Plaintiffs Agreed To Arbitrate by Reviewing, Acknowledging, and Consenting to Equifax's Terms & Conditions

The Plaintiffs agreed to arbitrate when they were presented with the Agreements—which states prominently that "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES"; were given an opportunity to review and download the Agreements; checked a box certifying, "I have reviewed and agree to the above Terms and Conditions"; and clicked the red "Agree & Continue" button to adopt the Agreements. *See supra* at pp. 5-8.

Courts in the Third Circuit and across the country acknowledge that enforceable agreements to arbitrate exist when Internet users accept "clickwrap" agreements, in which users

[2] Moreover, there appears to be no conflict between Missouri and Pennsylvania law on salient issues. *Cf. H.K. Porter Co. v. Transit Cas. Co.*, 215 S.W.3d 134, 140 (Mo. Ct. App. 2006) (observing Missouri and Pennsylvania law are "very similar" on issues of contract law).

are presented with a list of terms and conditions containing arbitration provisions and are required to click to indicate their agreement. *See, e.g.*, *Pricharda v. Checkr, Inc.*, 2022 WL 16749033, at *3-4 (E.D. Pa. Nov. 7, 2022) (noting "[c]ourts in this district have regularly held that 'clickwrap' agreements manifest sufficient agreement to the terms in the contract," and concluding that plaintiff "assented to the Arbitration Clause contained within" clickwrap agreement); *see also Foresta v. Airbnb, Inc.*, 2024 WL 329524, at *7 (E.D. Pa. Jan. 29, 2024) (Murphy, J.) (granting motion to compel arbitration based on arbitration clause contained in clickwrap agreement); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 237 (E.D. Pa. 2007) (holding that requiring user "to take affirmative action," such as a single click, provides reasonable notice of enforceable agreement) (collecting cases); *Albert v. Glob. Tel*Link Corp.*, 2025 WL 974530, at *8 (D. Md. Apr. 1, 2025) (finding "valid arbitration agreement" where plaintiffs "were presented with" updated terms and conditions upon accessing online accounts, "were asked to review" the updated terms and conditions, and "had to click the 'accept' button, to accept the Terms and Conditions, to continue using their . . . online accounts"); *Adibzadeh v. Best Buy, Co.*, 2021 WL 4440313, at *5-6 (N.D. Cal. Mar. 2, 2021) (finding enforceable arbitration agreement where plaintiff "was presented with and consented to conspicuous terms containing an arbitration agreement when he signed into" defendant's website); *Siebert v. Amateur Athletic Union of U.S., Inc.*, 422 F. Supp. 2d 1033, 1040 (D. Minn. 2006) (recognizing that "[m]ost courts which have considered the issue have upheld arbitration and forum selection clauses in so-called 'clickwrap' form contracts").

Missouri courts routinely enforce clickwrap agreements containing arbitration clauses. *See, e.g.*, *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) ("Assent is manifested expressly on clickwrap sites, usually by clicking a box or button (("e.g.*,* 'I Agree')."); *McIntosh v. Tenet Health Sys. Hosps., Inc.*, 48 S.W.3d 85, 89 (Mo. Ct. App. 2001) ("Under both the FAA and

Missouri law, a written agreement to submit a present or future dispute to arbitration is valid, enforceable and irrevocable."); *see also, e.g.*, *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) (observing "courts rarely find problems with clickwrap agreements" and "mutual assent is rarely an issue because the user sees the list of the terms and conditions before accepting them"); *Perficient, Inc. v. Palfery*, 2022 WL 1102117, at *5 (E.D. Mo. Apr. 13, 2022) ("Missouri law recognizes electronic modes of acceptance as valid and binding."); *Hillow v. E*Trade Sec., LLC*, 2022 WL 1165791, at *5, *8 (E.D. Mo. Apr. 20, 2022) (finding valid acceptance of clickwrap agreement with mandatory arbitration clause under Missouri law).

Here, Plaintiffs expressly manifested their consent to the Agreements—not only by clicking a red button labeled "Agree & Continue" but also by checking a box certifying, "I have reviewed and agree to the above Terms and Conditions." Further, they were presented with the Agreements themselves as well as an opportunity to download and print them, including a reminder in all capital letters that each contained a "BINDING ARBITRATION AGREEMENT." Missouri courts, and federal courts in this Circuit and across the country, recognize "that an arbitration agreement exists" under such circumstances. *Foresta*, 2024 WL 329524, at *7.

Furthermore, although each Plaintiff accepted their respective Agreements with Defendant Equifax Workforce Solutions LLC, both Defendants are entitled to enforce the Agreements. Under Missouri's doctrine of equitable estoppel, Defendant Equifax, Inc.—the parent company of Defendant Equifax Workforce Solutions LLC—is entitled to rely on the Agreements' arbitration provisions either if reliance would avoid "evisceration of the underlying arbitration agreement," or if Plaintiffs would need to rely on the Agreement to "assert[] [their] claims against the non-signatory." *Bull v. Torbett*, 529 S.W.3d 832, 838 (Mo. App. 2017) (citation omitted); *see, e.g.*, *Sunline USA LLC v. Ezzi Grp., Inc.*, 708 F. Supp. 3d 585, 601-02 (E.D. Pa. 2023) (Murphy, J.)

(non-signatory bound to arbitration agreement because of "agency relationship" with contracting party and allegations against non-signatory were "clearly linked to the execution and terms" of the agreement). Both conditions are met here, because the arbitration agreement would be eviscerated if Plaintiffs were compelled to arbitrate their claims against one Defendant while being allowed to litigate in this Court the same claims based on the same facts and law seeking the same relief against Defendant's parent company, and because Plaintiffs must rely on their purchases of Verification Services under the Agreements to assert their antitrust claims. Indeed, Plaintiffs collectively define "Equifax" and plead all allegations against both Defendants in their complaint. ECF No. 1. Both Defendants are entitled to enforce the Agreements against Plaintiffs.

## II. The Agreements Delegate Issues of Arbitrability to an Arbitrator

The FAA allows parties to agree to arbitrate "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein*, 586 U.S. at 65. When they do so, unless Plaintiffs challenge "'the delegation provision specifically,' [the arbitration agreement] must be treated as valid under § 2 [of the FAA] and enforced under § 4," and all "questions of arbitrability must be decided by the arbitrator." *Deardorff v. Cellular Sales of Knoxville, Inc.*, 2022 WL 407396, at *7 (E.D. Pa. Feb. 9, 2022) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 72, (2010)); *Foresta*, 2024 WL 329524, at *7 ("Normally, it is for the courts to decide whether the claims fall within the scope of the arbitration agreement, however, 'the parties may contract around it, and agree to have . . . these questions decided by an arbitrator.'" (citation omitted)).

Here, the Agreements expressly delegate questions of arbitrability to an arbitrator by mandating "binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules," Ex. C ¶ 14, which grant the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence,

scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court." AAA Commercial Arbitration Rules and Mediation Procedures, Rule 7(a), available at https://www.adr.org/media/lwanubnp/2025_commercialrules_web.pdf. The Third Circuit and courts in this District and elsewhere have held that incorporation by reference of the AAA rules constitutes "clear and unmistakable evidence" of an intention to delegate issues of arbitrability to an arbitrator. *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020); *Gruchacz v. Coventry Res. LLC*, 2024 WL 4350327, at *3 (E.D. Pa. Sept. 30, 2024) ("all disputes . . . shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. . . "); *Deardorff*, 2022 WL 407396, at *8 ("parties may 'clearly and unmistakably' delegate arbitrability issues to an arbitrator by incorporating by reference the American Arbitration Association ('AAA') or the Judicial Arbitration and Mediations Services ('JAMS') rules"); *see also, e.g.*, *VR Consultants, Inc. v. J.P. Morgan Chase & Co.*, 2021 WL 5494373, at *2 (D.N.J. Nov. 23, 2021); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.,* 687 F.3d 671, 675 (5th Cir. 2012); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332–33 (11th Cir. 2005); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842 (6th Cir. 2020); *Oracle Am., Inc. v. Myriad Grp. A.G.,* 724 F.3d 1069, 1074 (9th Cir. 2013). Accordingly, the Court should find the parties clearly and unmistakably delegated arbitrability disputes to an arbitrator and allow the arbitrator to rule on all issues regarding the scope of the Agreements.

**III. Even if Threshold Issues of Arbitrability Were Not Delegated to an Arbitrator, All of Plaintiffs' Claims Are Plainly Arbitrable**

Even if the parties had not delegated threshold questions of arbitrability to be decided by an arbitrator, the Agreements' arbitration provisions plainly encompass all of Plaintiffs' claims, including for all the reasons set forth below.

**A. Plaintiffs' Claims Fall Within the Scope of the Agreements**

Plaintiffs agreed to arbitrate "***[a]ny*** controversy or claim ***arising out of or related to*** this Agreement." Ex. C ¶ 14 (emphases added). An arbitration agreement applies to claims when the "factual allegations 'touch' matters covered by the parties' contract." *Kan. City Urology, P.A. v. United Healthcare Servs.*, 261 S.W.3d 7, 13 (Mo. Ct. App. 2008) (citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999)); *see id.* at 12 (arbitration clause covering claims "relating to or arising from this Agreement" "creates a strong presumption in favor of arbitrability"). Even if Plaintiffs "could maintain their antitrust claims without referring to the underlying contracts," the claims still "touch" the Agreements if Plaintiffs' alleged injuries arise from the Agreements' other provisions, *e.g.*, pricing. *Id.* at 14–15 ("[T]he reimbursement rates in the contracts are the illegal action that Blue Cross and United Healthcare allegedly conspired to produce and are enough for us to conclude that the physicians' factual allegations touch matters covered by the parties' contracts.") (citing *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) (antitrust claim "touches matters" related to contract because alleged conduct resulted in the terms in the contract)); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 406 (S.D.N.Y. 2003) (antitrust claim "touches matters" related to credit card agreements because the anticompetitive prices appear on the credit card statements)).

Here, Plaintiffs' only claims are antitrust claims alleging injury from allegedly anticompetitive prices for purchases of Verification Services. *See* ECF No. 54 at 2 (citing ECF

No. 1 ¶ 3); *see also* ECF No. 1 ¶¶ 193 (Count 1); 206 (Count 2); 217 (Count 3); 236 (Count 4); 249 (Count 5). Plaintiffs can only bring these claims because of their purchases under the Agreements. ECF No. 1 ¶¶ 21–22 (alleging purchases of TWN). All claims thus "touch" the Agreements. *Kan. City Urology*, 261 S.W.3d at 14; *see also Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 293 (3d Cir. 2016) (evaluating arbitration clause covering claims "arising out of or related to" the contract and holding "we must resolve any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.").

In this situation, the "FAA requires courts to enforce arbitration agreements according to their terms." *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183 (2019) (compelling arbitration of antitrust claims pursuant to arbitration clauses in distribution contracts)); *see also id.* ("The Federal Arbitration Act (FAA) reflects the 'national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.'" (citation omitted)). Upon identical facts—antitrust claims arising out of purchase agreements containing substantively identical arbitration clauses—the law of Missouri and the Third Circuit support a finding that the claims are arbitrable. *Kan. City Urology*, 261 S.W.3d at 13 (remanding to trial court to compel arbitration of antitrust claims as "relating to or arising from this Agreement"); *In re Remicade Antitrust Litig.*, 938 F.3d at 526 ("Accordingly, because RDC's antitrust claims 'aris[e] out of or relate[] to' the Agreement, they must be arbitrated."); *Black v. JP Morgan Chase & Co.*, 2011 WL 3940236, at *6 (W.D. Pa. Aug. 25, 2011) ("language of an arbitration provision providing that 'any controversy, claim or dispute arising out of or relating' is of the broadest nature"). This dispute readily falls within the scope of the parties' broad arbitration agreement, which reaches "[a]ny controversy or claim

arising out of or relating to" the Agreement governing all Verification Services provided by Equifax in the past or future to Plaintiffs. Ex. C ¶ 14.

### B. The Parties Agreed That the Arbitration Provision Applies Retroactively

In the Agreements, the parties not only mutually agreed to arbitrate "any controversy or claim arising out of or relating to this Agreement," but agreed that "[t]his Agreement specifically ***supersedes and replaces*** any agreement that ***predates*** this Agreement and which relates to ***the Service as provided*** in ***each*** Schedule A"—where "Service" was defined to include "The Work Number®" and "various other services" provided by Equifax Workforce Solutions LLC. Ex. C at 1 & ¶¶ 1, 14 (emphases added). The reference to "as provided" in "each Schedule A" refers not only to any present purchases, but also to each prior purchase of Verification Services. Contracts between businesses like Plaintiff mortgage lenders and Equifax are enforced according to their "objective terms." *Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 509 (Mo. 2001).

Under the Agreements' objective terms, the parties' arbitration agreements apply not only to the Verification Services provided to Plaintiffs most recently, but also retroactively to all prior Verification Services provided to Plaintiffs, particularly given the retroactive-specific language, superseding nature of the Agreement, and broad definition of "Service." Ex. C at 1 & ¶ 1; *see Jaludi v. Citigroup,* 933 F.3d 246, 256 (3d Cir. 2019) (superseding agreement concerning same subject matter, including arbitration, controls); *see also McCarney v. Nearing, Staats, Prelogar & Jones*, 866 S.W.2d 881, 887 (Mo. App. 1998) ("The public policy favoring arbitration is so strong that once an agreement to arbitrate is proven, the arbitration clause will be construed in favor of arbitration unless the clause positively cannot be interpreted to cover the asserted dispute." (citation omitted)).

The FAA expressly provides that "an agreement in writing to submit to arbitration an ***existing controversy*** arising out of . . . a contract[] [or] transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). Thus, "the weight of authority supports applying broad arbitration provisions retroactively." *Kutluca v. PQ New York Inc.*, 266 F. Supp. 3d 691, 703 (S.D.N.Y. 2017). As one court observed, Third Circuit precedent is clear:

> Plaintiff argues that his claims that arose before the amendments [adding arbitration clauses to the parties' agreements] are not subject to arbitration because "any amendment providing for arbitration had only a prospective effective date." However, this is simply wrong. The United States Court of Appeals for the Third Circuit has held that claims arising prior to an amendment to add an arbitration clause where such amendment was added in accordance with the amendment procedure set forth in the original agreement between the parties covers all claims arising under the original agreement.

*Mayer v. Verizon New Jersey, Inc.*, 2014 WL 12789832, at *2 n.6 (D.N.J. May 6, 2014) (citing *Lloyd v. MBNA Am. Bank, N.A.*, 27 F. App'x 82, 84-85 (3d Cir. 2002)). Moreover, courts in the Third Circuit and elsewhere routinely hold that "in the absence of a provision placing a temporal limitation on arbitrability, an arbitration provision may cover claims that accrued prior to the execution of the agreement to arbitrate." *Lai Chan v. Chinese-Am. Plan. Council Home Attendant Program, Inc.*, 180 F. Supp. 3d 236, 241 (S.D.N.Y. 2016); *see Newhall v. Chase Home Fin. LLC*, 2010 WL 4387517, at *6 n.4 (D.N.J. Oct. 28, 2010) ("It is not uncommon for an arbitration clause employing broad language to apply retroactively and cover claims that pre-date the agreement."); *Hamilton v. Dean Witter Reynolds, Inc.*, 1989 WL 89434, at *4 (W.D. Pa. July 19, 1989) (holding arbitration agreement applies retroactively, explaining "contrary to plaintiff's argument, the terms of the agreement to arbitrate are not limited to activities undertaken in the account after January 6, 1987"); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 542 (S.D.N.Y. 2018) (analyzing arbitration clause without explicitly retroactive language and holding that "[g]iven that Airbnb's broad arbitration clause applies retroactively, the arbitration clauses in the modified versions of the TOS

are sufficient to govern this dispute and refer the entire matter to arbitration, including any claims . . . that arose . . . prior to the incorporation of any arbitration provision").

Here, the Agreement not only omits any temporal limitation on arbitrability, but reflects an intent to expand arbitrability to include past disputes. As the Agreement states, it "specifically supersedes and replaces any agreement that predates this Agreement and which relates to the Service as provided in each Schedule A." Ex. C ¶ 1. Courts have found that such language removes any doubt about retroactive application—even after litigation already has begun. For example, in an antitrust class action alleging illegal price fixing, a court held that provisions stating that an agreement "supersedes all prior agreements, representations, and understandings between the parties" caused "arbitration clauses [to] apply retroactively to encompass even those antitrust claims that arose prior to the execution of the relevant contracts," regardless of whether the provisions were introduced after the plaintiffs filed their action. *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 854-55 & n.9 (D. Md. 2013). Courts frequently enforce agreements to arbitrate claims retroactively, even when those agreements have been entered into after litigation has begun. *See, e.g.*, *Vargison v. Paula's Choice, LLC*, 2025 WL 346197, at *2 (W.D. Wash. Jan. 30, 2025), *opinion clarified*, 2025 WL 822659 (W.D. Wash. Mar. 13, 2025) (retroactively enforcing arbitration agreement entered after litigation commenced); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577-79 (W.D.N.C. 2000) (compelling individual arbitration based on terms and conditions revised after the commencement of litigation); *Lai Chan*, 180 F. Supp. 3d at 241 (compelling arbitration of wage-related class action where arbitration provision was entered into "during the pendency of this motion"); *Laster v. T-Mobile USA, Inc.*, 2012 WL 1681762, at *1, *4 (S.D. Cal. May 9, 2012) (compelling individual arbitration based on revision to arbitration agreement entered into after commencement of lawsuit); *Newhall*, 2010 WL 4387517, at *6 n.4

(rejecting plaintiff's attempt to disregard an "arbitration agreement entered *after* a lawsuit is filed" as "unavailing" because "[i]t is not uncommon for an arbitration clause employing broad language to apply retroactively and cover claims that pre-date the agreement"). And even if there were any "doubts" concerning the scope of arbitrable issues, they "should be resolved in favor of arbitration." *Foresta*, 2024 WL 329524, at *6 (citation omitted).

**C. Equifax Timely Moved To Compel Arbitration**

Equifax timely moved to compel arbitration and did not waive any right to compel arbitration. The right to enforce an arbitration agreement is waived only when done so intentionally and with knowledge of the contractual right. *See, e.g.*, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022) (arbitration agreements are subject to the general rule that waiver is effected only through "intentional relinquishment or abandonment of a known right."). Swiftly after learning that Plaintiffs had agreed to arbitrate, Equifax invoked its rights, asking Plaintiffs to agree to stay the litigation pending arbitration. When Plaintiffs refused, Equifax moved to stay discovery the following business day and within five days filed this motion. In the meantime, Equifax ceased all offensive discovery and alerted subpoena recipients (having already alerted Plaintiffs) of its invocation of its arbitration right and the motion to stay discovery. *See* Bennett Decl. ¶¶ 6-8, Ex. J. Even considering Equifax's unanswered third-party subpoenas, at all times Equifax has acted consistent with that right in every conceivable manner.

**CONCLUSION**

All of Plaintiffs' claims are governed by valid arbitration agreements containing clear delegation provisions that reserve all threshold issues of arbitrability to the arbitrator. Equifax respectfully requests that the Court stay the action so that the parties can proceed to arbitration in Missouri, and grant any further relief the Court deems proper.

Dated: July 25, 2025

Respectfully Submitted,

*/s/ Edward J. Bennett*

Edward J. Bennett (*pro hac vice*)
Jonathan B. Pitt (*pro hac vice*)
Elise Baumgarten (*pro hac vice*)
Sean Douglass (*pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
ebennett@wc.com
jpitt@wc.com
ebaumgarten@wc.com
sdouglass@wc.com

Christopher H. Casey (50625)
Joseph Welsh (329626)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
chcasey@duanemorris.com
jrwelsh@duanemorris.com

*Counsel for Defendants Equifax Workforce Solutions LLC and Equifax Inc.*