**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GREYSTONE MORTGAGE, INC., and
FIRST FINANCIAL LENDING LLC, *on
behalf of themselves and all others similarly
situated*,

               Plaintiffs,

     vs.

EQUIFAX WORKFORCE SOLUTIONS LLC
and EQUIFAX, INC.,

              Defendants.

Case No. 2:24-cv-2260-JFM

ORAL ARGUMENT
REQUESTED

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO ENJOIN
ENFORCEMENT OF DEFENDANTS' ARBITRATION CLAUSE AND LIMIT
DEFENDANTS' COMMUNICATIONS WITH CLASS MEMBERS AS TO THIS
<u>LITIGATION</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND ...........................................................................................3

I.    There Are Multiple Methods Available for Verifying Income and Employment ..............3

II.   There Are Multiple Methods of Contracting with Equifax for Verification
      Services ...............................................................................................................4

III.  Plaintiffs Made Only Isolated And Infrequent Purchases Before Filing This
      Lawsuit ...............................................................................................................5

IV.   Plaintiffs—in Consultation with Counsel—Placed New Orders and Agreed to
      Binding Arbitration ...........................................................................................6

V.    Plaintiffs' Agreements to Arbitrate Come to Light During Discovery ...............................8

LEGAL STANDARD .....................................................................................................8

ARGUMENT ................................................................................................................10

I.    The Agreements Do Not Violate Rule 23(d) ............................................................10

      A.    Plaintiffs Are Financial Institutions That Are Not Vulnerable .........................11

      B.    Plaintiffs Initiated Their Purchases and Were Not Deliberately Targeted ...........12

      C.    The Agreements Are Bilateral Contracts .......................................................15

      D.    Plaintiffs Were Not Coerced into Entering into the Agreements .........................16

      E.    The Agreements Clearly Require Arbitration ...................................................20

II.   The Agreements Are Not Improper Communications by Lawyers to Represented
      Parties ...............................................................................................................23

III.  Any Other Relief Under Rule 23(d) Is Not Warranted ............................................24

CONCLUSION ............................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Avery v. TEKsystems, Inc.*, 2024 WL 3908103 (N.D. Cal. Aug. 21, 2024)...................................20

*Billingsley v. Citi Trends, Inc.*, 560 Fed. App'x 914 (11th Cir. 2014) ..........................................16

*Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239 (E.D. Tex. 1997)...............................19

*Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014) ....................................................................16

*Carter-Herman v. City of Philadelphia*, 897 F. Supp. 899 (E.D. Pa. 1995)................................9

*Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216 (S.D.N.Y. 2020) ..................... passim

*Cruz v. Redfin Corp.*, 2016 WL 2621966 (N.D. Cal. May 9, 2016)..............................................16

*Custom Hair Designs by Sandy, LLC v. Central Payment Co., LLC*, 2021 WL 5868204
      (D. Neb. Dec. 9, 2021)..........................................................................................................15, 20

*Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758 (N.D. Ohio 2010)...............................................22

*Garcia-Alvarez v. Fogo De Chao Churrascaria (Pittsburgh) LLC*, 2021 WL 5804289
      (E.D. Tex. Dec. 7, 2021) ..............................................................................................................19

*Gorgonzola v. Dir. United States Off. of Pers. Mgmt.*, 2023 WL 1478999 (3d Cir. Feb. 2,
      2023) ...........................................................................................................................................9, 24

*Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509 (N.D. Cal. 2010)............................11

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)...........................................................................9, 24

*Haider v. Lyft, Inc.*, 2021 WL 3475621 (S.D.N.Y. Aug. 6, 2021) .........................................23, 24

*Hegazy v. Halal Guys, Inc.*, 2023 WL 8924092 (S.D.N.Y. Dec. 27, 2023) .................................21

*In re Blackbaud, Inc., Customer Data Breach Litig.*, 2022 WL 1137885 (D.S.C. Apr. 18,
      2022) ...............................................................................................................................................16

*In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ........17, 22

*In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988).......................................................9, 10, 20

*Jenifer v. Delaware Solid Waste Auth.*, 1999 WL 117762 (D. Del. Feb. 25, 1999)....................16

*Jones v. Judge Tech. Servs. Inc.*, 2014 WL 3887733 (E.D. Pa. Aug. 7, 2014)  ...............10, 14, 23

*Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055 (W.D. Wash. 2019) ....................... passim

*Lillehagen v. Alorica, Inc.*, 2014 WL 12768156 (C.D. Cal. Dec. 18, 2014) ...............................24

*Magee v. Francesca's Holding Corp.*, 2020 WL 3169518 (D.N.J. June 15, 2020) .....................10

*Monroe v. Stake Ctr. Locating, LLC*, 2025 WL 941310 (E.D. Va. Mar. 27, 2025) .....................11

*O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020) ........................................20

*O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) .............................11

*Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952 (N.D. Ill. 2013) ........................................17

*Portillo v. Nat'l Freight, Inc.*, 2021 WL 3486894 (D.N.J. Aug. 9, 2021) .....................................17

*Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001) .....................................................................................................................................17, 25

*Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893 (N.D. Ill. 2013) .................................................17

*Rushing v. Williams-Sonoma, Inc.*, 2020 WL 6787135 (N.D. Cal. Oct. 8, 2020) .........2, 12, 13, 16

*Salazar v. Driver Provider Phoenix LLC*, 532 F. Supp. 3d 832 (D. Ariz. 2021) .............10, 11, 15

*Story v. Heartland Payment Sys., LLC*, 461 F. Supp. 3d 1216 (M.D. Fla. 2020) ..............2, 11, 15

*Tripicchio v. UPS Store, Inc.*, 2023 WL 6307528 (D.N.J. Sept. 28, 2023) .............................9, 25

*Univ. Patents, Inc. v. Kligman*, 737 F. Supp. 325 (E.D. Pa. 1990) .................................................9

*Vargison v. Paula's Choice, LLC*, 2025 WL 822659 (W.D. Wash. Mar. 13, 2025) ...................22

*Williams v. Sake Hibachi Sushi & Bar, Inc.*, 2018 WL 4539114 (Sept. 21, 2018) ......................22

*Williams v. Securitas Sec. Servs. USA, Inc.*, 2011 WL 2713741 (E.D. Pa. July 13, 2011) ... passim

## STATUTES & RULES

Mo. Rev. Stat. §§ 435.460 *et seq.* .................................................................................................21

Fed. R. Civ. P. 23 .................................................................................................................. passim

Plaintiffs here seek to have the Court rewrite and invalidate key portions of Equifax's broadly applicable agreements, to vitiate contractual rights, to brand Equifax and its counsel as violators of the rules of ethics, and to force Equifax (and all major companies who find themselves in the unremarkable position of being named as defendants in class action lawsuits) to engage in a costly and wasteful monitoring regime to ensure putative class members do not seek out its services—all on the basis of a routine update to agreements governing Equifax's "pay as you go" web portal (which accounts for a fraction of 1% of Equifax's verification business), presented to Plaintiffs only because they themselves initiated contact with Equifax.  That is not the law.

## INTRODUCTION

Equifax fulfills hundreds of millions of income and employment verifications per year to banks, mortgage companies, and other financial institutions and government agencies pursuant to direct contracts.  But Equifax also makes its verification services available via a web portal, which is used on a "pay as you go" basis, including by infrequent or sporadic purchasers of verifications.

This past March and June, Plaintiffs First Financial Lending LLC and Greystone Mortgage, Inc. placed new orders for income and employment verification reports from Equifax's pay-as-you-go web portal.  Each mortgage company had ordered verifications from Equifax on only one or two occasions in the years before filing this lawsuit, and each could have obtained similar verifications in multiple other ways, but elected to purchase from Equifax's web portal.  By the time they initiated their latest purchases, Equifax had updated the Online Universal Membership Agreement for pay-as-you-go purchases to include an arbitration clause—similar to one it has negotiated in the past in other agreements with verifiers—which Plaintiffs reviewed and accepted.  But Plaintiffs now assert that Equifax is barred from enforcing the Agreements because the Agreements supposedly constitute either abusive communications to putative class members in violation of Federal Rule of Civil Procedure 23(d), or unethical communications to represented

1

parties in violation of Pennsylvania Rule of Professional Conduct 4.2.  ECF No. 121-1 ("Mot.").

That suggestion does not pass the straight-face test, much less the standards Plaintiffs purport to

invoke.

Contrary to Plaintiffs' suggestion, there is nothing improper about Equifax requiring

merchants placing orders for services to accept updated terms as a precondition to their

purchases—a common and benign practice for firms that do business in the United States.  And

contrary to Plaintiffs' suggestions, filing suit against a company does not freeze its ability to

change its terms of service, including terms for dispute resolution—even where that lawsuit names

a putative (and, of course, uncertified) class.  Nor does it require the company to apply different

terms of service to a plaintiff than to other customers.  Thus, courts frequently enforce such updated

terms of service where plaintiffs accepted them in connection with new transactions they initiate

during litigation.  *See, e.g.*, *Story v. Heartland Payment Sys., LLC*, 461 F. Supp. 3d 1216, 1223-24

(M.D. Fla. 2020); *Rushing v. Williams-Sonoma, Inc.*, 2020 WL 6787135 (N.D. Cal. Oct. 8, 2020).

Plaintiffs attempt to create the opposite impression by citing a raft of cases presenting

different scenarios—such as threats to fire employees who do not sign agreements, unilateral

changes to consumer agreements, or onerous "opt out" procedures.  Whereas Plaintiffs here were

presented with a clear option to either agree to the new terms or to decline, the only two cases

Plaintiffs cite in which updates to online terms of service were inappropriate involved companies

unilaterally changing terms without assent, Mot. 13 (citing *Custom Hair Designs by Sandy, LLC*

*v. Central Payment Co., LLC*, 2021 WL 5868204 (D. Neb. Dec. 9, 2021)), or hiding the method

for "opting out" and imposing stiff penalties on individuals who elected to do so, Mot. 13-14 (citing

*Kater v. Churchill Downs, Inc.*, 423 F. Supp. 3d 1055, 1061 (W.D. Wash. 2019)).  Such cases

could not be more different from Equifax's clear, bilateral Agreements with corporate customers.

2

Plaintiffs also assert that they, and the putative class of large banks and mortgage companies they purport to represent, had no choice but to accept the Agreements because Equifax is the only source for the information they seek. But Equifax customers do not have to use the web portal governed by the terms in the Agreements, and may enter into separate agreements, as a great many verifiers have done. And as Plaintiffs have acknowledged, there are multiple alternative sources for verifying income and employment information. Plaintiffs' assertions that they only made their recent purchases because unnamed individuals employed by third parties told them to obtain verifications from Equifax do not establish that Equifax coerced them to do so.

Plaintiffs' Motion boils down to an attempt not only to *sua sponte* expand their page limits for opposing Equifax's pending Motion To Compel Arbitration, but also to wrest control of companies' contracting with its own customers by weaponizing the rules of civil procedure and ethics. Because there is no basis for such relief in the facts or the law, Plaintiffs' Motion should be denied.

## FACTUAL BACKGROUND

### I. There Are Multiple Methods Available for Verifying Income and Employment

This case concerns verification services that mortgage companies and banks use to verify borrowers' income and employment information before extending loans. Plaintiffs are mortgage companies that purport to represent a putative class including other companies that allegedly have overpaid to verify such information using Equifax's product The Work Number ("TWN") since May 2020. ECF No. 1 ("Compl.") ¶¶ 21-22, 178. Plaintiffs assert that members of the putative class include some of the largest financial institutions in the country, including Morgan Stanley, CoreLogic, U.S. Bancorp, Better Mortgage Corporation, and DHI Mortgage Company. Ex. S.

Although Plaintiffs contend that Equifax has a monopoly, verifiers have many other options for confirming borrowers' income and employment information. For example, companies

can contract with other providers, such as Experian, TransUnion, Truework, Truv, and Xactus, among many others. *See* Ex. T (Plaintiffs requesting that "the names of Equifax's competitors" including the foregoing companies be included as search terms); Compl. ¶¶ 2-3. Lenders can also obtain verifications directly from employers or payroll providers that have contracted with employers, including many that have not contracted at all with Equifax or whose contracts with Equifax do not include any exclusivity. *See id.* ¶ 2. And lenders can manually verify borrower information themselves, free of charge, including through sources like paystubs, bank statements, and the like. *Id.*

## II.    There Are Multiple Methods of Contracting with Equifax for Verification Services

Verifiers can also obtain services from Equifax in multiple ways. First, verifiers can and do contract with Equifax directly and negotiate terms that vary widely, including as to dispute resolution. Some such agreements include arbitration provisions, others do not, and others refer to additional procedures. *See* Ex. R (Supplemental Declaration of Edward J. Bennett, "Bennett Supp. Decl.") ¶ 6.

Second, verifiers can navigate to Equifax's web portal, create an account, and purchase verification services on a "pay as you go" basis after being prompted to agree to the operative terms of service. ECF No. 114-3 ("Nonnenkamp Decl.") ¶ 2. A majority of users who place pay-as-you-go orders via Equifax's web portal make just one or two purchases before their accounts go inactive and are eventually deactivated for security and compliance reasons, and most customers who purchase more than that limited number of verifications do so pursuant to separate agreements with Equifax rather than through the web portal. Ex. M (Supplemental Declaration of Sarah Nonnenkamp, "Nonnenkamp Supp. Decl.") ¶¶ 3-5. Over the past 3 years, Equifax has updated its web portal's terms of service on at least 3 occasions. *See* Ex. B, ECF No. 114-4; Nonnenkamp Decl. ¶¶ 8, 11-12. The terms of use that have governed all users' (not just

customers') use of all Equifax web pages (not just the web portal) have reminded potential customers that they may obtain verification services either if they "enter into an Agreement via an online signup process *and/or* contract with Us through an agreement."  Ex. Q (emphasis added).

### III.    Plaintiffs Made Only Isolated And Infrequent Purchases Before Filing This Lawsuit

Despite having purported to operate for at least six or twelve years, respectively, Exs. V-W, each Plaintiff purchased verifications from Equifax on only one or two occasions before filing this suit.  Plaintiff First Financial Lending LLC ordered a single verification in June 2023, and did not place another order for nearly two years.  *See* Ex. B, ECF No. 114-4.  Plaintiff Greystone Mortgage, Inc. ordered two verifications on the same day in October 2023, placed an additional order the week after filing the complaint, and did not place another order during the next year.  *Id*. And according to public data, Plaintiffs appear to have collectively originated dozens of mortgages in 2023 and 2024, for which they apparently obtained verifications of borrowers' income and employment information from sources other than Equifax.  Ex. U.  Plaintiffs have not provided any evidence that either of them made any attempt to negotiate an agreement with Equifax containing terms different from those that govern customer-initiated transactions on its web portal.

After Plaintiffs' initial purchases, Plaintiffs filed this antitrust lawsuit on May 28, 2024, alleging they overpaid for Verification Services because of allegedly ongoing antitrust violations. Compl. ¶ 36.  The lawsuit was the subject of widespread media attention, including by national organizations like Reuters, industry media outlets like HousingWire, National Mortgage

Professional, and National Mortgage News, and legal publications such as Law360 and Bloomberg Law—not to mention on class counsel's own website.[1] Ex. X.[2]

On August 2, 2024, Equifax filed a motion to dismiss, which the Court denied on February 18, 2025. *See* ECF Nos. 36, 55. Further press coverage of the lawsuit followed the Court's decision. Ex. Y. Equifax filed its answer on March 4, 2025. ECF No. 58.

## IV.    Plaintiffs—in Consultation with Counsel—Placed New Orders and Agreed to Binding Arbitration

After Equifax filed its answer, both Plaintiffs placed new orders on Equifax's "pay as you go" web portal in consultation with their counsel. Greystone Mortgage, Inc.'s president testified that he "consulted [his] attorneys" when making purchases on Equifax's web portal, and did so "before proceeding with logging in or using TWN," which he used to place a new order on June 3, 2025. ECF No. 121-6 ("D'Ambrosio Decl.") ¶¶ 10-11. First Financial Lending LLC's principal testified that he only "attempted to access" his TWN account "[a]fter [his] counsel asked me to collect documents for this litigation," and when he was "unable to log in," an employee created another account for shared use (in violation of Equifax's Terms & Conditions, Ex. C, ECF No. 114-5; *see also* Nonnenkamp Supp. Decl. ¶ 9), which they used to place new orders on March 13 and 19, 2025. ECF No. 121-5 ("Salotto Decl.") ¶¶ 7-8, 11-12. Despite disclosing that their counsel instructed them regarding their purchasing, neither corporate representative explained why they were advised to suddenly supplement their purchasing during this litigation—including whether

---

[1] *See, e.g., Katie R. Beran*, HAUSFELD, https://www.hausfeld.com/who-we-are/katie-r-beran ("*Greystone Mortgage Inc. and First Financial Lending LLC v. Equifax Workforce Solutions LLC and Equifax Inc.* – Hausfeld represents verifiers in an antitrust class action alleging Equifax monopolized the market for electronic verification of income and employment services."); *Daniel P. Weick*, HAUSFELD, https://www.hausfeld.com/who-we-are/daniel-p-weick (same).

[2] Plaintiffs state that putative class members "have no meaningful way of learning of the current lawsuit," Mot. 6 n.2, but omit any reference to this widespread news coverage, let alone any explanation for why it does not provide a "meaningful" way to learn about the lawsuit.

the new purchases were strategically intended to overcome Plaintiffs' clear inadequacy to represent a class that purports to include lending behemoths that have longstanding, near-constant relationships with Equifax.

As described in Equifax's brief in support of its motion to compel arbitration and stay proceedings, ECF No. 114-1 ("Defs.' Mot."), Plaintiffs accepted updated terms including an arbitration provision in connection with initiating their latest purchases (the "Agreements"). As relevant here, the first line of the Agreements, which is displayed prominently on the screen shown to every user, reads in all capital letters: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." Ex. C at 1, ECF No. 114-5. Paragraph 14 of the Agreements then contains the following arbitration agreement:

> ARBITRATION. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in St. Louis, Missouri, administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgement of the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Additionally, each of the parties hereby waive, to the fullest extent permitted by applicable laws, the right to bring or join any class action proceedings.

*Id.* ¶ 14. And the last line of the Agreements repeats in all capital letters: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." *Id.* at 5.

To purchase Verification Services, a user first must create an account and navigate to the web portal log-in screen. Nonnenkamp Decl. ¶ 9; Ex. D, ECF No. 114-6. After entering credentials, the user is asked to "review and acknowledge" the "applicable terms and conditions," and sees a portion of the first page of the Agreement that the user can scroll through, with the visible portion including the following text in all capital letters at the top: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY

THE PARTIES."  Nonnenkamp Decl. ¶ 9; Ex. D, ECF No. 114-6.  To accept the Agreement, the user is prompted to check a box stating "I have reviewed and agree to the above Terms and Conditions" and to click either the "Agree & Continue" button or the "Disagree & Logout" button. Nonnenkamp Decl. ¶ 9; Ex. D, ECF No. 114-6.  Only after being prompted to agree can a user proceed to purchase Verification Services on the web portal.  Nonnenkamp Decl. ¶ 9.

## V.    Plaintiffs' Agreements to Arbitrate Come to Light During Discovery

Given Plaintiffs' inactivity after their initial orders, which is not inconsistent with the behavior of most web portal users, Equifax would have had no reason to believe that Plaintiffs would have placed new orders after filing their lawsuit.  It was only upon reviewing hundreds of thousands of pages of documents that Equifax had gathered as part of efforts to respond to Plaintiffs' discovery requests that Equifax discovered that both Plaintiffs had recently agreed to binding arbitration provisions via the web portal.  *Id.* ¶ 5.  Within ***two days*** of learning this fact, Equifax's counsel alerted Plaintiffs' counsel and promptly filed its motion to compel arbitration. ECF No. 114.

On August 25, 2025, in addition to opposing Equifax's motion, Plaintiffs filed this Motion, asserting that Equifax should be enjoined from enforcing the updated terms that Plaintiffs and any other corporate representatives accepted, on the ground that they constitute impermissible communications with companies that are putative class members and are represented by counsel. ECF No. 121.  Plaintiffs' Motion should be denied and the parties' Agreements should be enforced.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23(d) provides that "the court may issue orders that," among other things, govern communications with class members in order "to protect class members and fairly conduct the action."  Fed. R. Civ. P. 23(d)(1)(B).  The Third Circuit has held that communications constitute "abuse of the class action process" when they involve (1) "***blatant***

**misconduct** that sought either to affect class members' decisions to participate in the litigation or to undermine class plaintiffs' cooperation with or confidence in class counsel," or (2) **implicit threats** intended to manipulate the litigation, such as "communications that seek or threaten to influence the choice of remedies." *In re Sch. Asbestos Litig.*, 842 F.2d 671, 682-83 (3d Cir. 1988) (emphases added).

Any "order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *see Tripicchio v. UPS Store, Inc.*, 2023 WL 6307528, at *5 (D.N.J. Sept. 28, 2023) ("When courts do enter Rule 23(d) relief, it is based on specific evidence that putative plaintiffs will be deterred from participating in the class action."). Such an order must "be restricted to the minimum necessary to correct the effects of [any] improper conduct under Rule 23," and "therefore should be the narrowest possible relief which would protect the respective parties." *Gorgonzola v. Dir. United States Off. of Pers. Mgmt.*, 2023 WL 1478999, at *6 (3d Cir. Feb. 2, 2023).

Pennsylvania Rule of Professional Conduct 4.2 provides that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter." Rule 4.2 aims at "prevent[ing] lawyers from taking advantage of uncounselled lay persons." *Carter-Herman v. City of Philadelphia*, 897 F. Supp. 899, 901 (E.D. Pa. 1995). Any remedy ordered pursuant to Rule 4.2 must be supported by evidence that a party is prejudiced by an ethical violation and must be limited to avoid "draconian" relief. *Univ. Patents, Inc. v. Kligman*, 737 F. Supp. 325, 329 (E.D. Pa. 1990).

## ARGUMENT

### I.    The Agreements Do Not Violate Rule 23(d)

Plaintiffs' request that the Court "hold the arbitration clause [contained in the Agreements] ineffective," Mot. 1, has no support in the case law of this Circuit.  Courts have only found mid-litigation arbitration agreements to meet the Third Circuit's criteria for "abuse of the class action process," *In re Sch. Asbestos Litig.*, 842 F.2d at 680, when the agreements are self-executing or otherwise misleading—such as when they purport to unilaterally "bind" putative class members even if they never accepted them, or contain a hidden "opt-out" procedure designed to be "misleading" to vulnerable individuals such as "hourly-paid security guards." *Williams v. Securitas Sec. Servs. USA, Inc.*, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011).  Otherwise, courts have upheld bilateral agreements that "do not contain the sort of confusing, misleading or unfair" content that risks a violation of Rule 23(d).  *Jones v. Judge Tech. Servs. Inc.*, 2014 WL 3887733, at *7-8 (E.D. Pa. Aug. 7, 2014) (upholding mid-litigation arbitration agreement that "did not become effective until signed" and was easy for employees to read and understand); *Magee v. Francesca's Holding Corp.*, 2020 WL 3169518, at *10 (D.N.J. June 15, 2020) (upholding mid-litigation arbitration agreements with employees who were putative class members as "simply not analogous" to the "far more invasive communication" sufficient to justify Rule 23 relief).

Courts outside this Circuit have applied a similar approach.  Such courts have invalidated arbitration agreements upon evidence, for example, that agreements were forcibly imposed on vulnerable consumers.  Courts have summarized their analysis of the relevant circumstances by reference to five factors: (1) the plaintiffs' relative vulnerability; (2) whether the putative class was deliberately targeted; (3) whether agreements were unilaterally imposed; (4) whether plaintiffs were coerced into accepting the agreements; and (5) whether the agreements were otherwise

misleading. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 264 (S.D.N.Y. 2020).[3] All these factors show that there is no basis for the injunction that Plaintiffs seek.

### A.    Plaintiffs Are Financial Institutions That Are Not Vulnerable

Plaintiffs are not "particularly vulnerable," *id.*—they are mortgage companies in the business of brokering legal agreements with consumers, and they have been represented by counsel throughout this litigation.  Courts have found individual laypersons to be vulnerable when, for example, they are "low-wage" or "hourly workers" with "no more than a high school education," *Monroe v. Stake Ctr. Locating, LLC*, 2025 WL 941310, at *4 (E.D. Va. Mar. 27, 2025); *Salazar v. Driver Provider Phoenix LLC*, 532 F. Supp. 3d 832, 837 (D. Ariz. 2021); *Williams*, 2011 WL 2713741, at *2; "addicted gamblers," *Kater*, 423 F. Supp. 3d at 1061; or "immigrants" with "limited English proficiency and little or no formal education," *O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013); *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 511 (N.D. Cal. 2010).

By contrast, Plaintiffs are financial institutions that broker home loan transactions with consumers, including by preparing contracts, and Plaintiffs have asserted that the putative class that they seek to represent allegedly includes some of the largest financial institutions in the country, including Morgan Stanley, CoreLogic, U.S. Bancorp, Better Mortgage Corporation, and DHI Mortgage Company.  Ex. S.  No court has found such entities to be so vulnerable to warrant Rule 23(d) intervention.  In fact, courts have concluded that individual "financial services

---

[3] *Chen-Oster* provides a comprehensive analysis and has been cited by federal district courts across the country.  *See, e.g.*, *Salazar*, 532 F. Supp. 3d at 837 (finding *Chen-Oster* "instructive").  Curiously, Plaintiffs identify (without citation) just three of the factors described in *Chen-Oster*: whether the arbitration agreement is misleading, whether plaintiffs were coerced into agreeing to arbitrate, and whether Equifax's intent was to "frustrate the pending action."  Mot. 7.  They acknowledge that these are three factors "among others," *id.*, but choose to omit the others, such as their lack of "vulnerability" and the fact that the Agreements were not "unilaterally imposed" but accepted by Plaintiffs in transactions Plaintiffs initiated.  *Chen-Oster*, 449 F. Supp. 3d at 264.

professionals" were not vulnerable, *Chen-Oster*, 449 F. Supp. 3d at 264, nor were "lawyer[s], school district employee[s], and information technology professional[s]," *Story*, 461 F. Supp. 3d at 1223. Plaintiffs' relative lack of vulnerability "is a factor that distinguishes this case from those where courts deemed it necessary to take action to prevent or cure likely confusion among low-wage or less-educated workers." *Chen-Oster*, 449 F. Supp. 3d at 264.

Even if Plaintiffs were to attempt to analogize themselves to "lay persons" recognized by courts as particularly vulnerable, *Williams*, 2011 WL 2713741, at *3, Plaintiffs have been represented by counsel throughout this litigation. *See* Salotto Decl. ¶ 3; D'Ambrosio Decl. ¶ 3. In fact, the principals of both Plaintiffs testified that they consulted with their counsel in connection with their use of Equifax's web portal. *See* D'Ambrosio Decl. ¶¶ 10-11; Salotto Decl. ¶¶ 7-8, 11-12; *see supra* p. 6. Plaintiffs were eminently "well-positioned to understand the implications of [the Agreements] presented to them." *Chen-Oster*, 449 F. Supp. 3d at 264.

### B.    Plaintiffs Initiated Their Purchases and Were Not Deliberately Targeted

Plaintiffs also have presented no evidence that Equifax deliberately "targeted" the putative class in this case, *id.*, including because: (1) ***Plaintiffs themselves—not Equifax—initiated the transactions that led to their acceptance of the Agreements***; (2) updates to terms of service for "pay as you go" web portal customers could not have been targeted at a putative class including other purchasers subject to other agreements; and (3) Equifax had no reason to expect Plaintiffs would use the web portal, let alone place new orders there, given their inactivity and *de minimis* use of Equifax's services, which is not inconsistent with the behavior of many pay-as-you-go web portal users. Thus, Plaintiffs' accusations that Equifax "intended to injure Class members" or "lay in wait" with intent to "eviscerate" the class action, Mot. 15, is factually and legally wrong.

***First***, Plaintiffs themselves initiated the transactions with Equifax that led to their voluntary acceptance of the Agreements—namely, making new purchases of Equifax's products since

August 13, 2024.  *See* Nonnenkamp Decl. ¶¶ 7, 9-10.  Courts have relied on that same conduct to hold that a post-litigation arbitration agreement did not impermissibly "target" plaintiffs and was not an impermissible communication under Rule 23(d).  In *Rushing v. Williams-Sonoma, Inc.*, for instance, a named plaintiff in a putative class action made a new purchase from defendant during the litigation, and accepted updated Terms & Conditions that included an arbitration clause.  2020 WL 6787135, at *1.  The court observed that the defendant "chang[ing] its Terms and Conditions for purchases after this lawsuit was commenced" was not "abusive, misleading, or coercive," did not "justify invalidating the arbitration clause," and "can[not] appropriately be deemed an improper communication on the part of [defendant]," because it was the plaintiff who "***initiated the transaction that resulted in her agreement***."  *Id.* at *4 (emphasis added).

Similarly, in *Jones v. Waffle House, Inc.*, the named plaintiff in a putative class action against Waffle House applied for employment at, and was hired by, a Waffle House restaurant while his lawsuit was pending.  866 F.3d 1257, 1272 (11th Cir. 2017).  He signed a broad arbitration agreement as a condition of his employment, and Waffle House moved to compel arbitration.  *Id.* at 1263.  The Eleventh Circuit rejected the argument that Waffle House had violated Rule 23(d) by presenting its employee with a mid-litigation arbitration agreement, holding that "there [was] not the slimmest shred of evidence that the arbitration agreement was part of a purposeful attempt to communicate with putative class members," because "it was [plaintiff] who ***initiated the communication with the defendant*** by seeking employment."  *Id.* at 1272 (emphasis added).  As the Eleventh Circuit explained: "Nothing in this case implicates the concerns we have expressed about unsupervised, unilateral communications with the plaintiff class."  *Id.*

***Second***, the terms of service in this case were only updated for pay-as-you-go web portal users, and did not apply to customers who purchased millions of verifications pursuant to other

agreements with Equifax, which Plaintiffs have not shown they ever attempted to enter.  *Supra* p. 5.  Such separate agreements with other verifiers contain varying terms, including as to dispute resolution procedures.  Bennett Supp. Decl. ¶ 6.  That only a sliver of purchasers accepted updated web portal terms of service refutes Plaintiffs' theory Equifax was "targeting" the putative class. *See, e.g.*, *Chen-Oster*, 449 F. Supp. 3d at 266 (no "target[ing]" to "putative Class Members").

*Third*, the circumstances of Equifax's discovery that Plaintiffs entered into the Agreements further underscore that they did not intentionally target Plaintiffs.  As explained, Equifax employees discovered that Plaintiffs entered into the Agreements only while reviewing documents collected in response to Plaintiffs' discovery requests.  *See* Nonnenkamp Decl. ¶¶ 3, 5-6.  Plaintiffs were infrequent users of Equifax's services, purchasing just three verifications before filing this lawsuit in May 2024.  *See* Ex. B, ECF No. 114-4.  Such *de minimis* use of Equifax's services is commonplace and unremarkable—most web portal users purchase just two or fewer verifications before their accounts are eventually deactivated.  Nonnenkamp Supp. Decl. ¶ 5.  Equifax had no reason to think that Plaintiffs would log back in to their accounts and purchase additional verifications after terms were updated in August 2024.  And Equifax was not constantly monitoring whether Plaintiffs initiated new purchases and entered into the Agreements; when it did discover that Plaintiffs had done so, Equifax promptly raised the issue with Plaintiffs and the Court.  *See* Nonnenkamp Decl. ¶¶ 5-6; Defs.' Mot. 8-9.  This is hardly the behavior of a defendant that has deliberately targeted Plaintiffs.  *See, e.g.*, *Jones*, 866 F.3d at 1272 (noting, in holding that arbitration agreement prompted by plaintiff's application for employment did not violate Rule 23(d), that defendant's "central legal team . . . did not know that [plaintiff] had" entered into the agreement).  Plaintiffs speculate that the fact that the terms of service were updated to include a brand-new arbitration clause months after the commencement of this litigation shows they were

14

meant to undermine the class action, Mot. 16-17, but that is unsupported. Equifax has updated its terms of service several times in recent years, *see* Ex. B, ECF No. 114-4, arbitration clauses have existed in various contracts with verifiers for many years, Bennett Supp. Decl. ¶ 6, and the updated terms only applied to web portal users, not to a great many customers who purchase millions of verifications from Equifax pursuant to other agreements, *see* Nonnenkamp Supp. Decl. ¶¶ 3-4. Plaintiffs' speculation about the timing of Equifax's updates is improper and irrelevant. *See, e.g.*, *Salazar*, 532 F. Supp. 3d at 838 (finding plaintiffs failed to show targeting by asserting that the contested arbitration agreement was added during ongoing class litigation).

### C.    The Agreements Are Bilateral Contracts

Further, the Agreements were mutually agreed, not "unilaterally imposed" on anyone. *Chen-Oster*, 449 F. Sup. 3d at 255. Each Plaintiff was presented with the Agreement, which states that it "CONTAINS A BINDING ARBITRATION PROVISION." Ex. C at 1, ECF No. 114-5. Each Plaintiff certified, "I have reviewed and agree to the above Terms and Conditions," and clicked "Agree & Continue" instead of "Disagree & Logout." Nonnenkamp Decl. ¶ 9; Defs.' Mot. 1-2, 5-7. The fact that Plaintiffs were prompted to "affirmatively agree" to "boldly stated" terms, *Story*, 461 F. Supp. 3d at 1224, which they "individually accepted," *Chen-Oster*, 449 F. Supp. 3d at 267, weighs strongly against intervention under Rule 23(d).

The bilateral nature of the Agreements distinguishes this case from many upon which Plaintiffs rely. In *Kater*, for instance, a pop-up prompting gamblers to accept an arbitration clause in updated terms included only an "I Agree" button with no visible option to "Disagree" or otherwise "opt out," which the court found constituted a "false ultimatum." 423 F. Supp. 3d at 1060, 1063. In *Custom Hair Designs*, an arbitration agreement did not "require any affirmative action from [putative class members] to constitute acceptance," and anyone who wished to opt out faced a potential fine for doing so. 2021 WL 5868204, at *2, 7, 9. And in *Williams*, the arbitration

clause at issue was included in a document that purported to "bind" putative class members "even [if they] never sign[ed] the document," unless they opted out by "calling a phone number deeply embedded in the 'agreement.'" 2011 WL 2713741, at *2.

### D. Plaintiffs Were Not Coerced into Entering into the Agreements

Nor were the Agreements obtained by "actual or potential coercion." *Chen-Oster*, 449 F. Supp. 3d at 264. "The test for coercion is whether the conduct somehow overpowers the free will or business judgment of the potential class members." *Jenifer v. Delaware Solid Waste Auth.*, 1999 WL 117762, at *5 (D. Del. Feb. 25, 1999). "[C]oercive communications" include, for example, "urging the potential members to opt out or not participate in the lawsuit." *Cruz v. Redfin Corp.*, 2016 WL 2621966, at *2 (N.D. Cal. May 9, 2016); *see, e.g.*, *Billingsley v. Citi Trends, Inc.*, 560 Fed. App'x 914, 918 (11th Cir. 2014) (employer holding two-on-two meetings between HR representatives and putative class members); *Camp v. Alexander*, 300 F.R.D. 617, 623-24 (N.D. Cal. 2014) (employer threatening putative class members that a lawsuit would necessitate layoffs). Courts readily find there is no coercion where, as here, it was the plaintiffs who "initiated the transaction that resulted in her agreement to [updated] Terms and Conditions," *Rushing*, 2020 WL 6787135, at *4, or plaintiffs fail to show a communication "that misleads [putative class members] about their rights related to the pending litigation," *In re Blackbaud, Inc., Customer Data Breach Litig.*, 2022 WL 1137885, at *3 (D.S.C. Apr. 18, 2022) (emphasis omitted).

Neither the facts nor the law supports Plaintiffs' position that there was coercion due to Plaintiffs' "ongoing dependent business relationship" with Equifax. Mot. 13. At the outset, the parties' relationship cannot reasonably be described as "ongoing." Prior to his login attempt in March 2025, Robert Salotto, a principal at First Financial, had not placed an order through Equifax's web portal in almost two years (since June 2023). *See* Ex. B, ECF No. 114-4. Marc D'Ambrosio, Greystone Mortgage's President, had not placed an order in approximately a year

16

(since a week after filing this lawsuit in June 2024).  *See id.*  Plaintiffs have not cited a single case suggesting that a plaintiff's one-off purchases constitute an ongoing business relationship in which the plaintiff is financially dependent on a defendant.

Moreover, to the extent there was any kind of business relationship between the parties, it was not one in which Plaintiffs were financially "dependent" on Equifax, as in the cases Plaintiffs cited involving employees dependent on their employers, *see, e.g.*, *Portillo v. Nat'l Freight, Inc.*, 2021 WL 3486894, at *1, 5 (D.N.J. Aug. 9, 2021); *Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952, 953 (N.D. Ill. 2013), or cardholders dependent on their credit card companies, *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005), or car dealers who "have no other source" for products than the manufacturers who are their suppliers, *Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*, 2001 WL 1035132, at *4 (S.D.N.Y. Sept. 7, 2001). In contrast to the foregoing cases, "[n]one of the [Plaintiffs is] dependent on [Equifax] for their financial livelihood in the same way that the potential class members were dependent on the defendants in those cases." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 928 (N.D. Ill. 2013).

Plaintiffs' assertion that they are "unable to run their businesses without going through Equifax," Mot. 14,[4] is divorced from reality.  Although Plaintiffs assert, without support, that unnamed employers "would only provide verification through TWN," D'Ambrosio Decl. ¶ 7; Salotto Decl. ¶10, Equifax has not had an exclusive relationship with any of the employers of the

---

[4] Plaintiffs vaguely assert, using identical language, that "[b]ased on [their] experience in the mortgage lending industry," "there are no realistic alternatives to Equifax's TWN" because "[m]any employers . . . will not allow mortgage lenders to verify an applicant's income and employment history except through TWN."  Salotto Decl. ¶ 6; D'Ambrosio Decl. ¶ 6.  Plaintiffs provide no support for this contention, and do not even identify a single such employer.  This contention is also inconsistent with Plaintiffs' own recognition that alternative methods of verification are available.  *See, e.g.*, Compl. ¶¶ 1-2.

borrowers who were the subject of Plaintiffs' March and June 2025 verification requests. Nonnenkamp Supp. Decl. ¶ 7.  There are also many VOIE providers from which Plaintiffs can obtain the same or similar services—for example, Robert Salotto, principal of First Financial, averred that his firm has requested verifications from "Truv and Truework," two competing VOIE providers, Salotto Decl. ¶ 9, and one of Plaintiffs' own exhibits is a screenshot of the browser of Marc D'Ambrosio, President of Greystone Mortgage, showing that he pinned to his bookmarks bar a link to "Xactus," which refers to another VOIE provider, ECF No. 121-3; *see also supra* p. 4.[5]  And as Plaintiffs' complaint acknowledges, verifying income and employment information does not require the services of ***any*** verification-of-income-and-employment ("VOIE") provider, let alone Equifax, because one can manually verify borrower information free of charge, including through sources like paystubs and bank statements.  Compl. ¶ 2.

Moreover, although Plaintiffs have only purchased a handful of verifications from Equifax since the beginning of 2023, they have provided no evidence of the number of mortgages they have brokered during that time.  Public data appears to reflect that their principals have collectively brokered dozens of mortgages since 2023, while only using Equifax's verification services once or twice.  *See* Ex. U.  Plaintiffs plainly have had no trouble running their businesses by using alternative methods for verifying income and employment information, which contradicts their conclusory assertions that they are "dependent" on Equifax for such information.

---

[5] Xactus resells verification data collected and compiled by sellers of verification services, including Equifax, Experian, and Truv.  *See Verifications*, Xactus360, https://xactus.com/wp-content/uploads/2025/04/Xactus-0632-Employment-Income-Flyer-Final-3-26-25.pdf.    To the extent Plaintiff Greystone Mortgage, Inc. argues that it used Xactus to obtain Equifax verification data, that simply underscores that it was not coerced into entering the Agreement—since it could obtain verification information from Equifax indirectly, from Xactus, without needing to agree to Equifax's web portal's updated Terms & Conditions.

Putting aside that Plaintiffs have not demonstrated the sort of business relationship that may give rise to coercion, Plaintiffs also have not identified any actual or threatened coercion. That is, even accepting the premise that the relationship between Plaintiffs and Equifax could be susceptible of coercion, "[i]t is not enough that a *potentially coercive* situation exists"; the court must also make "specific findings" that defendant has actually coerced, or threatened to coerce, Plaintiffs or other putative class members. *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 244 (E.D. Tex. 1997) (emphasis added) (citation omitted). But Plaintiffs ignore their burden to offer such evidence, and instead limit their arguments on coercion to generalized assertions regarding an "ongoing" business relationship with Equifax and Equifax's alleged dominance in the market, while failing to point to any specific facts showing actual or potential coercion. That is insufficient to show that their free will has been somehow overborne. *See Garcia-Alvarez v. Fogo De Chao Churrascaria (Pittsburgh) LLC*, 2021 WL 5804289, at *3 (E.D. Tex. Dec. 7, 2021) (rejecting coercion argument because plaintiff "point[ed] to no other specific evidence of coercion or efforts to undermine the potential collective action by Defendants").

Cases in which courts have found evidence of coercion, including those cited by Plaintiffs, only highlight the absence of coercion here. For example, in *Hampton Hardware, Inc. v. Cotter & Co.*, the court found evidence of coercion where defendant wholesaler sent a series of agitated letters to its member retailers urging them not to participate in ongoing litigation and warning of severe financial consequences in an "attempt[] to reduce the class members participation in the lawsuit based on threats to their pocketbooks." 156 F.R.D. 630, 631, 633 (N.D. Tex. 1994). In this context of trust and reliance, the parties' ongoing business relationship was relevant because the class members were "particularly susceptible to believing the defendant's comments that the lawsuit will cost them money." *Id.* at 633. And in *Kater*, the court found an arbitration agreement

19

coercive where updated terms and conditions "force[d] addicted gamblers to choose between preserving their class action rights and continuing to play games they ha[d] already invested money in." 423 F. Supp. 3d at 1061. "With such pressures at play," the court explained that the misleading arbitration agreement "pop-up, and revised Terms, are clearly intended to steer putative class members away from participating in these cases." *Id.* at 1063.[6] Plaintiffs' other cases involve employers' threats that class members' continued employment depended upon acceptance of arbitration agreements, *see Avery v. TEKsystems, Inc.*, 2024 WL 3908103, at *7–8 (N.D. Cal. Aug. 21, 2024); *O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 598 (S.D.N.Y. 2020), or potential financial repercussions for failure to accept, *see Custom Hair Designs*, 2021 WL 5868204, at *9.

Each of these cases is similar in a critical way: to find coercion (or other factors supporting intervention under Rule 23(d)), courts employ highly fact-specific analyses of the circumstances to identify some genuine dependence by plaintiff and facts supporting a conclusion that defendant deliberately exploited or leveraged that dependence to interfere with class membership. Plaintiffs could not possibly muster such evidence here, nor have they even attempted to do so.

### E.    The Agreements Clearly Require Arbitration

Finally, the Agreements are not "misleading" in any other respect, *Chen-Oster*, 449 F. Supp. 3d at 264, including because (1) they plainly require arbitration, and there is no requirement that they identify any pending class action, including the Plaintiffs' widely reported lawsuit; and (2) the Agreements were individually presented to users and were not hidden or at risk for confusion with others terms on Equifax's websites.

---

[6] Some of the cases on which Plaintiffs rely do not involve *either* a finding of coercion or an ongoing business relationship, contrary to Plaintiffs' characterization. *See In re Sch. Asbestos Litig.*, 842 F.2d at 682-83 (holding that defendants engaged in litigation misconduct, but omitting any mention of an ongoing business relationship or any finding of coercion).

***First***, any concern that the Agreements are "misleading" is dispelled by the fact that the Agreements indicate in all capital letters, at the top and bottom of the Agreements, that the Agreements contained an arbitration provision.  Ex. C at 1, 5, ECF No. 114-5.  Such a statement is all that is required to avoid misleading putative class members.  *See, e.g.*, *Chen-Oster*, 449 F. Supp. 3d at 269 (noting that "the agreements clearly set forth that the employees . . . would have to arbitrate any and all claims"); *Hegazy v. Halal Guys, Inc.*, 2023 WL 8924092, at *6 (S.D.N.Y. Dec. 27, 2023) (any "concern" that arbitration agreement did not mention ongoing class action was "tempered by the fact that the Arbitration Agreement clearly advised that employees who signed the agreement waived their rights to bring a class action lawsuit").  Moreover, that language (and all-capital formatting) is all the notice required under Missouri law, which governs the Agreements.  *See* Mo. Rev. Stat. §§ 435.460-.465; *see also* Ex. C ¶ 13, ECF No. 114-5.

It borders on the frivolous for Plaintiffs to suggest they were somehow misled by Agreements because they did not disclose the existence ***of their own lawsuit***.  Mot. 8.  Indeed, had the Agreements singled out the pending lawsuit, Plaintiffs would argue on that basis (as other plaintiffs have done) that Equifax was deliberately targeting the putative class with its updated terms of service.  *See, e.g.*, *Kater*, 423 F. Supp. 3d at 1059 ("The updated Terms, however, are expressly directed at this lawsuit."); *Williams*, 2011 WL 2713741, at *3 (finding that arbitration agreement was "clearly designed to thwart unfairly the right of its employees" to participate in class litigation where agreement "specifically references this lawsuit").

To the extent that Plaintiffs assert other putative class members have been misled by the Agreements because the Agreements did not specifically refer to Plaintiffs' lawsuit, Mot. 8-12, Plaintiffs fail to present any evidence that this occurred.  Plaintiffs also omit that this lawsuit was widely reported in the press and industry.  *See supra* pp. 5-6.  As such, putative class members had

other methods of learning about this lawsuit.  *Compare, e.g.*, *In re Currency Conversion Litig.*, 361 F. Supp. 2d at 253 (agreement omitting name of ongoing class action misleading only because consumer plaintiffs "have *no other realistic source of information* regarding this litigation" (emphasis added)).  Plaintiffs' cited cases all involve agreements that were misleading for reasons unrelated to the absence of a reference to pending litigation—such as by claiming to be self-executing, *Williams*, 2011 WL 2713741 at *2, or by confusing vulnerable consumers, *Vargison v. Paula's Choice, LLC*, 2025 WL 822659, at *1 (W.D. Wash. Mar. 13, 2025); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 760 (N.D. Ohio 2010), hourly workers, *see Williams*, 2011 WL 2713741, at *2; *Williams v. Sake Hibachi Sushi & Bar, Inc.*, 2018 WL 4539114, at *1 (Sept. 21, 2018), or "addicted gamblers," *Kater*, 423 F. Supp. 3d at 1061; *supra* Part I.A.

*Third*, Plaintiffs' argument that the Agreements are misleading because Equifax's "pay as you go" web portal also includes a link to separate "Terms of Use" is unpersuasive.  The Terms of Use, which are linked at the bottom of the web portal sign-in page, govern use of Equifax's website and services, but are not affirmatively presented to web portal users.  *See* Nonnenkamp Supp. Decl. ¶ 10.  In contrast, as explained, Plaintiffs were shown the Agreements and prompted to affirmatively accept them as a condition of purchase of verification services from the web portal. Nonnenkamp Decl. ¶¶ 5, 9; *see supra* Part I.C.  And the Agreements made abundantly clear that they included an arbitration provision.  Nonnenkamp Decl. ¶ 9; *supra* p. 21.   Under these circumstances, it is difficult to see how a user could be confused about whether it is agreeing to arbitrate, when the Agreements contain an all-capital letters message at the top of the screen that "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION."  Nonnenkamp Decl. ¶ 9.  Moreover, the Terms of Use clarify that if a company seeks to purchase services from Equifax, it must do so subject to a separate agreement—here, the Agreements.  Ex. Q ¶ 4.

## II.    The Agreements Are Not Improper Communications by Lawyers to Represented Parties

Plaintiffs' contention that their ***own*** acceptance of the Agreements amounted to a breach of Pennsylvania Rule of Professional Conduct 4.2 by ***Equifax's attorneys*** is likewise unsupported by law or by the facts.  Rule 4.2 provides that "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter." Pa. R. Prof. Conduct 4.2.  The Rule, by its terms, applies only to "***communicat[ions]***" by "***a lawyer***."  *Id.* (emphases added).  A public company's updates to widely applicable terms of service do not constitute "communications" to particular parties, let alone communications "by a lawyer," even if attorneys had a role in their preparation.  *See Haider v. Lyft, Inc.*, 2021 WL 3475621, at *3 (S.D.N.Y. Aug. 6, 2021) (holding that defendant's "counsel did not communicate with [absent class members] about the subject of the litigation," and thus did not violate Rule 4.2, by "drafting revisions to [defendant's] arbitration agreement"); *see also Jones*, 866 F.3d at 1272-73 (rejecting argument that form contract containing arbitration agreement prepared by in-house counsel was impermissible communication with a represented party in violation of Rule 4.2).

The cases cited by Plaintiffs only illustrate that a broadly applicable update to online terms of service does not constitute an impermissible communication by an attorney under Rule 4.2.  In *Dasher v. RBC Bank*, in considering an argument that an attorney's assistance in updating terms of service amounted to a Rule 4.2 violation, the Eleventh Circuit noted that it "d[id] not mean to suggest [defendant's] litigation counsel communicated directly with [Plaintiff]."  882 F.3d 1017, 1024 (11th Cir. 2018).  Similarly, in *Russell v. Citigroup, Inc.*, the Sixth Circuit considered the fact that defendants had sent an arbitration agreement to plaintiff (as opposed to his counsel) in determining whether the parties had intended to enter an arbitration agreement at all.  Acknowledging that defendant's counsel may have helped prepare the agreement, the Sixth Circuit

23

stated that "we do not mean to suggest that [defendant's] in-house counsel violated the rules of ethics." 748 F.3d 677, 680 (6th Cir. 2014).

Crediting Plaintiffs' contrary argument would have dramatic implications. If Plaintiffs are correct, then whenever anyone files a lawsuit against a public company like Equifax, the company would be prohibited from asking its own customers to accept contractual terms, including in connection with new purchases, at the risk of ethical violations for the company's in-house or outside counsel. Every such defendant would have to track and exclude every plaintiff or putative class member from routine updates to any terms of service that could conceivably apply to them until the conclusion of the litigation, which could stretch on for many years. Given that litigation is a constant fact of life for large, leading companies like Equifax, this burden could be immense. Indeed, the court in *Haider* rejected a similar argument for this very reason, explaining that "[a] large corporation" such as Equifax "may face a number of lawsuits at any given time, and prohibiting routine amendments to their terms of service would essentially freeze their contracts in place." 2021 WL 3475621, at *3. The Court ought not to adopt Plaintiffs' expansive, dramatic, and novel interpretation of Rule 4.2.

## III.    Any Other Relief Under Rule 23(d) Is Not Warranted

The remedy Plaintiffs request—wholesale invalidation of the Agreements' arbitration provisions not just as to themselves, but as to every other purchaser of Equifax's verification services, ECF No. 121-10 ¶ 19—is as unsupported by the evidence as the rest of Plaintiffs' assertions. Any relief ordered under Rule 23 must be the "minimum necessary," *Gorgonzola*, 2023 WL 1478999, at *6, and must be based on specific evidence, *Gulf Oil*, 452 U.S. at 101. And courts regularly reject requests for invalidation of agreements to arbitrate with putative class members as to which Plaintiffs have failed to present evidence. *See, e.g.*, *Lillehagen v. Alorica, Inc.*, 2014 WL 12768156, at *7 (C.D. Cal. Dec. 18, 2014) (declining to invalidate arbitration

24

agreements as to entire putative class where plaintiffs had not introduced any evidence showing that absent class members "did not understand that they were agreeing to arbitrate their disputes with [defendants]"); *Ralph Oldsmobile*, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001) (declining to invalidate class action releases where "no [absent putative class member] who ha[d] signed a release ha[d] asked the [c]ourt to void its release,"); *see also Tripicchio*, 2023 WL 6307528, at *5 ("When courts do enter Rule 23(d) relief, it is based on specific evidence that putative plaintiffs will be deterred from participating in the class action.").

For all the reasons set forth above, Plaintiffs have not presented sufficient evidence to show that any relief is justified as to them.  Plaintiffs were aware of the ongoing litigation, they willingly entered into the Agreements after consulting with counsel about their use of Equifax's web portal, and they were not and could not have been "coerced" into entering the Agreements based on their infrequent use of Equifax's web portal, particularly given that could contract for different terms with Equifax, or obtain the verifications they sought in multiple other ways.

Moreover, Plaintiffs have come forward with ***no*** evidence that any absent class members were somehow misled or coerced into entering Agreements.  Even if they had, any relief should be limited to permitting each such class member to make their own evidence-based "application to void" their arbitration agreement, as in the cases Plaintiffs cited.  *See, e.g.*, *Ralph Oldsmobile* 2001 WL 1035132, at *7.

## <u>CONCLUSION</u>

For the foregoing reasons, Equifax respectfully requests that the Court deny Plaintiffs' Motion in its entirety and enter the proposed findings of fact and conclusions of law attached hereto.[7]

---

[7] The proposed findings of fact and conclusions of law are not necessary to deny Plaintiffs' Motion, but because Plaintiffs have proposed a version, ECF No. 121-10, Equifax has provided one as well.

Dated:  September 17, 2025                Respectfully Submitted,

/s/ Edward J. Bennett

Edward J. Bennett (*pro hac vice*)
Jonathan B. Pitt (*pro hac vice*)
Elise Baumgarten (*pro hac vice*)
Sean Douglass (*pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
ebennett@wc.com
jpitt@wc.com
ebaumgarten@wc.com
sdouglass@wc.com

Christopher H. Casey (50625)
Joseph Welsh (329626)
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: (215) 979-1000
chcasey@duanemorris.com
jrwelsh@duanemorris.com

*Counsel for Defendants Equifax Workforce Solutions LLC and Equifax Inc.*