# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREYSTONE MORTGAGE, INC.,** : | **CIVIL ACTION** |
| **FIRST FINANCIAL LENDING LLC** : | |
| : | |
| **v.** : | **NO. 24-2260** |
| : | |
| **EQUIFAX WORKFORCE SOLUTIONS** : | |
| **LLC, EQUIFAX, INC.** : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                    **February 17, 2026**

Two months after plaintiffs filed this antitrust class action, defendant Equifax quietly

revised its Online Universal Membership Agreement to include an arbitration provision. Then,

silence. Equifax attended oral argument on its motion to dismiss; held numerous meet and

confers with opposing counsel; negotiated, drafted, and filed a discovery plan; served and

responded to discovery requests; and produced over 94,000 documents — all without mention of

its arbitration provision. One of the named plaintiffs even accepted the revised agreement to

access Equifax's services. Still, nothing. It was not until over a year into the case, after Equifax

purportedly discovered the existence of its agreement to arbitrate with both named plaintiffs, that

Equifax finally spoke up. And now Equifax wants to pull the plaintiffs into arbitration and

foreclose the class action.

A defendant seeking to enforce an arbitration clause often has a strong wind in its sails,

even when it's a post-complaint tactic. But there are limits. One is waiver; another is the broad

authority of Rule 23(d). Because Equifax's litigation behavior clearly evinced an intent to

litigate, and because enforcement of Equifax's arbitration provision would not serve the interests

of justice in this case, we deny Equifax's motion to compel arbitration and grant in part

plaintiffs' motion to enjoin enforcement of defendant's arbitration clause. The law counsels against reaching this conclusion lightly, but we have not. Equifax's conduct forced our hand.

## I.    **Background**

On May 28, 2024, Greystone Mortgage, Inc. and First Financial Lending LLC sued Equifax Workforce Solutions LLC, and Equifax, Inc. (Equifax) under Sections 1 and 2 of the Sherman Act. DI 1. Greystone and First Financial allege that Equifax maintains a monopoly over the United States market for electronic verification of income and employment (VOIE) services, and that Equifax has used that monopoly power to charge supracompetitive prices through its Work Number product.[1] *Id.* at ¶ 164. To that end, Greystone and First Financial say that Equifax has entered and continues to enter into exclusive agreements with data contributors, pay a share of its Work Number profits to those contributors, and acquire smaller would-be competitors. *Id.* at ¶ 13. Greystone and First Financial sue on behalf of "[a]ll persons or entities in the United States that purchased Electronic VOIE Services directly from Defendants Equifax Workforce Solutions and/or Equifax, Inc., during the period beginning May 28, 2020 until such time as the anticompetitive conduct alleged herein has ceased (the 'Class Period')." DI 1 at 40. Equifax moved to dismiss the complaint on August 9, 2024, DI 36, which we denied on February 18, 2025. DI 54. Equifax then answered the complaint on March 4, 2025. DI 58.

With Equifax's answer on file, the parties planned for discovery and worked out a schedule: they were to have until March 5, 2026 to complete fact discovery, with summary judgment, *Daubert*, and class certification motions due by October 15, 2026. DI 66. But on July

---

[1] Our opinion deciding Equifax's motion to dismiss contains a more in-depth explanation of the antitrust-related allegations in this case. *Greystone Mortgage, Inc. v. Equifax Workforce Solutions LLC*, No. 24-2260, 2025 WL 5400112 (E.D. Pa. Feb. 18, 2025).

25, 2025 — nearly 14 months after the filing of the complaint — Equifax moved to stay proceedings and compel arbitration, arguing that both Greystone and First Financial agreed to arbitrate the present dispute under its amended Online Universal Membership Agreement. DI 114.

Equifax's post-complaint agreement took effect on August 13, 2024.[2] DI 114-3 at ¶ 8. Adding an arbitration provision not contained in previous versions, *id.* at ¶ 10-11, its first and last lines state: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES." DI 114-5 at 1, 5. The arbitration provision reads:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in St. Louis, Missouri, administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgement on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. Additionally, each of the parties hereby waive, to the fullest extent permitted by applicable laws, the right to bring or join any class action proceedings.

*Id.* at 5. The Agreement further specifies that it "shall be governed by the laws of the state of Missouri, without giving effect to the principles of conflict of laws thereof." *Id.*

As to its scope, the Agreement states that "[t]his agreement specifically supersedes and replaces any agreement that predates this Agreement and which relates to the Service as provided in each Schedule A, even if the prior agreement contains an 'entire agreement' or 'merger' clause, and any such agreements are terminated." *Id.* at ¶ 1. And its modification provision says that Equifax "may change the price of the Service and/or the Service Description by updating the pricing, Service Description, and/or terms and conditions on the web interface for ordering verifications, which Company shall acknowledge and agree to in order to continue receiving the

---

[2] The footer of the Membership Agreement says "July 31, 2024 template," though Equifax maintains that it went into effect on August 13, 2024. DI 122 at 2 n. 1; DI 114-1 at 4.

Service[.]"[3]  *Id.* at ¶ 9.

Upon logging in to the Equifax website, users are prompted by a pop-up displaying the "Terms and Conditions" and allowing them to scroll through the updated Membership Agreement.  DI 114-1 at 6; DI 114-3 at ¶ 9.  To accept the Agreement, users must check a box which says, "I have reviewed and agree to the above Terms and Conditions," and click a red "Agree & Continue" button.  *Id.*  The Membership Agreement states:

> By clicking to agree to these terms and conditions, User certifies that (i) User is authorized to execute this Agreement on behalf of User and any person or user that User represents, (ii) Equifax Workforce Solutions LLC (provider of Equifax Verification Services, including The Work Number) has reasonable grounds to assume and deem it apparent that User has such authority, (iii) this Agreement is a binding obligation of User and any person or company that User represents, (iv) User has carefully reviewed to user's complete satisfaction and understands and agrees to all of the terms and conditions above and accessible below by scrolling down, and intend this to be a binding agreement signed by User accepting and agreeing to all such terms and conditions

DI 115-5 at 5.  If a user disagrees with the terms of the Agreement, the user is ineligible to receive services from Equifax:

> Use of this website and Equifax Verification Services therein is expressly conditioned upon acceptance of the terms and conditions set forth in this Online Universal Membership Agreement . . . . If User does not agree with any part of the following terms and conditions, User must promptly exit this website, and the User may not use this website or the services offered herein.

 DI 114-5 at 1.

Following the August 13, 2024 amendment, both plaintiffs ordered additional services from Equifax.  DI 121-6 at ¶ 7.  By Equifax's records, principal Robert Salotto of First Financial purportedly executed the agreement before ordering verification services from Equifax on March

---

[3] A miscellaneous provision of the agreement explains that by executing the agreement, the user "certifies" that she "is authorized to execute this agreement on behalf of User and any person or user that User represents[.]"  DI 114-5 at ¶ 17.

12, 2025.  DI 114-3 at ¶ 7; DI 114-4.  Initially, one of Mr. Salotto's employees sought verification services from other verification service providers, Truv and Truework.  DI 121-5 at ¶¶ 9-10.  But after learning that the applicant's employer would provide income verification only through Equifax's Work Number product, Mr. Salotto's employee cancelled the request from those providers and created a new Work Number account for First Financial to order verification services.  *Id.* at ¶¶ 9-10, 11.  Mr. Salotto has no recollection of signing or discussing an arbitration clause, and he is "confident" that one of his agents or employees would have informed him if they understood they were agreeing to arbitrate on First Financial's behalf Mr. *Id.* at ¶¶ 13-14.

Then, on June 3, 2025, Greystone's president, Marc D'Ambrosio, logged into the Work Number system to purchase a report.  DI 121-6 at ¶ 7.  Mr. D'Ambrosio, like Mr. Salotto, does not recall signing or discussing an arbitration clause.  *Id.* at ¶ 8.  And Mr. D'Ambrosio also logged into the Work Number system to verify income for an applicant whose employer would only provide verification through the Work Number.  DI 121-6 at ¶ 7.  Over a month later, in a July 16, 2025 email, Equifax notified Greystone and First Financial for the first time of its intent to compel arbitration.  DI 122-1 at ¶ 40; DI 114-12.  Equifax then filed its motion to compel arbitration and stay proceedings on July 25, 2025.  DI 114.  We promptly stayed discovery pending consideration of Equifax's motion.  DI 117.

Between August of 2024, when the amendment took effect, and June of 2025, when Equifax informed Greystone and First Financial of its intent to move to compel arbitration, the parties: met and conferred regarding their joint Rule 26(f) report (DI 59); negotiated a protective order and protocol for electronically stored information (DI 64, 65; DI 122-1 at ¶ 15); attended a Rule 16 pretrial videoconference (DI 67); negotiated document custodians, search terms, and

other discovery-related issues and participated in corresponding meet and confers (DI 122-1 at ¶ 36); produced over 94,000 documents (*id.* at ¶ 37); and served subpoenas and interrogatories (*id.* at ¶¶ 38-39). Equifax says that its counsel was not informed that Greystone and First Financial had agreed to its amended agreement until July 14, 2025, and that it informed plaintiffs' counsel of its intent to compel arbitration two days later. DI 114-3 at ¶ 5-6; DI 114-12. The parties met and conferred regarding Equifax's motion, but Greystone and Equifax refused to consent to arbitration. DI 114-10 at ¶¶ 6-7.

## II. <u>Motions at Issue</u>

Equifax moved to compel arbitration on July 25, 2025, arguing that because both Greystone and First Financial accepted the terms of its membership agreement, their Sherman Act claims are subject to binding arbitration in St. Louis, Missouri. DI 114-1 at 11-14. And Equifax contends that, consistent with its arbitration provision, the question of arbitrability is for an arbitrator to decide. *Id.* at 14-15. On August 25, 2025, Greystone and First Financial opposed Equifax's motion, arguing that Equifax waived the right to arbitrate this dispute by participating in the case for nearly a year and failing to disclose its intent to arbitrate sooner.[4] DI 122 at 7-15. And even if Equifax did not waive its right to arbitration, Greystone and First Financial say they did not agree to arbitrate and, at any rate, that the arbitration clause does not apply retroactively to their Sherman Act claims. *Id.* at 16-23.

On the same day their opposition brief was filed, Greystone and First Financial filed a motion of their own, seeking to enjoin enforcement of the Equifax arbitration clause and limit

---

[4] Greystone and First Financial have filed two supplemental notices of authority. The first, filed on December 19, 2025, is the Third Circuit's recent decision in *Valli v. Avis Budget Group*, 162 F.4th 396 (3d Cir. 2025). DI 129. The second is a Ninth Circuit decision, *Avery v. TEKsystems, Inc.*, _ F.4th _, 2026 WL 218992 (9th Cir. Jan. 28, 2026). DI 134. We address both cases extensively below.

Equifax's communication with class members.  DI 121.  Principally, Greystone and First Financial argue that the arbitration clause fails to inform class members of their rights in this litigation, threatens to eviscerate the potential class, and constitutes inappropriate communication with the represented parties and potential class members in violation of ethical rules governing attorney conduct.  *Id.* at 6-22.  Equifax maintains that its Membership Agreement, including its arbitration clause, constitutes a bilateral agreement that does not coerce potential class members and is not misleading in its terms, and argues that "wholesale invalidation" of the arbitration provisions is unsupported by the evidence and the law.  DI 126 at 10-25.

## III.    Standard of Review

Courts within the Third Circuit assess a motion to compel arbitration using one of two Federal Rules of Civil Procedure — Rule 12(b)(6) governing motions to dismiss, or Rule 56 governing summary judgment.  As the Third Circuit has explained:

> when it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay. . . .  But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question.

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (citation and internal quotations omitted).  Here, the complaint makes no mention of the arbitration agreement and both parties attach evidence (declarations, documents, and the Membership Agreement itself) in support of their positions, so Rule 56 governs.  *Id*. at 772.

Discovery is not always required when Rule 56 applies, however: "the seemingly mandatory language of *Guidotti* 'is more prescriptive than is helpful or accurate' and . . . its 'call

for limited discovery into arbitrability is best understood as being itself limited.'" *Cornelius v. CVS Pharmacy, Inc.*, 133 F.4th 240, 249 (3d Cir. 2025) (citation modified). Thus, "[i]n the absence of a factual dispute, there is nothing to discover and thus no need to delay a decision on the motion to compel." *Young v. Experian Information Solutions, Inc.*, 119 F.4th 314, 319-20 (3d Cir. 2024). On January 15, 2026, we held an on-the-record case management conference to discuss the necessity of discovery to decide the present motions. DI 136. There, both parties took the position that the information necessary to decide those motions is already before the court. *Id.* at 5:20-23 ("[Plaintiffs'] position is that everything the Court needs is before it now and that's, in large part, because many issues are clear from the record without the need for further discovery."); *id.* at 7:10-11 ("[defendants] don't believe discovery is necessary . . . I think the record is quite clear[.]").

We therefore apply the familiar summary judgment standard to decide the motion to compel without discovery's delay.[5] So, we will only grant Equifax's motion to compel if, drawing all reasonable inferences in favor of Greystone and First Financial, "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." *Guidotti*, 716 F.3d at 771.

## IV.    <u>Discussion</u>

This case will remain in federal court. Starting with Equifax's motion to compel arbitration, we clarify that Greystone and First Financial entered into an agreement with Equifax by clicking the "Agree & Continue" button on Equifax's website. We then turn to the issue of

---

[5] As explained below, a motion to enjoin enforcement of an arbitration provision under Federal Rule of Civil Procedure 23(d) entails a different standard. In that context, "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).

waiver, concluding that the parties did not agree to delegate that question to the arbitrator, and that Equifax's litigation behavior to date has resulted in waiver of its right to arbitrate the parties' dispute here. We consider Greystone and First Financial's motion to enjoin enforcement of the arbitration agreements last. Our analysis leads to the conclusion that updated Membership Agreement does not implicate Pennsylvania Rule of Ethics 4.2. But we do exercise the broad authority bestowed by Federal Rule of Civil Procedure 23(d), ordering Equifax to provide a curative notice to putative class members, and revise its Membership Agreement to explicitly mention users' potential rights in this litigation.

## A. The parties entered into an arbitration agreement

Setting aside scope, there is an agreement to arbitrate here. The Federal Arbitration Act provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. "[A] court must hold a party to its arbitration contract just as the court would to any other kind," but "may not devise novel rules to favor arbitration over litigation." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022).

"Deciding whether arbitration is required is a two-step process: in the first step, the court determines whether 'there is an agreement to arbitrate,' and then in the second step, the court decides whether 'the dispute at issue falls within the scope of that agreement.'" *Jaludi v. City Group*, 933 F.3d 246, 254 (3d Cir. 2019) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 523 (3d Cir. 2009)); *Theroff v. Dollar Tree Stores, Inc.*, 591 S.W.3d 432, 436 (Mo. 2020) ("Unlike the standard scenario in which there is no dispute about whether a party signed an arbitration agreement, when a party disputes signing, the court must

first decide the existence of an agreement to arbitrate.").[6]  We apply "ordinary state-law principles" of contract law to determine whether the parties agreed to arbitrate.  *Jaludi*, 933 F.3d at 254; *Arrowhead Contracting, Inc.*, *v. M.H. Washington, LLC*, 243 S.W.3d 532, 535 (Mo. Ct. App. 2008).

Here, the updated Membership Agreement specifies that Missouri law applies.  DI 114-5 at 5.  But, by its own terms, the Agreement's choice of law provision does not apply Missouri's conflict of law rules.  *Id.*  So, we apply Pennsylvania choice of law rules to determine if Missouri law properly governs whether the parties agreed to arbitrate.  *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007).  Under Pennsylvania law, "courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them" unless the designated state "has no substantial relationship to the parties or the transaction" or its application would be "contrary to a fundamental policy" of Pennsylvania.  *Id.* (citation modified).  Equifax is headquartered in Missouri, we discern no reason Missouri law would be contrary to any fundamental policy of the Commonwealth, and the parties agree that its application is appropriate here, so we apply Missouri law.[7]  DI 114-1 at 11; DI 122 at 6.

As is widely understood, "[t]he essential elements of any contract, including one for arbitration, are offer, acceptance, and bargained for consideration."  *Haworth v. GuestServices,*

---

[6] Even where the parties have agreed to arbitrate the issue of arbitrability, "a role remains for the district court, which cannot compel parties to arbitrate any dispute, including one over the arbitrability of plaintiff's claims, unless it determines that they have contractually agreed to do so."  *Coleman v. System One Holdings, LLC*, 117 F.4th 97, 102 n.5 (3d Cir. 2024).

[7] The parties cite interchangeably to both Missouri and Pennsylvania law.  *See generally* DI 114-1, 122.  Where there is no conflict between Pennsylvania and Missouri law, we do the same.  *Philidor Rx Services LLC v. Polsinelli PC*, 552 F. Supp. 3d 506, 512 n.4 (E.D. Pa. 2021).  But where there is a conflict, we rely on Missouri law in adherence to the parties' agreement and Pennsylvania choice of law rules.  *Gay*, 511 F.3d at 389.

*Inc.*, _ S.W.3d _, 2025 WL 3276260, at *4 (Mo. Ct. App. November 25, 2025) (citation modified).  The existence of "mutual assent" is based "upon the objective intentions of the contracting parties, which are determined by reviewing the parties' words and conduct."  *Id.*  Missouri courts routinely enforce contracts accepted by electronic means, including "clickwrap" agreements.  *Perficient, Inc. v. Palfery*, 2022 WL 1102117, at *5 (E.D. Mo. April 13, 2022) (citing *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009)).

There is no genuine dispute that Greystone and First Financial accepted the updated terms of the Membership Agreement.  In their opposition to Equifax's motion to compel arbitration, Greystone and First Financial claim they didn't agree to arbitrate this dispute because the arbitration clause's language is forward-looking and they have vigorously litigated this case.  DI 122 at 17-19.  In support, Greystone and First Financial's motion to enjoin enforcement of the arbitration provision says that they "never knowingly agreed to arbitrate," and attaches the declarations of Mr. Salotto and Mr. D'Ambrosio, in which both aver they have no recollection of any arbitration agreement.  DI 121-1 at 4; DI 121-5 ¶¶ 20–24; DI 121-6 at ¶¶ 17–21.  This is unpersuasive.

First, the temporal language of the arbitration provision — whether forward-looking or all-encompassing — is a question of scope that we do not decide here.  *Arrowhead*, 243 S.W.3d at 535.  And second, as explained above, during the January 15, 2026 case management conference, Greystone and First Financial did not dispute that they entered into the updated Membership Agreement by clicking the "Agree & Continue" button upon logging in to the Work Number software.  DI 136 at 8:19-22 ("[plaintiffs] don't need discovery to decide if the and boxes and color of texts, we're not making those kinds of arguments."); *id.* at 10:17-12:4.

Greystone and First Financial also confine the analysis of their objective manifestations to their "litigation behavior." DI 122 at 19. But such a narrow analysis conveniently overlooks the action of clicking the "Agree & Continue" button as an objective manifestation of its own. In doing so, both Greystone and First Financial agreed:

> By clicking to agree to these terms and conditions, User certifies that (i) User is authorized to execute this Agreement on behalf of User and any person or user that User represents, (ii) Equifax Workforce Solutions LLC (provider of Equifax Verification Services, including The Work Number) has reasonable grounds to assume and deem it apparent that User has such authority, (iii) this Agreement is a binding obligation of User and any person or company that User represents, (iv) User has carefully reviewed to user's complete satisfaction and understands and agrees to all of the terms and conditions above and accessible below by scrolling down, and intend this to be a binding agreement signed by User accepting and agreeing to all such terms and conditions.

DI 115-5 at 5. This was an objective manifestation of an intent to agree. *Miller v. Securitas Security Services USA, Inc.*, 581 S.W.3d 723, 730 (Mo. Ct. App. 2019) (signing dispute resolution agreement containing acknowledgement of receipt and understanding of the agreement was evidence that plaintiff "unequivocally accepted" its terms.).

The declarations of Mr. Salotto and Mr. D'Ambrosio do not establish a genuine dispute of fact regarding whether Greystone and First Financial accepted the Membership Agreement's terms. Having conceded that they — that is, *someone* at both First Financial and Greystone — accepted the updated Membership Agreement, the declarations amount to suggesting that because Mr. Salotto and Mr. D'Ambrosio did not personally see or read the Membership Agreement, they should not be bound by it. That is not the law: "a signer's failure to read and understand a contract is not, without fraud or the signer's lack of capacity to contract, a defense to the contract." *Lopez v. GMT Auto Sales, Inc.*, 656 S.W.3d 315, 321 (Mo. Ct. App. 2022) (citing *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 228 (Mo. 2013)); *CoMo Premium Construction LLC v. Pulster*, 724 S.W.3d 823, 830 (Mo. Ct. App. 2025) ("Missouri law

presumes that a party had knowledge of the contract he or she signed; and those who sign a contract have a duty to read it and may not avoid the consequences of the agreement on the basis that they did not know what they were signing.") (citation modified). Whatever the scope of the disputes encompassed by it, there is no genuine dispute that Greystone and First Financial accepted the updated Membership Agreement's terms.

## B. Equifax waived the right to arbitrate

An agreement to arbitrate does not alone open a clear path for Equifax because we must consider whether Equifax waived its right to compel arbitration in this case. We first address the parties' respective arguments about whether waiver was delegated to the arbitrator to decide. Because we determine that they did not delegate waiver to the arbitrator, we then turn to whether Equifax waived the right to arbitrate. We conclude it did.

### 1. *The parties did not delegate the issue of waiver*

"[W]aiver of the right to arbitrate based on litigation conduct remains presumptively an issue for the court to decide[.]" *Ehleiter v. Grapetree Shores, Inc*., 482 F.3d 207, 221 (3d Cir. 2007). Thus, the issue of waiver will be referred to the arbitrator "only where the parties' arbitration agreement contains 'clear and unmistakable evidence'" of the parties' intent to do so. *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). This is an "onerous standard." *Id.* at 221 & n.13 (noting "concern about the enforceability of arbitration agreements that expressly authorize the arbitrator to resolve claims of waiver based on litigation conduct.").

Equifax posits that waiver is within the province of the arbitrator. DI 114-1 at 14. The arbitration provision provides that "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration . . . administered by the

American Arbitration Association in accordance with its Commercial Arbitration Rules[.]"  DI

114-5 at 5.  This is enough to remove the waiver question from the court, says Equifax, because

those rules allow the arbitrator to "rule on his or her own jurisdiction, including any objections

with respect to existence, scope, or validity of the arbitration agreement or to the arbitrability of

any claim or any claim or counterclaim, without any need to refer such matters first to a court."

DI 114-1 at 14-15 (citing AAA Commercial Arbitration Rules and Mediation Procedures, Rule

7(a)).  Equifax also cites authority to support its argument that incorporation by reference of the

AAA meets the required "clear and unmistakable evidence" of an intention to delegate waiver.

*Id.* at 15.  We disagree.[8]

Equifax is correct that the Third Circuit has said that incorporation by reference of the

AAA rules may suffice as clear and unmistakable evidence of an intent to arbitrate a bilateral

dispute.  *See Richardson v. Coverall N. Am., Inc.*, 8111 F. App'x 100, 103 (3d Cir. 2020).  But

the Third Circuit has been equally clear that "this 'bilateral arbitration dispute case law' is

entitled to relatively little weight in the class arbitrability context" because "the whole notion of

class arbitration implicates a particular set of concerns that are absent in the bilateral context."[9]

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 764 (3d Cir. 2016).  For

---

[8] While we determine that the parties did not delegate waiver, we do not decide whether the causes of action here fall within the scope of the Agreement.  *Richardson*, 8111 F. App'x at 103.

[9] Following the Supreme Court's decision in *Morgan*, 596 U.S. at 418 (2022), Missouri courts have declined to refer the waiver inquiry to the arbitrator even where the parties agree to arbitrate arbitrability.  *GFS, II, LLC v. Carson*, 684 S.W.3d 170, 184 (Mo. Ct. App. 2023) ("claims of waiver-by-litigation are properly decided by the circuit court, despite the fact that an arbitration agreement generally submits issues of 'enforceability' or 'arbitrability' to the arbitrator.");  *Lopez*, 656 S.W.3d at 327-28 ("waiver by inconsistent acts is a ***judicially created doctrine*** designed to protect the integrity and resources of the court as well as promote fairness to both parties[.]") (emphasis in original).

example, class arbitration implicates the rights of absent parties, involves heightened commercial stakes with "much more limited" judicial review, and is "poorly suited" to take on such cases. *Opalinski v. Robert Half Intern. Inc.*, 761 F.3d 326, 332-35 (3d Cir. 2014) (citation modified).

And while Equifax is quick to cast the agreements here as the type of bilateral agreements that give the arbitrator the power to decide waiver, Greystone and First Financial's antitrust claims — brought on behalf of a proposed nationwide class — implicate the very concerns that the Third Circuit has said accompany the delegation of waiver to an arbitrator where class arbitration is involved. *Id.* By compelling both named plaintiffs into arbitration, Equifax aims to end this class action litigation in federal court. It is far from "clear and unmistakable" that relinquishment of the right to sue on behalf of those similarly situated was part of what the parties agreed to here, especially because this litigation was already underway at the time of the arbitration clause's creation.[10] Applying the "onerous burden" of presumption in favor of permitting the court to decide waiver, we construe the uncertainty inherent in Equifax's arbitration provision against it. *Chesapeake*, 809 F.3d at 763 (construing ambiguity against drafter of arbitration provision); *see also MZM Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefits Funds*, 974 F.3d 386 ("it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide the existence of an arbitration agreement when one of the parties has put the existence of that very agreement in dispute."). After all, "it could have, and, at least in retrospect, should have, drafted a clearer

---

[10] In addition, at least one district court in the Third Circuit has persuasively reasoned that the AAA rules do not apply to litigation conduct. *See Smith v. Experian Information Solutions, Inc.*, 2023 WL 6057377, at *4 (D.N.J. Sept. 14, 2023) ("[t]he AAA Rules 'apply . . . at the time the administrative filing requirements are met for a demand for arbitration' and "have no bearing on litigation conduct.").

arbitration agreement." *Id.* We undertake an analysis of Equifax's litigation conduct to determine whether it waived the right to arbitrate this dispute.

2. *Equifax's litigation behavior effects a waiver of its right to arbitrate this dispute*

Greystone and First Financial argue that Equifax waived any right to arbitrate this dispute because it had a duty to alert both plaintiffs and the court of the applicability of the arbitration clause after it drafted it, but nonetheless acted consistent with an intent to litigate in federal court. DI 122 at 9-16. Equifax responds that any litigation prior to plaintiffs' acceptance of the agreement is irrelevant, and that it could not have known it would have arbitration rights before then. DI 127 at 7-10. We conclude that Equifax waived its right to arbitration because its actions evinced an intent to litigate in federal court.

In the arbitration context, "[w]aiver is the 'intentional relinquishment or abandonment of a known right.'" *Valli*, 162 F.4th at 405 (citing *Morgan*, 596 U.S. at 417; *White v. Samsung Electronics America, Inc.*, 61 F.4th 334, 339 (3d Cir. 2023). Waiver of a "*known* right" is not simply a "presently enforceable one." *Id.* at 408 (emphasis in original). Rather, "the waiver analysis is triggered once a defendant is on notice that a claim '*could* be arbitrable,' not solely when the right to compel is certain." *Id.* (citing *White*, 61 F.4th at 340) (emphasis in original). To preserve future arbitration rights, then, "a defendant must provide clear, reasonably prompt record notice of its intent to compel arbitration." *Id.* at 409. Where a party does not explicitly waive arbitration, courts conduct an "implied-waiver analysis." *Id.* at 405. Accounting for the "circumstances and context of each case," the implied-waiver analysis asks "whether the right-

holder acted inconsistently with an intent to assert its right to arbitrate, and thus, evinced a preference for litigation over arbitration." *Id.* (citation modified).[11]

Recently, in *Valli v. Avis Budget Group*, the Third Circuit vacated a district court's denial of a motion to compel arbitration on somewhat similar facts. 162 F.4th at 401. There, a car renter from defendant Avis brought a proposed class action under the New Jersey Consumer Fraud Act in June of 2014. *Id.* at 401-402. Nearly two years later, in April of 2016, Avis updated its terms and conditions to include an arbitration provision. *Id.* at 402. After an unsuccessful attempt to dismiss the amended complaint, Avis included the arbitration provision as an affirmative defense for the first time.[12] *Id.* at 403. By February of 2024, the class was certified, and Avis moved to compel arbitration as to the prospective class members. *Id.* at 404-405. The district court held that Avis waived the right to arbitrate and denied its motion. *Id.* at 404-405. The Third Circuit disagreed. Looking to the time between Avis's adoption of the arbitration provision and when Avis formally moved to compel, the Court concluded that Avis did enough to preserve its right to arbitrate by: including the provision as an affirmative defense fifteen days after the denial of its motion to dismiss; repeatedly putting its intent to arbitrate on the record during discovery; and promptly moving to compel when it was no longer futile to do so. *Id.* at 410-413.

Foreseeably, the parties have different interpretations of *Valli's* effect here. Greystone and First Financial lean on the clarity brought by *Valli*, namely that rights which are known but

---

[11] The test for waiver under Missouri law is similar. *Housley v. Autohaus, L.L.C.*, 711 S.W.3d 554, 557-58 (Mo. Ct. App. 2025) ("The issues we must resolve are (1) whether the party knew of the right to arbitrate and (2) whether the party acted inconsistently with that right.").

[12] Relevant to the question of scope, the Third Circuit explained that the amendment did not implicate the named plaintiff's dispute because the arbitration provision "applied only prospectively." *Id.* at 402.

not presently enforceable are not excused from the waiver inquiry, and that the relevant window for analyzing arbitration provisions begins when the moving party first adopts the provision at issue. DI 129 at 1-2 (citing *Valli*, 162 F.4th at 408, 410). Equifax, in turn, argues that *Valli* affirms — and that Greystone and First Financial ignore — the "fundamental principle" that "[a]rbitration rights do not exist, and cannot be waived (or enforced), until a contract is formed that obligates a party to arbitrate." DI 130 at 1 (citing *Valli*, 162 F.4th at 401). Equifax's articulation of the principle affirmed by *Valli* is myopic. True, Equifax would have no power to enforce its arbitration rights against Greystone or First Financial (or prospective class members) until those parties accepted the terms of its Membership Agreement. But *Valli* is clear that the waiver inquiry begins earlier than that, when Equifax *incorporated* the operative arbitration language. *Valli*, 162 F.4th at 411.

That rule is sensical because "insulating a right from waiver until it becomes enforceable would reward outcome-oriented gamesmanship and undermine the very purpose of waiver in this setting" and Third Circuit precedent "cannot be read to bless such a cost-free about-face." *Id.* at 408. Nor does a correct reading of *Valli* suggest, as defense counsel implies, that Equifax had no responsibility to make prompt notice of its intent to arbitrate until its counsel was informed of the existence of the arbitration clause on July 14, 2025.[13] DI 127 at 8; *PDC Machs., Inc. v. Nel*

---

[13] We have said as much before where, as here, counsel claimed a lack of awareness of the arbitration provision in issue. *See Dougherty v. Fred Beans Holdings, Inc.*, No. 2:23-cv-00100, DI 29 at ¶ 15 (E.D. Pa. Aug. 17, 2023) ("Because of the centrality (and admitted ready availability) of the personnel file; the intensive discovery planning requirements in this court; and the critical nature of an arbitration agreement, we find that defendants here 'should have known they could arbitrate plaintiffs' claims and yet expressly went forward with litigation.' *White*, 61 F.4th at 341.") (brackets omitted). That there was a mid-litigation change in defense counsel is similarly unpersuasive because a basic inquiry by counsel, and diligent record-keeping by Equifax, would have revealed the existence of the agreements; not to mention what the client surely knew or was responsible for knowing.

*Hydrogen*, 2018 WL 4006378, at *8 (E.D. Pa. Aug. 22, 2018) (Sanchez, J.) (counsel's discovery of arbitration provision during discovery insufficient to explain delay). We have little hesitation assigning to Equifax knowledge of the arbitration provision it drafted from the time that the provision was incorporated. *See Lopez*, 656 S.W.3d at 328 ("GMT knew of its right to arbitrate because it drafted the Agreement to Arbitrate[.]"); *Housley*, 711 S.W.3d at 558 (same). So, we disagree with Equifax that its litigation conduct prior to March 12, 2025 — when First Financial entered into the updated Membership Agreement — is "irrelevant." DI 127 at 8 (citing *Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 293 (3d Cir. 2016)). Our inquiry therefore focuses on Equifax's litigation conduct between August 13, 2024, when the updated Membership Agreement took effect, and July 25, 2025, when Equifax formally moved to compel arbitration. *Valli*, 162 F.4th at 410-11; DI 114; DI 114-3 at ¶ 8.

During the relevant period, Equifax engaged in the following litigation conduct: on February 5, 2025, Equifax appeared at oral argument in support of its motion to dismiss (DI 122-1 at ¶ 11); on March 3, 2025, Equifax met and conferred about the parties' Rule 26(f) report (DI 59); on March 3 and 4, 2025 Equifax met and conferred with plaintiffs regarding the protocol for discovery and production of documents (DI 122-1 at ¶ 15); on March 4, 2025, Equifax answered the complaint; on March 11, 2025, Equifax exchanged its initial disclosures (*id*. at ¶ 18); on March 13, 2025, Equifax met and conferred about the discovery schedule (*id.* at ¶ 20); on March 18, 2025, the parties filed their joint Rule 26(f) report[14] (*id.* at ¶ 21); on March 24, 2025, Equifax moved for entry of a protective order and the parties jointly moved for entry of the ESI protocol (*id.* at ¶¶ 22, 24); on March 28, 2025, Equifax sent a letter to Greystone and First Financial

---

[14] As Greystone and First Financial point out, our Rule 26(f) report template asks the parties to "summarize" their efforts at alternative dispute resolution. The parties' report makes no reference to arbitration with regard to the named plaintiffs or even the putative class. DI 59.

regarding their discovery requests (*id.* at ¶ 28); on April 2, 2025, Equifax served requests for production on Greystone and First Financial (*id.* at ¶ 29); on April 10, 2025, Equifax served objections and responses to Greystone and First Financial's first requests for production (*id.* at ¶ 30); on April 25, 2025, Equifax served objections and responses to Greystone and First Financial's second requests for production; on June 4, 18 the parties met and conferred on discovery related issues (*id.* at ¶ 36); on June 19, 2025, Equifax produced 94,299 documents (*id.* at ¶ 37); on June 20, June 27, and July 3, 2025, Equifax notified Greystone and First Financial it had served subpoenas on 29 third parties, and the parties met and conferred about those subpoenas on July 10, 2025 (*id.* at ¶ 38); and on July 2, 2025, Equifax served interrogatories on Greystone and First Financial (*id.* at ¶ 39). Equifax did not mention the possibility of arbitration during any of those interactions.

This record belies Equifax's contention that it "diligently preserved its arbitration rights by moving to compel as soon as it learned that Plaintiffs had agreed to arbitrate." DI 127 at 9. Rather, Equifax continued to litigate this case after First Financial executed the updated Membership Agreement on March 12, 2025 by creating and filing a joint discovery plan with the court, engaging in meaningful discovery and related meet and confers, and moving for a protective order and ESI protocol. Equifax's litigation conduct did not stop after June 3, 2025, by which time Greystone had also executed the agreement: Equifax continued to engage in meet and confers, produced over 94,000 documents, and served numerous third-party subpoenas and interrogatories. It was not until approximately 10 months after the incorporation of its arbitration provision (and four months after First Financial's acceptance) that Equifax finally mentioned arbitration in any form. DI 122-1 at ¶ 40; DI 114-12.

Considering the context and circumstances of this case, we conclude that Equifax demonstrated "a preference for litigation over arbitration." *Valli*, 162 F.4th at 405. Absent here is the required "reasonably prompt record notice" of any intent to compel arbitration. *Id.* at 409. Such notice is important in situations such as here, where — as is the basis for Greystone and First Financial's motion to enjoin enforcement of the arbitration agreement — an arbitration provision has the potential to impact the rights of putative class members. This case is distinct from the situation in *Valli* where "Avis set course almost immediately after the District Court denied its motion to dismiss" by including arbitration as an affirmative defense. *Id.* at 411. And unlike in *Valli*, where it was "speculative as to whether the class included renters who agreed to arbitrate their claims," 162 F.4th at 411 (citation modified), the proposed class is clear:

> All persons or entities in the United States that purchased Electronic VOIE Services directly from Defendants Equifax Workforce Solutions and/or Equifax, Inc., during the period beginning May 28, 2020 until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are (a) Defendants, their subsidiaries, affiliate entities, and employees, and (b) all federal government entities or agencies.

DI 1 at 40.

Equifax argues that it "is entitled to amend its answer to include such matters before the (stayed) deadline for amending pleadings . . . . To the extent other companies agree to arbitrate and are included in a certified class, Equifax will arbitrate with them as well." DI 127 at 10. But Equifax has already, by any objective account, demonstrated its intent to litigate in federal court. Equifax would not "need to wait to inform the district court about its arbitration strategy until [class members] who had signed the arbitration agreements joined the case." *Valli*, 162 F.4th at 409 (quoting *Degidio v. Crazy Horse Saloon and Restaurant Inc.*, 880 F.3d 135, 141 (4th Cir. 2018)) (citation modified).

Equifax's litigation conduct during the 10 months between August 13, 2024 and July 25, 2025 gave Greystone, First Financial, and the court the reasonable impression that it intended to litigate in federal court. As counsel for both parties is no doubt aware, antitrust cases are often long, complex, and expensive undertakings for all involved. *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."); *In re Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *4-5 (E.D. Pa. Jan. 3, 2009) ("This litigation, like most antitrust cases, has been exceedingly complex, expensive, and lengthy."). To permit a party to capitalize on a post-complaint arbitration clause it was silent about after litigating in federal court for 14 months would perversely incentivize future defendants to use "arbitration to manipulate the legal process and in that process waste scarce judicial resources." *Valli*, 162 F.4th at 408 (citation modified). Equifax's right to arbitrate this dispute has been waived.

### C. The exercise of Rule 23(d) authority is warranted

Waiver is not the only reason Equifax will not be permitted to send this case to arbitration. Greystone and First Financial argue that we should refuse for two more reasons. First, because the post-complaint arbitration language of the Membership Agreement constitutes a communication with a represented party in violation of Pennsylvania Ethics Rule 4.2. DI 121-1 at 17-20. And second, because the court should exercise the authority granted by Federal Rule of Civil Procedure 23(d)(1) to make orders relating to the fair and effective administration of class actions. *Id.* at 20-23. We disagree that the updated membership agreement violates Pennsylvania Rule of Ethics 4.2. But we agree that Equifax's litigation conduct, in combination with the nature of its arbitration provision, warrants action under Rule 23(d)(1). We therefore enjoin the enforcement of the updated Membership Agreement under its present form, order

Equifax to make a curative notice to those who have already accepted its terms, and order Equifax to revise its arbitration provision to appropriately apprise potential class members of this litigation.

1. *The updated membership agreement does not contravene Pennsylvania Rule of Ethics 4.2*

Rule 4.2 of the Pennsylvania Rules of Professional Conduct provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Pa. R.P.C. 4.2. The rule is meant to "prevent lawyers from taking advantage of uncounselled lay persons and to preserve the efficacy and sanctity of the lawyer-client relationship." *State Farm Mut. Auto. Ins. Co. v. Sanders*, 975 F. Supp. 2d 509, 510-11 (E.D. Pa. 2013). However, "[p]arties to a matter may communicate directly with each other, and a lawyer is not prohibited from advising a client concerning a communication that the client is legally entitled to make." Comment 4 to Pa. R.P.C. 4.2.

Greystone and First Financial do not cite any authority invalidating or enjoining enforcement of an arbitration agreement for violation of Rule 4.2, and it is hard to think of a good reason to do so. We agree with Equifax that to adopt Greystone and First Financial's interpretation of Rule 4.2 would unreasonably expand the bounds of the behavior that Rule 4.2 is meant to protect against. DI 126 at 23. Viewed under the lens of Rule 4.2, a proposed update to Equifax's Membership Agreement does not qualify as a communication between Equifax's counsel and the named plaintiffs. If anything, the updated Membership Agreement constitutes a communication between represented parties described in the comments to Rule 4.2. Comment 4 to Pa. R.P.C. 4.2. The update to Equifax's membership agreement does not implicate Rule 4.2.

## 2. *Enforcement of the arbitration agreements would threaten the fairness of this litigation and frustrate the administration of this class action*

Under Federal Rule of Civil Procedure 23(d), "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *In re Sch. Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) (citing *Gulf*, 452 U.S. at 100); *Valli*, 162 F.4th at 415 (same). "That authority is often aimed at preventing misleading communications to class members concerning the litigation, which pose a serious threat to the fairness of the litigation process and the administration of justice generally." *Valli*, 162 F.4th at 415 (quoting *In re Sch. Asbestos Litig.*, 842 F.2d at 680) (citation modified). To justify the exercise of that authority, there must be a "specific record showing by the moving party of the particular abuses by which it is threatened" and the relief sought must be "consistent with the policies of Rule 23 giving explicit consideration to the narrowest possible relief which would protect the respective parties." *Id.* (quoting *Gulf*, 452 U.S. at 102) (citation modified).

Greystone and First Financial ask us to exercise our Rule 23(d) authority to invalidate Equifax's arbitration clause as it applies to this case because it is misleading, coercive, and threatens the fairness of this litigation. DI 121-1 at 6-17. Equifax responds by applying a five-factor analysis laid out in a Southern District of New York case, *Chen-Oster v. Goldman Sachs & Co.*, 449 F. Supp. 3d 216, 264 (S.D.N.Y. 2020). Those factors are:

> (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the arbitration provision was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions, including the extent to which the agreement does or does not mention the existence of the putative class action and related information.

*Id*. at 263-64. [15]  Equifax says these factors support an outcome in its favor.  DI 126 at 11.  As with waiver, we disagree.

For starters, Greystone and First Financial have made the required record showing of the threat Equifax's arbitration provision poses to the effective administration of this action and the interests of justice.  *Valli*, 162 F.4th at 415.  Greystone and First Financial filed this putative class action on May 28, 2024.[16]  DI 1.  By July 2, 2024, Equifax had retained counsel.  DI 26-28. Equifax then moved to dismiss the complaint on August 9, 2024.  DI 36.  Its updated Membership Agreement — to which the addition of the arbitration clause was the only change — took effect four days later, on August 13, 2024.[17]  DI 114-3 at ¶ 8.  Equifax then went silent about the arbitration provision: as explained above, Equifax attended oral argument, answered the complaint, collaborated on and filed a discovery plan, made initial disclosures, and served and responded to discovery requests — all without mention of its arbitration provision with regard to the named *or* putative class members.  *See* section B.2, *supra*.  That remained so even after March 12, 2025, when First Financial entered the updated Membership Agreement.  DI 114-3 at ¶ 7.  It was not until July 16, 2025 that Equifax finally notified Greystone and First

---

[15] The factors identified in *Chen-Oster* are "relevant considerations" but are "non-exclusive."  449 F. Supp. 3d at 264.  We do not apply the *Chen-Oster* factors in formulaic fashion, and instead look to the totality of the circumstances to assess whether the exercise of authority under Rule 23(d) is warranted.  *Id.* at 263-64 ("to determine whether they are the product of coercion or deception, courts will (or should) consider the totality of circumstances[.]")

[16] While the Third Circuit clarified that the waiver inquiry begins from the adoption of the arbitration provision in *Valli*, 162 F.4th at 408, nothing in *Valli* suggests the Rule 23(d) inquiry is so temporally limited.

[17] The "July 31, 2024 template" language in the footer of the Membership Agreement suggests that the time between when Equifax retained counsel and drafted its arbitration agreement is even closer in proximity.  DI 122 at 2 n. 1; DI 114-1 at 4.

Financial of any intent to compel arbitration, DI 114-12, and not until ten days later that Equifax

formally moved to compel, putting its intent on record.  DI 114.  Conveniently, Equifax did not

seek arbitration until both named plaintiffs had accepted the updated Membership Agreement.

This sequence of events is manifestly tactical, if not cynical.

The threat is compounded by the nature of the Agreement and its presentation.  First, the

Membership Agreement makes no mention of this action or putative class members' potential

rights in it, despite requiring the User to waive the right to join any class action proceedings.  DI

114-5.  Moreover, class members were presented with both a "Terms of Use," which does not

contain an arbitration clause, and a separate "Terms and Conditions," which does contain the

arbitration clause.  DI 121-6 at ¶¶ 13-14; DI 121-7; DI 121-8.  And the Membership Agreement

expressly conditions receipt of Equifax's services on acceptance of its terms:

> Use of this website and Equifax Verification Services therein is expressly
> conditioned upon acceptance of the terms and conditions set forth in this Online
> Universal Membership Agreement . . . .  If User does not agree with any part of
> the following terms and conditions, User must promptly exit this website, and the
> User may not use this website or the services offered herein.

DI 114-5 at 1.  Such characteristics create the very real possibility that a putative class member

would: (1) believe the only way to obtain verification services from Equifax was to agree to

arbitration; (2) be confused by the litany of terms; or (3) be unaware that she is waiving the right

to join in a class action in which her interests are represented for lack of knowledge this litigation

even exists.[18]  In *Valli*, the Third Circuit noted that while the issue was not before it, "in

appropriate circumstances . . . a district court *may* have authority to invalidate mid-litigation

---

[18]  We are not moved by Equifax's suggestion that because "this lawsuit was widely
reported in the press and in the industry" the Membership Agreement is not misleading.  DI 126
at 21-22.  While media coverage might be worth considering sometimes, Rule 23's notice
requirements are far more salient.

contract changes that mislead or coerce putative members or *otherwise undermine the orderly administration of a class action*." 162 F.4th at 416 (emphasis added). We believe this is one such case.

While these motions were under advisement, the Ninth Circuit issued an opinion upholding a district court's refusal to enforce an arbitration agreement under Rule 23(d) in *Avery v. TEKsystems, Inc.*, _ F.4th _, 2026 WL 218992 (9th Cir. Jan. 28, 2026).[19] There, the plaintiffs brought a putative class action on behalf of former and current recruiters alleging violations of various state wage and hour laws. *Id.* at *1. After the close of class certification, defendant TEKsystems implemented a new arbitration agreement, which included a class action waiver. *Id.* at *1-2. TEKsystems sent two emails to potential class members in which it disparaged the efficacy of class actions and made a variety of inconsistent statements about when and how class members could accept or otherwise opt out of the arbitration provision. *Id.* at *9-11. Applying the Supreme Court's decision in *Gulf*, 452 U.S. at 100, the Ninth Circuit held that "FRCP 23(d) authorizes a district court to refuse to enforce an arbitration agreement."[20] *Id.* at *7. This adds up because "there would be no point to FRCP 23(d)'s broad authority to oversee class action communications if the authority stopped when a party's misleading communications with class members resulted in an agreement before the district court intervened." *Id.*

---

[19] The *Avery* decision also cited favorably to the Fourth Circuit decision in *Degidio*, 880 F.3d at 138, which the Third Circuit relied on in *Valli*, albeit for different reasons. Compare *Avery*, 2026 WL 218992 at *8, with *Valli*, 162 F.4th at 408-409.

[20] The Ninth Circuit noted that while orders under Rule 23(d) are reviewed for abuse of discretion, "[e]ven if we review the district court's decision de novo rather than for abuse of discretion, we hold that TEK's communications were misleading and threatened the fairness of the class action proceedings." *Avery*, 2026 WL 218992, at *9.

We are unpersuaded by Equifax's attempt to distinguish this case from *Avery*. DI 135. Equifax points out that in *Avery*, defendant TEKsystems communicated with the class after class certification, made inconsistent statements, disparaged the efficacy of class actions, and presented its agreement as an ultimatum: "No arbitration, no job." *Id.* at 1-2. Equifax says this case is "fundamentally different" because "it was Plaintiffs who initiated the transactions, through an optional online portal, and affirmatively agreed to a clearly displayed arbitration provision in Equifax's updated Terms and Conditions." *Id.* at 2. This turns a blind eye to the fact that soon after the filing of the class action complaint, Equifax undertook to amend its Membership Agreement, adding the arbitration provision and conditioning the use of its services on agreement to its terms: no arbitration, no income verification services. DI 114-5 at 1.

For similar reasons, we find unavailing Equifax's position that the agreements are non-coercive bilateral contracts. Equifax argues that because there are multiple available methods for verifying income and employment (namely its competitors), and that there are multiple ways of contracting with Equifax for verification services, its agreement is not coercive. DI 126 at 3-4. First, that there are other methods of contracting with Equifax outside of its website is not clear from the language conditioning receipt of services on acceptance of its terms, so it would be unreasonable to expect that, faced with the clear language of the agreement, a potential class member would think contacting Equifax directly would yield a different outcome. DI 114-5 at 1. After all, the Agreement says that "[i]f User does not agree with any part of the following terms and conditions, User must *promptly exit this website*, *and the User may not use this website or the services offered herein.*" *Id.* (emphasis added). The Agreement says nothing of alternative means for obtaining verification services from Equifax.

Second, Equifax's argument regarding alternative methods for obtaining verification services focuses too narrowly on just Greystone and First Financials' ability to do so. DI 126 at 16-20. Our concern here is with fairness to the potential class as a whole. *Valli*, 162 F.4th at 415. Contrary to Equifax's characterization of the law, the exercise of discretion under Rule 23(d) is justified where there is a record showing of communications "which pose a serious *threat* to the fairness of the litigation process and the administration of justice *generally*." *Valli*, 162 F.4th at 415 (citation modified); *In re Sch. Asbestos Litig.*, 842 F.2d at 683 ("Rule 23(d) does not, however, require a finding of *actual* harm; it authorizes the imposition of a restricting order to guard against the likelihood of serious abuses.") (citation modified) (emphasis in original). That much is present here: Greystone and First Financial have alleged that "Equifax's exclusive deals with large employers, payroll providers, and other entities whose data is required to verify income and employment information have left Verifiers unable to run their business without going through Equifax." DI 121-1 at 14. The declarations of both Mr. Salotto and Mr. D'Ambrosio confirm that this was what prompted their purchase of services from Equifax, and in turn, their acceptance of the Membership Agreement. DI 121-5 at ¶¶ 9-10; DI 121-6 at ¶ 7.

Indeed, Equifax's alleged ability to limit consumer choice is at the crux of this case. DI 1 at ¶ 14 ("Equifax's Scheme has also denied purchasers a meaningful choice in a provider of electronic VOIE Services, even though alternatives would charge less and do a better job of protecting consumers' data privacy."). Like in *Avery*, "there would be no point to FRCP 23(d)'s broad authority to oversee class action communications if the authority" was blunted by the tenuous hypothetical ability to avoid agreeing to arbitration altogether. 2026 WL 218992 at *7. In light of the threat to the just resolution and effective administration of this class action that

would result from the enforcement of Equifax's post-complaint arbitration agreement, we will exercise our authority under Rule 23(d).

### 3. *The arbitration agreement will be invalidated until revised*

As explained above, a court acting under the authority of Rule 23(d) must give "explicit consideration to the narrowest possible relief which would protect the respective parties." *Valli*, 162 F.4th at 415 (citing *Gulf*, 452 U.S. at 102). But the relief granted "must still be consistent with the policies of FRCP 23." *Avery*, 2026 WL 218992, at *11. We do not go so far as to invalidate all of Equifax's arbitration agreements for the duration of this litigation. But under Rule 23(d), we will not enforce the arbitration agreements that Equifax has reached under the present terms. For the reasons explained above, permitting Equifax to enforce its arbitration agreements here would unjustly deprive members of the putative class of their interests being represented in this litigation, and would incentivize procedural gamesmanship — the same type of gamesmanship the Third Circuit warned of in *Valli*. 162 F.4th at 409. Whatever Equifax's actual intentions were behind the creation of its arbitration clause, these circumstances raise the specter that gamesmanship is at play here. *O'Connor v. Uber Technologies, Inc.*, 2013 WL 6407583, at *4 (N.D. Cal. Dec. 6, 2013) (noting that insulating arbitration agreement from Rule 23(d) authority would be "particularly inappropriate" where "there is a distinct possibility that the arbitration provision and class waiver imposed by Uber was motivated at least in part by the pendency of class action lawsuits."); *Portillo v. National Freight, Inc.*, 2021 WL 3486894, at *5 (D.N.J. Aug. 9, 2021) (same).

We recognize that a post-complaint revision to an agreement does not always evince an intent to eviscerate a putative class. *Jones v. Waffle House*, 866 F.3d 1257, 1272 (11th Cir. 2017); *Rushing v. Williams-Sonoma, Inc*., 2020 WL 6787135, at *3 (N.D. Cal. Oct. 8, 2020).

But the facts presented here are more dubious than just the convenient timing of the arbitration provision's creation: Equifax said nothing of its arbitration provision despite numerous opportunities to do so over a period of several months; waited until both Greystone and Equifax accepted the Agreement to act; conditioned its services on acceptance of the Agreement; and said nothing of this litigation in the Agreement. That's not merely a business decision or a litigation tactic; it's a subversion of the federal forum. *Degidio*, 880 F.3d at 142 ("It is hard to escape the impression that defendants knew exactly what they were up to, and the district court was right to put a stop to it."); *Billingsley v. Citi Trends, Inc.*, 560 F. App'x. 914, 922-23 (collecting cases and holding that district court did not abuse its discretion by permitting putative class members to join the lawsuit notwithstanding arbitration agreements because it "limited its order temporally and substantively" and "did not prevent [defendant] from entering into new arbitration agreements[.]"); *Fox v. Saginaw County, Michigan*, 35 F.4th 1042, 1050 (6th Cir. 2022) (permitting class members to rescind their agreements in light of misleading communication "is not extraordinary in the class-action context.").

In reaching our decision, it is worth reiterating that Rule 23(d) not only grants district courts "broad authority," but also imposes a "duty" upon them. *Gulf*, 452 U.S. at 100; *Valli*, 162 F.4th at 415; *In re Sch. Asbestos Litig.*, 842 F.2d at 80; *Avery*, 2026 WL 218992, at *6. We take this duty seriously. Thus, when the record indicates that a defendant's attempt to compel arbitration would "pose a serious threat to the fairness of the litigation process" or "the administration of justice generally," *Valli*, 162 F.4th at 415, we will undertake our duty to protect the effective administration of class actions, which "serve an important function in our system of civil justice." *Gulf*, 452 U.S. at 99.

Accordingly, we will order Equifax to: (1) draft a curative notice to all putative class members that have accepted Equifax's updated Membership Agreement, apprising them of the nature and history of this litigation, outlining the relief sought by plaintiffs, and informing them of the right to rescind their agreement to arbitration for purposes of this litigation only; (2) meet and confer with plaintiffs regarding Equifax's draft curative notice and submit a joint proposed curative notice to the court; and (3) revise its Online Universal Membership Agreement to apprise users of the existence and nature of this litigation and their potential rights in it and submit a proposed copy of the revised Membership Agreement for the court's approval.[21]  Upon our approval, Equifax will be permitted to enforce any arbitration agreements entered into thereafter.

## V.  <u>Conclusion</u>

There's nothing wrong with cooking up a great legal tactic, and it is not our place to tell parties how to litigate, much less conduct business.  After all, this is not some sort of Justice League that prowls about setting right every wrong.[22]  But like any contest, there are rules, and it is our job to say when a tactic is too clever by half.  So it is here.  We conclude that Equifax waived the right to arbitrate this dispute.  And because we find that the enforcement of Equifax's arbitration provision would frustrate this class action and the administration of justice generally, we exercise our discretion under Rule 23(d).  Equifax is ordered to:  (1) draft a curative notice to all putative class members that have accepted Equifax's updated Membership Agreement; (2)

---

[21] Equifax's previous agreements shall remain enforceable to the extent not related to this litigation.

[22] *See Burns v. City of Philadelphia*, 2025 WL 1907469, at *11 & n.16 (E.D. Pa. July 9, 2025) (observing that the court is "not a member of the Justice League" and "can't rectify every wrong") (citing *Faulk v. Owens Corning Roofing and Asphalt, LLC*, 2025 WL 5317777, at * 9 & n. 90 (N.D. Tex. Feb. 18, 2025).

meet and confer with plaintiffs regarding Equifax's draft curative notice and submit a joint

proposed curative notice to the court; and (3) revise its Membership Agreement to apprise users

of the existence and nature of this litigation and their potential rights in it.  The parties should

consult the order accompanying this memorandum for further instructions.